UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 21 CR 618-5 |
| | ) | |
| **MARCUS SMART,** | ) | The Honorable |
| | ) | Martha M. Pacold, |
| **Defendant.** | ) | Judge Presiding. |

### DEFENDANT MARCUS SMART'S
### MOTIONS *IN LIMINE*

Defendant MARCUS SMART, by and through his attorneys, MARC M. BARNETT, EUGENE STEINGOLD, and MICHELLE MARIN, and respectfully moves this Honorable Court to bar the following evidence and arguments at trial:

**Summary of Charges and Anticipated Evidence**

Defendants Charles Liggins, Kenneth Roberson, Tacarlos Offerd, Christopher Thomas, Ralph Turpin, and Marcus Smart are charged in the Superseding Indictment with a shooting that occurred on August 4, 2020, on Oak Street in Chicago in which Carlton Weekly was killed and two other persons were injured. The defendants are charged in Count One with a violent crime (murder) in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); in Count Two with a firearm offense resulting in death, in violation of 18 U.S.C. § 924(j); in Count Three with a violent crime (murder) in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); and other offenses.

According to the Government's *Santiago* Proffer (Dkt. No. 191), and Motion to Admit Certain Acts as Direct Evidence of Charged Offenses or under Federal Rule of Evidence 404(b) (Dkt. No. 209), the Government's theory is that Defendant Turpin provided information as to Mr.

1

Weekly's location on Oak Street and that the five other Defendants (Liggins, Roberson, Offerd, Thomas, and Smart) along with a sixth individual were present at or involved in the shooting.[1] The Government's theory is that (a) the six individuals drove in two cars from Parkway Gardens, a housing project on the south side of Chicago, to 68 East Oak Street; and (b) after the shooting one of the cars returned to Parkway Gardens and the second car was returned to a car dealership, Midway Autohaus located at 7405 S. Harlem Avenue, in Bridgeview, Illinois.

As part of their investigation into the murder of Carlton Weekly on August 4, 2020, Chicago Police Department ("CPD") personnel obtained various types of video surveillance from that date. This included video surveillance of a parking lot, a stairway, and other locations in Parkway Gardens; video surveillance from various POD cameras and license plate readers between Parkway Gardens and Oak Street; and video surveillance from businesses on Oak Street. CPD eventually selected portions of the various video surveillance and combined them into a single video which CPD dubbed "Camtasia."

As part of their investigation of the murder of Carlton Weekly, law enforcement officials from CPD and the FBI collected a number of photographs and videos of Defendant Marcus Smart. The photographs and videos appear to be from social media. Marcus Smart does not concede that he is in these photographs and videos, and expects the Government to present evidence establishing that fact at trial.

I. **Motion to Exclude the Identification Testimony of TG, TH, MW, and RW Pursuant to Federal Rules of Evidence 701 and 403**

According to the Government's *Santiago* Proffer (Dkt. No. 191), and Motion to Admit Certain Acts as Direct Evidence of Charged Offenses or under Federal Rule of Evidence 404(b) (Dkt. No. 209), the Government may call four individuals (TG, TH, MW, and RW) who

---

[1] The sixth individual, Ezell "Zell" Rawls, was alleged to have participated, but has committed suicide.

"identified" Marcus Smart on the Camtasia video.

Individual TG

Individual TG used to work for a security company at Parkway Gardens before and after the murder of Carlton Weekly on August 4, 2020. However, TG was not a witness to any activity at Parkway Gardens on August 4, 2020 identified by the Government as related to the murder. In addition, TG was not a witness to the murder of Carlton Weekly on Oak Street, nor was TG at the Oak Street location on August 4, 2020. Moreover, TG did not identify Marcus Smart from the Camtasia video as being at or one of the shooters at the Oak Street location on August 4, 2020.

On August 26, 2020, TG testified before the grand jury. The prosecutor showed TG three photographs (Grand Jury Exhibits 2, 5, and 6), which TG identified as Marcus Smart. When asked how he knows Marcus Smart, TG testified that he has "seen him over the course of time with me working at Parkway Gardens." (Grand Jury Transcript 8/26/20, page 10) TG also testified that Marcus Smart does not live at Parkway Gardens, but is just someone who hangs around Parkway Gardens. (Grand Jury Transcript 8/26/20, page 11).

The prosecutor also showed TG portions of the Camtasia video. The prosecutor repeatedly stopped and started the Camtasia video and directed TG's attention to certain images. TG testified that the images of a black male on the Camtasia video at the :22 mark, 2:25 mark, and 2:47 mark is Marcus Smart.

TG was not a witness to the murder of Carlton Weekly on Oak Street, nor was TG at the Oak Street location on August 4, 2020. Moreover, TG did not identify Marcus Smart from the Camtasia video as being at or one of the shooters at the Oak Street location on August 4, 2020.

Individual TH

Individual TH is the co-parent of a child with Defendant Tacarlos Offerd. TH claims to have spent time at Parkway Gardens. On August 27, 2020, TH was interviewed by FBI Agents at her residence. The topic of the interview was Defendant Offerd and a Ford Fusion that the Government alleges was one of the two vehicles used in the shooting on Oak Street. The 302 report of this interview does not indicate any discussion or identification of Marcus Smart on that date.

On September 28, 2020, TH testified before the grand jury. The prosecutor also showed TH the Camtasia video. The prosecutor stopped the Camtasia video at the :39 and :47 marks and this colloquy took place between the prosecutor and TH:

> Q. I've now paused at the 47-second mark. Do you recognize either of the persons who I've circled at the 39-second mark who's wearing black who walked over to the Ford Fusion or the other person who exited from the passenger side of the Ford Fusion in brown?
> A. I don't make out who they are, but I can assume who they are.
> Q. Why would you assume who they are?
> A. Because the way they walk.
> Q. Who do you think that based on the way they walk?
> A. Muwop and Zell.
> Q. Which one do you think is Muwop and which one do you think is Zell?
> A. I think Muwop the one in gray and Zell is the one in black.
> (Grand Jury Transcript 9/28/20, page 62)

When asked how does she know "Muwop" to be a member of O-Block, TH simply stated, "I seen him in Parkway. He rep O-Block" (Grand Jury Transcript 9/28/20, page 72)

TH was not a witness to any activity on August 4, 2020, at Parkway Gardens, nor was she present at that location at the time the activity was recorded. In addition, TH was not a witness to the murder of Carlton Weekly on Oak Street, nor was TH at the Oak Street location on August 4, 2020. Moreover, TH did not identify Marcus Smart from the Camtasia video as being at or one of

4

the shooters at the Oak Street location on August 4, 2020.

Individual MW

Individual MW is a confidential source or informant for the Government. Although the details have not yet been provided to the defense, it appears that MW has been paid for the information he has provided in this case. MW claims that he is a member of the Black Disciples and that he lived at Parkway Gardens from around 2006/2007 through approximately 2011, when he had to leave because of a falling out with some O-Block Black Disciples and has supposedly left Chicago.

The prosecutor also showed MW portions of the Camtasia video. The prosecutor repeatedly stopped and started the Camtasia video and directed MW's attention to certain images. MW testified that the images of a black male on the Camtasia video at the 2:51 mark, and 4:28 mark is Muwop.

MW was not a witness to any activity on August 4, 2020, at Parkway Gardens, nor was he present at that location on that date. In addition, MW was not a witness to the murder of Carlton Weekly on Oak Street, nor was MW at the Oak Street location on August 4, 2020. Moreover, MW did not identify Marcus Smart from the Camtasia video as being at or one of the shooters at the Oak Street location on August 4, 2020.

Individual RW

Individual RW is a member of the STL Gangster Disciples. RW testified before the grand jury that the Gangster Disciples are rivals with O-Block. RW's sister, Gakirah Barnes, was a

5

self-proclaimed teenage assassin for the Gangster Disciples, and that his sister ambushed, shot, and murdered Odee Perry on August 11, 2011, when Barnes was just 14 years old. RW was present when his sister was shot and killed on April 11, 2014 when she was 17 years old. RW was also shot in the incident. RW did not cooperate with law enforcement in the investigation into who shot and killed his sister because that was not what his gang wanted him to do. Rather, the gang wanted to retaliate in their own way. Carlton Weekly was a member of the STL Gangster Disciples.

RW indicated to the grand jury on March 22, 2022, that he has a case pending in the Circuit Court of Cook County for possession of a gun. RW claimed that he was cooperating in this case without any consideration in the pending gun case "because this wasn't my gun," even though RW admitted that law enforcement officials recovered a gun in his possession.

The prosecutor also showed RW portions of the Camtasia video. The prosecutor repeatedly stopped and started the Camtasia video and directed RW's attention to certain images. RW testified that the images of a black male on the Camtasia video at the :44, 2:26 mark, and 2:46 mark is Muwop. According to RW, his identification of Muwop is based upon "a YouTube video with Muwop and them racing up the block and, umm, you know, it showed he already got distinctive standing – a distinctive walk, but I had seen him ran across the video." (Grand Jury Transcript 3/22/23, page 78)

RW was not a witness to any activity on August 4, 2020, at Parkway Gardens, nor was he present at that location on that date. In addition, RW was not a witness to the murder of Carlton Weekly on Oak Street, nor was RW at the Oak Street location on August 4, 2020. Moreover, RW did not identify Marcus Smart from the Camtasia video as being at or one of the shooters at the

Oak Street location on August 4, 2020.

Federal Rule of Evidence 701

>Rule 701 is a rule of limitation and states:
>
>If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>(a)   Rationally based on the witness's perception;
>(b)   Helpful to clearly understanding the witness's testimony or to determining a fact in issue, and
>(c)   Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In *United States v. Blackman,* No. 18 CR 728, Judge John Robert Blakey recently addressed a strikingly similar situation in his Memorandum Opinion and Order dated May 10, 2023. (Dkt. No. 437) In *Blackman,* the witness, Brittany King, attended a barbeque at her sister's house for Father's Day. (Dkt. No. 437, page 27)   At the barbeque, King was introduced to "JoJo," a man she had seen on multiple occasions when visiting her sister but had never formally met. *Id.* King now knows JoJo to be Defendant Jolicious Turman.  At the barbeque, Turman brought a dog, and King had the opportunity to observe Turman and the dog over the course of several hours, talking and drinking with him and others. *Id.* at 27-28.

Later in the evening, King left with others from the barbeque to go to a nearby liquor store. *Id.* at 28.  The women laughed and joked with a man they met inside the store, Ramal Hicks. Hicks left the store and King saw Hicks being surrounded by a group of people which included Turman.  King saw her brother-in-law, Lamarr Isaac, strike Hicks, and moments later she heard gunshots. *Id.*  King did not see the shooter as the shots rang out, and King immediately began to run from the scene.  King was shown surveillance video from the liquor store capturing the shooting, which Judge Blakey described as follows:

>While events in the foreground of the video are clear, albeit in

7

> black-in-white, the shooting itself takes place in the background, where *the image is blurry* and pixelated. *More specifically, while possible to make out certain details – a person in a white t-shirt; someone else in shorts; a person with a dog; someone pointing a gun; someone falling to the ground – it is difficult to make out the people gathered, and* **facial features remain totally indiscernible.** Nonetheless, Brittany King watched it and told officers that "JoJo" was the shooter.
> (Dkt. No. 437, page 29) (Emphasis added).

In analyzing the admissibility of King's identification off the surveillance video, Judge Blakey was guided by *Von der Ruhr v. Immtech Intern., Inc.,* 570 F.3d 858, 864-65 (7th Cir. 2009) (finding that an individual does not have first-hand knowledge of an event she did not personally witness) and found that Rule 701's requirement that lay witnesses base opinions upon their perception derives from the personal knowledge standard of Federal Rule of Evidence 602. (Dkt. No. 437, page 31)  Accordingly, Judge Blakey held that, under Rule 701, there is no dispute that King could testify what she personally observed on the night of the shooting.

With respect to the depictions in the surveillance video, Judge Blakey cited *United States v. Towns,* 913 F.2d 434, 445 (7th Cir. 1990) and *United States v. Jackman,* 28 F.3d 1 (1st Cir. 1995) for the proposition that Rule 701 "generally permits a person familiar with the defendant to look at the features depicted in the video of sufficient quality and, based upon his or her personal knowledge of the defendant's appearance, identify the person depicted as the defendant." (Dkt. No. 437, page 32)  However, in applying these principles in *Blackman*, Judge Blakey observed:

> … if the video permitted Ms. King to observe **discernable features** of the shooter then, based upon her preexisting knowledge of Defendant Turman's appearance generally (and on that night), she could testify that the person pointing a gun in the video is, in fact, Defendant Turman. But as discussed above, **the video quality is poor, the camera is positioned far from the events, and it is impossible to discern from the video any features beyond the most generic identifiers**. Ms. King gave no indication at the hearing that she was able to identify Turman based on

8

> characteristics discernable in the video. Thus, an identification of Defendant Turman as the shooter based solely on her viewing of the video remains inappropriate here, and leaves the witness no better suited to reach her ultimate conclusion than the jury, because such an identification would necessarily rely not upon personal knowledge but rather upon deductive reasoning (e.g.., "Isaac wore white, but the shooter wore a dark color, so Isaac must not have been the shooter.").
> (Dkt. No. 437, pages 32-33) (Emphasis added)

In the case at bar, the identification testimony of Marcus Smart from the Camtasia video by the four witnesses fails as to two of the three required elements. First, it is not "rationally based on the witness's perception." Each of the four witnesses did not witness the activities at Parkway Gardens that are depicted in the Camtasia video. In addition, as this Court can readily see, the camera is positioned far from the events in the parking lot, and the video of the stairwell is dark and so indistinct that their viewing it cannot be considered a sufficient perception on which a rational opinion can be based. Moreover, no facial characteristics of the individual alleged to be Marcus Smart are discernible on the Camtasia video.

As to the second element of Rule 701, the testimony of the four witnesses is not helpful to the jury in understanding the witnesses' testimony based on their viewing the Camtasia video. The discovery reveals TH (the former girlfriend of Defendant Offerd) and MW (the paid informant) have apparently met Marcus Smart, while TG (the former security company employee) and RW (rival gang member) have not had any personal contact or knowledge prior to their identification of Marcus Smart. RW has only seen "Muwop" in a YouTube video. It is apparent that TG has only seen who he thinks is Marcus Smart in questionable surveillance video as Parkway Gardens. If TH cannot make out Marcus Smart in the Camtasia video and must only "assume" it is Mr. Smart, it is abundantly clear that the four witnesses are no better suited to reach the ultimate conclusion

than the jury. As the Seventh Circuit has made clear, the theory behind Rule 701 is that wherever inference and conclusions can be drawn by the jury as well as by the witness, the witness is superfluous." *United States v. Earls,* 704 F.3d 466, 472 (7th Cir. 2012); and *United States v. Tinsley,* 62 F.4th 376, 386 (7th Cir. 2023). As a result, the requirements of Rule 701 are not satisfied and the four witnesses should not be allowed to testify to any identification of Marcus Smart in the Camtasia surveillance video.

Federal Rule of Evidence 403

In *Blackman,* Judge Blakey also excluded the identification testimony of Brittany King pursuant to Federal Rule of Evidence 403. (Dkt. No. 437, page 33) Under Federal Rule of Evidence 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

The recording of the parking lot at Parkway Gardens is from an extreme distance and height and it is completely impossible to discern any features beyond the most generic identifiers that the individual is supposedly Marcus Smart. In addition, the recording in the darkened stairwell is so fleeting that the image of the individual lasts for a split second, and the facial features of the individual alleged to be Marcus Smart are totally indiscernible. Here, if the four witnesses, TG, TH, MW, and RW are allowed to testify based upon their assumptions, speculation and mere conjecture that Marcus Smart was one of the numerous people recorded in the Camtasia video in the parking lot of Parkway Gardens or the stairwell, the jury may incorrectly conclude that it was, indeed, Marcus Smart. As in *Blackman,* this Court should exclude the identification testimony under Rule 403.

## II. Motion to Exclude Drill Rap YouTube Videos and Lyrics Pursuant to Federal Rules of Evidence 404 and 801

The Government intends to introduce two drill rap YouTube videos into evidence at trial.[2] One video is by Marcus Smart and is entitled "For Real." Marcus Smart performs under the name "Muwop." The second video is by Lil Durk ft King Von and is entitled "Still Trappin." The defense is concerned that these videos will bring inadmissible bad character propensity evidence through a back door into the trial. This evidence will inflame the jury and unfairly prejudice Defendant Marcus Smart. The defense submits that the Government's intended use of the videos will suggest to the jury that Mr. Smart has "drilled" about drug trafficking, firearms, possessing large amounts of cash, violence, and murders. The defense submits that this is an improper propensity argument, and that these videos and transcripts of the lyrics are neither relevant nor admissible, and are unfairly prejudicial.

The fact that Marcus Smart raps about drug trafficking, possessing large amounts of cash, firearms, and violence in his music fails to establish his involvement in any criminal activity, let alone the offenses for which he is charged with in the instant case.[3]

Federal Rule of Evidence 404

Rule 404 states that "[e]vidence of a person's character or character trait is not admissible

---

[2] According to Wikipedia, "Drill is a subgenre of hip hop music that originated in Chicago in the early 2010s. It is sonically similar to the trap music subgenre and lyrically similar to the gangsta rap subgenre." According to Music Industry How To, "Drill music is a form of trap music known for its violent and dark content. . . . One of the key characteristics of drill music is the raw and violent nature of the lyrics. They're dark, cynical, and representative of a difficult lifestyle that would drive most people over the edge. The language is typically slang and contains profanity." http://www.musicindustryhowto.com/what-is-drill-music.
[3] Does anyone believe Eric Clapton's lyrics "I shot the sheriff, but I did not shoot the deputy," is a confession to murdering a sheriff? In the song "Folsom Blues," Johnny Cash brags "I shot a man in Reno just to watch him die." Similarly, in the song, "Cocaine Blues," Johnny Cash sings, "I took a shot of cocaine and I shot my woman down, went right home and I went to bed, I stuck that lovin' 44 beneath my head, got up the next mornin' and I grabbed that gun, took a shot of cocaine and away I run, made a good run but I ran too slow, they overtook in Juarez Mexico, … the judge he smiled as he picked up his pen, 99 years in the Folsom pen, 99 years underneath that ground, I can't forget that day I shot that bad bitch down." Again, despite his songs, Johnny Cash did not shoot and kill a man in Reno, nor did Johnny Cash shoot his woman resulting in his being sentenced to 99 years in the Folsom penitentiary. In short, this is simply artistic expression.

11

to prove that on a particular occasion the person acted in accordance with the character or trait." Fed.R.Evid. 404(a)(1). The defense submits that the drill videos are relevant only to establish propensity to allegedly sell drugs and bad character, which Rule 404 prohibits. In the videos, the defendant purportedly raps about drug trafficking activity, possession of firearms, and the use of violence. In none of these videos does Marcus Smart admit to the charged offenses.

Temporal remoteness is an important factor to be considered as it deprecates the probity of the extrinsic offense. *United States v. Stephenson,* 550 F.Supp.3d 1246, 1252 (M.D. Fla. 2021). Here, as in *Stephenson,* there is absolutely no evidence before the Court as to when the lyrics were actually written, the songs recorded, or the videos filmed and edited. As such, the statements are too remote to be of much probative value.

In *Stephenson,* the defendant was charged with drug trafficking and possession of a firearm in furtherance of a violation. The Government sought to introduce three videos which depicted the defendant of bragging about his narcotics trafficking activity, the threatened use of violence to protect his drug turf, and his possession of a firearm. The district court granted the defendant's motion *in limine* to exclude the videos.

In *United States v. Williams,* No. 3:13-CR-764, 2017 WL 4310712, at *7 (N.D. Cal. Sept. 28, 2017), the court addressed the difficulty with establishing the probative value of rap lyrics in that the lyrics are a "form of artistic expression." The district court recognized the challenge of differentiating between reality and fantasy, which can occur with any form of artistic expression. *Id.* Because the rap videos at issue depicted images of "young African-American men, guns, and drugs atop musical lyrics" that belittled other "African-American men, women, and cooperating witness," the court found it was irrefutable that some of the videos scenes could "arouse an

12

emotional response, evoke a sense of horror, or appeal to an instinct to punish" to the jury. *Id.* at *7. The court accepted that rap lyrics constitute valid forms of artistic expression, and thereby found that admitting such lyrics into a criminal proceeding would only blur the thin line between fact and fiction and would therefore be unduly prejudicial. *Id.* at *7-8.

In *United States v. Johnson,* 469 F.Supp.3d 193, 222 (S.D. N.Y. 2019), the court found that the Government's intention to introduce rap lyrics had "little to no probative value, [but] the references to violence and possible allusions to police misconduct, and the use of profanity, present a risk of unfair prejudice to the Defendants." Accordingly, the district court excluded the rap video excerpts as both irrelevant and because their probative value was substantially outweighed by the risk of unfair prejudice. *Id.*

In the instant case, the likely prejudice to Marcus Smart by admitting the video "For Real" and its lyrics greatly outweigh any probative value. Again, the lyrics depict drug related activities, possession and handling large amounts of cash, possessing and handling firearms, profanity, and violence.

Federal Rules of Evidence 801

The drill rap video entitled "Still Trappin" by Lil Durk is inadmissible hearsay pursuant to Federal Rules of Evidence 801. This video depicts scantily dressed women, sexual innuendo, promiscuity, the use of drugs, throwing around large amounts of cash, possessing and handling firearms, profanity, and violence.

Hearsay evidence may be admissible if it falls under an exception to the hearsay rule. It is anticipated that the Government will argue that the video is admissible as a statement offered against an opposing party, pursuant to Rule 801(d)(2)(A). In *United States v. Stephenson,* 550

13

F.Supp.3d 1246, 1252 (M.D. Fla. 2021), the district court held, "Rule 801(d)(2)(A) does not allow for admission of those portions of the videos which contain statements that were not made by Defendant, of which there are several." Marcus Smart does not make any statements in the drill video "Still Trappin." *See also United States v. Gamory,* 635 F.3d 480 (11th Cir. 2011) where the Government was permitted to introduce a rap video which did not feature the defendant. The Eleventh Circuit noted that the lyrics in the rap video presented a substantial risk of unfair prejudice, as it contained "violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle." *Id.* at 493. Ultimately, the Court of Appeals found the video was inadmissible pursuant to Rule 403 and was also inadmissible because it was hearsay. *Id.* at 494. Accordingly, the drill video "Still Trappin" should be excluded as hearsay.

Finally, in essence, the YouTube videos will become a feature of the trial if introduced into evidence. Furthermore, the likely curative effect of any limiting instruction will be minimal at best. Accordingly, this Court should exclude the videos as evidence in this case.

### III. Motion to Preserve the Opportunity to Make Objections as to Gruesome Photographs as Exhibits Offered by the Government

It is anticipated that the Government will seek to admit photographs that may contain some gruesome images of the deceased Carlton Weekly or the crime scene. It is requested that Defendant Marcus Smart be allowed to reserve any objection to the admission of gruesome photographs as exhibits, as such exhibits may be more prejudicial than probative and excludable under Federal Rule of Evidence 401 and 403.

### IV. Motion to Adopt Motions by Co-Defendants

It is anticipated that the co-defendants will be filing some motions *in limine* which may be

14

relevant to Defendant Marcus Smart. Accordingly, counsel respectfully asks for leave to expressly join such motions after they are filed.

Dated:   August 25, 2023                                    Respectfully submitted,

/s/ Marc M. Barnett
MARC M. BARNETT
53 W. Jackson Boulevard
Suite 1442
Chicago, Illinois 60604
(312) 719-0376

EUGENE STEINGOLD
LAW OFFICES OF EUGENE STEINGOLD
55 W. Wacker Drive
Suite 900
Chicago, IL 60601
(312) 726-1060

MICHELLE MARIN
53 W. Jackson Boulevard
Suite 1442
Chicago, IL 60604
(312) 719-0376

*Attorneys for Marcus Smart*

## CERTIFICATE OF SERVICE

I, Marc M. Barnett, the attorney for Defendant Marcus Smart, hereby certify that I filed the above-described document on the CM-ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

/s/ Marc M. Barnett
Marc M. Barnett
Attorney for Marcus Smart