8161

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
-vs-                               )   Case No. 21 CR 618
                                   )
CHARLES LIGGINS, KENNETH           )   Chicago, Illinois
ROBERSON, TACARLOS OFFERD,         )   December 19, 2023
CHRISTOPHER THOMAS, MARCUS         )   9:00 a.m.
SMART and RALPH TURPIN,            )
                                   )
                    Defendants.    )

VOLUME 37
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                        MR. SEAN HENNESSY
                        MS. ANN MARIE E. URSINI
                        MS. CAITLIN S. WALGAMUTH
                        Assistant U.S. Attorneys
                        219 S. Dearborn Street
                        Chicago, IL 60604
                        (312) 353-3500
                        jason.julien@usdoj.gov
                        sean.hennessy@usdoj.gov
                        annmarie.ursini@usdoj.gov
                        caitlin.walgamuth@usdoj.gov

For Defendant           MS. CYNTHIA LOUISE GIACCHETTI
Liggins:                Law Office of Cynthia Giacchetti
                        53 West Jackson, Suite 1035
                        Chicago, IL 60604
                        (312) 939-6440
                        Cg@cgdefense.com


        * * * * * * * * * * * * * * * * * *


        PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
             TRANSCRIPT PRODUCED WITH A COMPUTER

8162

APPEARANCES:   (Continued)

For Defendant
Liggins:                    MR. GREGORY T. MITCHELL
                            Law Office of Gregory T. Mitchell
                            19150 Kedzie Avenue, Suite 205
                            Homewood, IL 60430
                            (708) 799-9325
                            Mitchlaw00@sbcglobal.net

For Defendant
Roberson:                   MR. STEVEN GREENBERG
                            Greenberg Trial Lawyers
                            53 West Jackson, Suite 315
                            Chicago, IL 60604-6060
                            (312) 879-9500
                            Steve@greenbergcd.com

                            MS. CHERYL T. BORMANN
                            Cheryl Bormann
                            53 West Jackson, Suite 315
                            Chicago, IL 60604-6060
                            (312) 588-5011
                            Cheryl.t.bormann@gmail.com

For Defendant Offerd:       MR. JOHN SOMERVILLE
                            9924 S. Walden Parkway
                            Chicago, IL 60643-1702
                            (773) 505-1706
                            Jville62@gmail.com

                            MR. RICHARD S. KLING
                            Chicago-Kent Law Offices
                            565 W. Adams, 6th Floor
                            Chicago, IL 60661
                            (312) 906-5075
                            Rkling@kentlaw.iit.edu

For Defendant
Thomas:                     MS. ELLEN R. DOMPH
                            Law Offices of Ellen R. Domph
                            53 West Jackson, Suite 1544
                            Chicago, IL 60604
                            (312) 922-2525
                            Edomph@gmail.com

                            MR. KEITH ALLAN SPIELFOGEL
                            190 S. LaSalle Street, Suite 540
                            Chicago, IL 60603
                            (312) 236-6021
                            Spielfogel@sbcglobal.net

8163

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com

                          MS. MICHELLE MARIN
                          Criminal Defense Lawyer of Chicago
                          53 West Jackson Boulevard
                          Chicago, IL 60604
                          (312) 719-0376
                          Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com

                          MR. JOSHUA B. ADAMS
                          Law Offices of Joshua B. Adams, PC
                          900 W. Jackson Blvd., Suite 7 East
                          Chicago, IL 60607
                          (312) 566-9173
                          Josh@adamsdefenselaw.com

Also Present:             Ms. Christine Case, FBI
                          Mr. Domonique Dixon, FBI




Court Reporter:

                KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                          Official Court Reporter
                        United States District Court
                219 South Dearborn Street, Suite 2328A
                          Chicago, Illinois  60604
                          Telephone:  (312) 435-5569
                    Kathleen_Fennell@ilnd.uscourts.gov

8164

(Proceedings heard in open court; jury out:)

THE CLERK: Good morning. The United States District Court for the Northern District of Illinois is now in session, the Honorable Martha M. Pacold presiding.

21 CR 618, United States versus Liggins, et al.

If you can state your name for the record, we'll start with government counsel.

MR. JULIEN: Good morning, your Honor. Jason Julien, Ann Marie Ursini, Caitlin Walgamuth, and Sean Hennessy for the United States.

MR. SPIELFOGEL: Good morning, your Honor. Keith Spielfogel, and Ellen Domph will be here shortly on behalf of Mr. Thomas.

MR. MITCHELL: Good morning, your Honor. Cindy Giacchetti, Gregory Mitchell on behalf of Mr. Liggins, Judge.

MR. BARNETT: Marc Barnett and Michelle Marin on behalf of Marcus Smart.

MR. BOYLE: Good morning, your Honor. Patrick Boyle and Joshua Adams on behalf of Ralph Turpin.

MS. BORMANN: And good morning, Judge. Cheryl Bormann on behalf of Mr. Roberson. Mr. Greenberg will be here shortly.

MR. SOMERVILLE: Good morning, your Honor. John Somerville and learned counsel, Professor Richard Kling, on behalf of Tacarlos Offerd.

8165

MR. KLING:  With $3, which gets me on the bus.

THE COURT:  Good morning, everyone.

I just wanted to see if we were ready to talk about the issue that came up last night.

MR. JULIEN:  We are, your Honor.

MS. BORMANN:  We are, Judge.

And since it's my request, I'd prefer to go first, if that's okay with you.

THE COURT:  Yes, of course.

MS. BORMANN:  I'm terrible at electronics, so I'm not going to present you with anything.

Last night, we -- I, we, dug up some case law on this very issue.  So -- but to start it out, I want to revisit the Santiago proffer.

So in the Santiago proffer, which is found at document No. 191, filed on August 4th, which is, of course, before I filed my appearance on the case, if you go to page -- if I can find it -- go to page 57 near the end of the document, you'll find, in the first full paragraph, the second sentence talks about the government's position on what they have to prove and what they have to allege in the proffer.

And it reads:  The statements between the co-conspirators and to others outside of the conspiracy in furtherance of the VICAR conspiracy to murder Weekly fall into a number of categories, all concerning subjects integral to

8166

the conspiracy and its success and to further the objectives of O-Block as an enterprise.

These statements will be introduced through the testimony of witnesses, including but not limited to those noted above, other individuals who will be compelled to testify, consensually recorded in-person appearances, and telephone recordings, including the recordings referenced throughout the submission, as well as recorded jail telephone calls involving the defendants, their associates, and their unindicted co-conspirators.

In the Santiago proffer, the government does not allege that the specific phone calls involved in GX 3001 and GX 3002 are in furtherance of the conspiracy. There's no reference to them specifically, so there's this catchall.

And then the government goes on in the next paragraph to say: Given the extent and number of such statements in this case, the government does not and cannot detail each and every proposed co-conspirator statement of each witness or document.

I explain this to you, Judge, because we assumed when the government provided those jail phone calls that they would seek to introduce testimony that would prove up the underlying basis, that is, bring in people with personal knowledge of the topics and the people discussed in the telephone call.

Those telephone calls, specifically 3001, involve,

8167

according to the government's transcript, a guy named Dip, a woman named Sarah, a guy named Stephan, and Charles Liggins along with Mr. Roberson.

The phone call occurs in February, the end of February 2021, some six-and-a-half months after the murder of Mr. Weekly.

There is no connection in the record now among any of those individuals and anything having to do with O-Block as a gang, except for, of course, any evidence that they introduced against Mr. Liggins, O-Block as a place, or anything else.

The substance of the phone calls involve -- and I'm just going to put it succinctly here. But the first phone call involves a conversation where Mr. Roberson is asking some people where the money is from drugs, because he needs to pay his lawyer. His lawyer, as is explained in the second phone call, is Mr. Greenberg.

The people he's asking have no connection to this case. At this point, your Honor doesn't know who these people are, because there's been no evidence regarding these people. And maybe most importantly, your Honor has no idea where these drugs supposedly were sold, possessed or in any other way distributed. In fact, the only evidence in the phone calls regarding where the drugs are is my client's statement at -- I did this -- made myself little notes here -- is at minute 16:01 at GX 3001, where Mr. Roberson says: I was at Dip's

8168

crib and Dip watched me bag up 640, plus the stuff I already had.

So the phone call itself tends to indicate that the drug possession and distribution would have happened at a guy named Dip's place.

The only evidence -- well, there is no evidence in the record regarding where Dip lived.  In the discovery, we were provided at Bates -- bear with me, I have to look this one up -- too many documents -- at Bates FBI CH_001-00001 and 00002, information regarding an Eddie Bass.  That lists who I believe the government is going to allege is Dip.

That has his place of residence in Phoenix, Illinois, nowhere near Parkway Gardens.

So not only is the evidence not connected by time, that is, if it did go to enterprise in any way, shape or form, is it not connected timewise, because it's not at or near the time of the alleged conspiracy that existed at the time of Weekly's murder.  But it also doesn't involve anything that can be tied and was tied in any way, shape or form to Parkway Gardens, to O-Block or anything else.

A listen to both jail calls gives a full picture of what this was, which was Mr. Roberson, incarcerated for something unconnected to this case, was attempting to get people to put money on his books at Cook County Jail and pay Mr. Greenberg.

8169

At minute number 6:15 on the second phone call, GX_3002, Lyndrea Doumas -- that's a person identified by the government; I've never heard of her or seen her -- indicates I need to call Greenberg. And then at 7:45, the same phone call, Mr. Roberson says, Dip -- because at this point a guy named Dip is on the phone -- get the money to Drea, which indicates, in the light most favorable to the government, that Dip is supposed to get the money from the drugs that apparently he watched be divvied up by my client at his house, and get the money from that to Drea.

There is no evidence in the record, and there won't be, that Dip has anything to do with this conspiracy.

The jury, and frankly your Honor, has no idea who Dip is because there's been no evidence of it. Your Honor and the jury have no idea who Drea is because there's been no evidence of it provided to the jury.

The jury and your Honor have no idea who Sarah is, because there's been no evidence provided to the jury or your Honor regarding the identity of Sarah.

There's been no evidence regarding the other person involved in these phone calls, and that is Stephan. There's been no evidence of who he is and what he has to do with anything, and absolutely no evidence that he was part of any conspiracy or that he ever had anything to do with O-Block.

So right now, we have a phone call or two phone calls

8170

that the government wishes to play clips of that have no tie-in to anything regarding this case. And it leads the jury, and will lead the jury, to speculate about who all these people are.

The only -- there are no witnesses left on the witness list that could provide any information regarding these witnesses based on personal knowledge.

So I'm making this -- we're making this motion now because we know that this evidence wasn't tied in to the case.

So the question then is, can you revisit a -- something that was admitted, it was a CD, although never published to the jury? And the answer is yes.

So there's a case, in fact, directly on point out of the Seventh Circuit. Get it for you. It is following another case out of the Eighth Circuit. It's *United States v. Davis*. Bear with me, please. And it is found at -- somewhere -- 845 F.3d 282. That's a 2016 case.

And this is a case involving RICO and conspiracy issues. And so in that case, the government filed a Santiago proffer, and the question was whether or not a judge can conditionally admit stuff, because when you -- obviously, when provided evidence through a Santiago proffer, you cannot know whether or not the government will later be able to prove up all of the foundational and relevance portions that make something admissible.

8171

So in there -- and I'm going to direct your attention to page headnote 2, page -- trying to find the page number here -- it's under subsection B, the co-conspirator statements. Looks like page 285. And it reads: Under rule -- and I'm going to start on -- the full paragraph that starts "under rule."

Under Rule 801(d)(2)(E), co-conspirator statements are admissible against a defendant if the trial judge finds, by a preponderance of the evidence, that, 1, a conspiracy existed; 2, the defendant and the declarant were involved in the conspiracy; and, 3, the statements were made during and in furtherance of the conspiracy. And it cites to a Seventh Circuit case called *Haynie* from 1999.

The important part for us, though, Judge, is next: Under long-settled circuit law, a district court may admit co-conspirator statements conditionally based on the government's pretrial proffer known in this circuit as a Santiago proffer. And then it cites to Santiago. And then as you go past the cites: If, at the close of its case, the prosecution has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken. And it cites to *Haynie*, which is at 179 F.3d, and it's page number 1050.

Then it goes on to provide a little more information regarding why that's important. Because, as you are aware,

when we argued the Santiago proffer, you did not require the government to provide detailed listings of everything that they were going to admit, and it was going to be subject to admission as time went on and they laid the proper foundations.

Well, in this instance with respect to GX_3001 and GX_3002, they've not done that.

And so Mr. Roberson's counsel, Mr. Greenberg and I, are doing what the *Davis* court tells us we should do, which is move that it be stricken.

At this point, a mistrial I don't think is warranted because the jury, thankfully, has not yet heard the information, which is not -- you know, is no longer relevant or has frankly never been relevant.

So subject to your questions --

Were you able to open, Judge, the audio?

THE COURT: Yes. And I did listen to both calls yesterday.

MS. GIACCHETTI: Judge, could I add something on the admission of this? Because I've got the pages up here where these two -- if this is still an issue.

I agree with Ms. Gorman that regardless whether it's admitted, you always have the power -- we have additional cases here that Mr. Mitchell can address if you need that.

But we had a lengthy sidebar -- what happened with

8173

these two exhibits when Mr. Doyle was testifying is that at some point Mr. Julien started asking about the interview of Mr. Roberson, because he wanted Doyle to say that he could identify Roberson's voice. And so we had -- there was an objection, because we were impacting into a post-arrest interview that wasn't coming in. And I'm looking at the transcript of -- what's the date, 11/16 or 17?

MR. MITCHELL: 16. Started 15, came back on the 16.

MS. GIACCHETTI: Okay. I'm at about page 4259.

So there's this long sidebar, and basically we're talking about the stipulation and that there's a stipulation to foundation, so they don't have to go into this. And Mr. Greenberg says: We stipulated to the foundation on all of this evidence, the foundation. And you know if there was some other basis, like relevancy or something like that, we preserved that.

That's exactly what the transcript says at that page.

And later on you say basically, well, is there a stip to foundation? Meaning the basics of these jail calls are accurate, yes, and they were moved in.

But everyone proceeded knowing that the only reason it was coming in was on the basics of foundation of the accuracy as opposed to its relevancy.

So I think that, along with the rule -- I think it's --

8174

MR. MITCHELL: 104.

MS. GIACCHETTI: -- 104, which allows you to admit things and strike them later if they are found -- the relevancy is not proven.

But it's very clear as to these particular exhibits that that is the only reason they came in as accurate jail calls, but that Mr. Greenberg actually specifically has put on the record that we're preserving any issues of relevancy.

So I would just add that to Ms. Gorman's argument here. Sorry, it took me a while to go back and find this, and I'm not that good on my laptop, but I wanted your Honor to know that.

And I would add, again, my argument about -- and what I'd also note, as I went back, that I don't believe these transcripts were offered into evidence, but I could be wrong, but Mr. -- I believe Agent Doyle did these transcripts, and he was not able to identify -- or there was a question where I said, can he identify Charles Liggins' voice, and Mr. Julien said no. So that, of course, creates somewhat of a problem here on the voice on the transcript.

But I join Ms. Gorman's argument about both of these calls, okay, even if there's some inferential way that they can identify my client in the first call. My client is not in the second call.

The second call is not with anyone involved in the

8175

first call, or as far as I can tell from reading these transcripts, involved with the drugs, involved with anyone. It appears to be a girlfriend, and it appears that Mr. Roberson is just kind of yapping -- and I guess I'll go back to my casual conversation, chatting, arguments that your Honor has heard earlier about in furtherance of.

And then he starts talking about -- he starts talking about my client, C Murda, and in particular, things that he allegedly did. And then in the last one says -- he claims, I told Murda something about make them get off the block, something like that. That's the last one.

So all three of these are replete with references to my client made, again, not in furtherance of any conspiracy. So they definitely should not be admitted.

So I think I won't add to the argument Ms. Gorman made on the whole point of the relevancy of both of these, which I agree with, but added to that is these are being offered substantively. We've got someone chatting casually to a non-co-conspirator, who was not involved in any way in whatever was going on in the first call, and making substantive for-the-truth-of-the-matter statements about my client. And, therefore, for sure, the second call should not be allowed in.

But I don't think there's any question now, Judge, that I've looked at this record that we raised, Mr. Greenberg

8176

raised preserving of relevancy at the specific time that these two exhibits went in.

MS. BORMANN: I don't mean to --

Are you done?

MS. BORMANN: So I was not quite finished.

MS. GIACCHETTI: I'm sorry.

MS. BORMANN: So -- that's okay. I can finish now.

So when the government in that paragraph on page 60 -- 57 of the Santiago proffer says they're going to introduce testimony through witnesses that will make this relevant, in this case they haven't. And so, I mean, that's why we have to keep a check on it. It's part of the defense duty to do.

But there's nothing in the record that would answer your question, Judge, who is Dip? Would answer your question, Judge, who is Sarah? Would answer your question, Judge, who is Stephan or who is Lyndrea? There's nothing in the record to tie any of this in to anything. There's nothing in the record to tie any of a place in. There's nothing -- no mention of Parkway Gardens, no mention of O-Block, no mention of anything. As I said earlier, the only place mentioned is the "crib," meaning home of a guy named Dip.

And then on top of everything else, it takes place six-and-a-half months after the murder of Mr. Weekly, and it does not provide any sort of context that could even remotely

8177

answer any of the questions that you must have and that the jury certainly will have.

At this point, we have -- the only witness that would have anything to do with these would be Special Agent Case. And Special Agent Case is not in a position to guess as to what people are talking about.

As far as I can tell from any of the discovery we've been given, nobody has -- no agent has ever spoken with somebody named Dip. No agent has ever spoken with somebody named Lyndrea. No agent has spoken with Stephan. And no agent has spoken with somebody named Sarah.

So there's no "there" there. And for that reason, we're asking you to strike GX 3001 and 3002.

MR. MITCHELL: Judge, there was a couple of other cases that I found that the Court may find. In *Huddleston v. United States, a* Supreme Court case at 45 U.S. 661. It's a 1986 case. The court was dealing with the issue of a conditional 404(b) matter coming in. But the court made it clear that when there's questions of relevance of whether evidence that's been admitted is relevant, we have to look at Rule 104, which basically reads: When the relevancy of the evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon or subject to the introduction of the evidence sufficient to support a finding of a fulfillment of that condition.

8178

And in a similar case that sort of addresses that, it's a West Virginia district court case in 2023, the cite is 10 CV 800, a West Virginia district court case, the court there basically gives you this language that I thought was very apropos: Further, no ruling on admissibility of an exhibit is truly final until the jury has been charged and has begun deliberations. A trial court retains the authority to revisit its pretrial ruling thereupon during the course of the trial. Citing other district court cases, it says: It becomes obvious during trial that an error was made regarding the admissibility of a particular piece of evidence, the Federal Rules of Evidence provide an adequate remedy. The court may strike evidence that has been previously admitted into evidence and instruct the jury to disregard such evidence, or it may admit evidence of an exhibit that has been previously excluded.

That is clearly what Rule 104 provides, Judge. So to your question of whether you have the authority or discretion to do so, Rule 105 provides that to you, my understanding.

MS. BORMANN: And last but not least, Judge, I apologize, we seem to be crossing over each other.

If you're inclined to look at a Rule 403 analysis, I mean, obviously in order for the government to play this, the jury's going to be told that Mr. Roberson was in jail. They're going to be led to guess as to why that is. They're

8179

going to be led to guess as to who all of these people are. They're going to be led to guess as to why Mr. Roberson would be seeking to pay Mr. Greenberg. They're going to be wondering why Mr. Roberson would be seeking money to pay a lawyer, even if Mr. Greenberg's name is kept out, all of which is incredibly prejudicial.

And, I mean, we've already established, if you don't know who these people are, Judge, the jury won't either, so there's no probative value.

So in a 403 analysis, this is not even a close call.

THE COURT: Okay. Response from the government?

Also, it's almost 9:30, so we have to finish this up soon. And I allowed the defense to argue for now almost half an hour, so I am not going to cut the government's response short, but we just -- we do need to move forward at this point.

So let me just ask the government to be as brief as possible.

MR. JULIEN: I'll be pretty quick, your Honor.

So just taking some of the -- addressing some of the things that Ms. Giacchetti said first. These exhibits were not conditionally admitted. They just were not, categorically.

Mr. Greenberg objected to us attempting to lay the foundation for them and suggested that they would stip to the

foundation, and ultimately we did not agree as to a stipulation as to foundation.

At one point in the proceedings, we stopped and had a lengthy break to try to hammer out a stipulation. We didn't reach one, so Special Agent Doyle laid foundation for Exhibits 3001 and 3002.

In a separate occasion, Special Agent Prostko, who has had conversations with Mr. Liggins, laid the foundation for his voice on 3000, and he appears on 3001. But we went ahead and laid the foundation because we did not agree to a stipulation as to the foundation.

And it may be true that Mr. Greenberg at that time said that he wanted to try to stip as to foundation and preserve objections to other bases, such as relevance, but at the time that I moved to admit 3001 and 3002 into evidence, there was no such objection. They were not admitted conditionally. They were not admitted over anyone's objection subject to making later objections. They just were not -- there was no objection.

So these exhibits are in evidence, and they're not -- they have not been admitted conditionally.

And by the way, we're not even offering Exhibit 3000, even though we could because we believe the foundation has been laid. That would be the call that was referred to and that we did discuss during the Santiago proffer ruling, where

8181

Mr. Liggins is saying, tell everybody -- tell Duke or whatever to tell everybody to get new phones. We laid the foundation for that during Special Agent Prostko, but I'm not even going to seek to admit it today. But there was foundation for Mr. Roberson and Mr. Liggins's voice on these calls. And we went about it the way that we did because we didn't have a stipulation.

I just want to come back to some comments that were made yesterday. Again, I'm just being brief and then I'll come back to the things Ms. Bormann said. But yesterday it was suggested by Mr. Greenberg that leaving these exhibits in evidence would be structural error, and that's just not correct.

A failure to object to evidence is review for plain error on appeal. And we have case after case that says that. I'll give you a couple of cites. I won't go through the analysis. But *United States v. Lundberg*, which is Seventh Circuit case from 2021, that's 990 F.3d 1087, is pretty explicit. It goes through the analysis of what -- why it's plain error, the difference between forfeiture and waiver for failing to object to something when it comes in, or waiving when you fail to object and then refer to it later on in the trial. That's a Seventh Circuit case.

Here's another one: *Walker v. Groot*, G-R-O-O-T, and that's 867 F.3d 799, Seventh Circuit 2012.

8182

Give you a couple more.  *United States v. LeBeau*, which is L-E-B-E-A-U, 949 F.3d 334.  And that's Seventh Circuit 2020.  *United States v. Thomas*, 933 F.3d 685, Seventh Circuit 2019.

So when you fail to object to something, it's not -- it doesn't turn into a structural error.  It's a plain error on appeal, and that is a pretty high bar to say that, you know, the case should be reversed because a party failed to object to something.

A number of the factual predicates for Ms. Bormann's arguments were just blatantly not correct.  She started out saying that on these calls, the evidence and the only evidence in terms of the location for where these drugs were was Dip's house, and that's just not correct.

At the start of what we'd say is 3001-2, it's clear that Roberson says to Dip:  Hey, I bagged the stuff at your house and then I brought it to my sister Sarah's house.

And then the rest of that call, 3001, in the clips that we propose, and 3002, it is quite clear that the drugs are in Sarah's house.  He's talking to Sarah, his sister, about it.  He's talking to his cousin Stephan about it.  He's talking to Liggins about it.  The drugs are there.  Liggins went in there.  They only gave him 12 bags, all of these things.  On 3002, he's talking about the fact that Parkway is their block.

8183

But, again, it's quite clear that the drugs are in Parkway Gardens in his sister Sarah's house and not somewhere else.

Ms. Bormann suggested to you there's no evidence in terms of who Sarah and Stephan were. And, again, that's just not correct. She referred to them in opening statement. During the cross-examination of Montrell Eady, Mr. Greenberg brought out that his sister Sarah lived in Parkway Gardens. That's page 4898 of the transcript. And during that exchange, Mr. Greenberg was trying to get Mr. Eady to agree that when Roberson said to him, take the gun to the O that they were talking about, that he was really talking about take it to Sarah's house who lived in Parkway Gardens where Mr. Eady lived. I brought up on direct examination that Mr. Roberson -- or should I say Mr. Roberson lived. I brought out on direct that Mr. Roberson lived in Parkway Gardens.

During the cross-examination of Terrance Garrett, Ms. Bormann questioned him about: So how about a fellow by the name of Stephan Sykes, asking Mr. Garrett if he knew who that person was.

And then the next question is: So if they were family members of Kenneth Roberson who were living at 6356, you wouldn't know them?

Answer: Right.

And so then there are more questions: And that

would, of course, be consistent with somebody who had family living at Parkway Gardens and visited occasionally, right?

Yes.

So Mr. Greenberg, Ms. Bormann injected into the case that Kenneth Roberson's sister Sarah lived at Parkway Gardens. That evidence is in the record. The context of these calls is clear that the drugs are in Sarah's place. And Mr. Roberson is questioning Stephan and Sarah about what happened to all of the drugs, and they needed to get it to Murda. And by the way, at one point he's talking to Dip and says: Hey, go slide on Sarah tomorrow, meaning in Parkway, get the drugs from her.

So factually what she's saying is just not correct.

Your Honor, we talked about these calls extensively before the trial. Again, I'll reiterate, yesterday there was a deadline to object to these calls. There was no objection. There was no objection when we moved them into evidence. We talked about at least 3000 during the Santiago proffer hearing, so everybody was on notice of these calls. There was no objection to them coming into evidence.

It's direct evidence of racketeering, drug sales going on or drug dealing going on or Mr. Roberson's possession of drugs inside of Parkway Gardens. And that's clear on 3002 when he's talking to a girlfriend who we're not really even going to introduce the idea of who these people are because we don't really care who the other people are. All we are

8185

intending to elicit are Mr. Roberson's statements. And I'm going to ask Special Agent Case about Mr. Roberson's statements on these calls, did you hear him say this, did you hear him say this, did you hear him say this. But on 3002, he says, hey, I was talking to Murda. And basically he's, you know, mimicking what he was saying the day before, saying, I don't care if that's her house, meaning Sarah's house, that's our block, meaning Parkway.

So this is relevant evidence, it's indicia of racketeering, it's direct evidence of racketeering, that Mr. Roberson possessed and sold drugs in Parkway Gardens.

We are not intending to elicit in our clipped version references to him selling drugs to raise money for bond. I don't even know that that's even correct. Eady testified that Roberson was his weed man. So when he was out he was selling drugs.

If they want to suggest that somehow he only started selling drugs to raise money for bond, I don't know that the record supports that. But we don't intend to play in our clipped versions that -- any references to Mr. Greenberg or any other lawyer he was trying to hire, or the fact that he was trying to raise money for bond.

Our clipped versions are pretty narrowly tailored to him possessing drugs in Parkway Gardens and discussing what those drugs are with people, where they're at, and that they

needed to get the drugs to certain people.

MS. BORMANN: Judge, I don't know if you want to hear from me or not. I just have one overarching comment, which is, I've listened to these tapes ad nauseam, and I've never heard any reference to, I brought it to my sister's house, ever in any -- so if Mr. Julien can provide us the minute number for that, maybe I just missed it, but it's not there. The only house discussed in any of this is Dip's crib.

So, again, this is all about speculation. There -- I mean, Mr. Julien fills in the blanks, and they mean this and they mean that and they mean the other thing. The problem is Mr. Julien can't testify. He needs a witness to do that.

MS. GIACCHETTI: And, Judge, just one thing to make it clear, that we view this as 404(b) evidence, not as part of the racketeering.

But, second, I heard no response to my in furtherance argument about 3002. And so I believe 3002 as to -- cannot be put into evidence against our client. And if they're proceeding to put this in against Mr. Roberson, then my client's name should be redacted from these transcripts because there is absolutely no basis for this as a co-conspirator statement.

MR. JULIEN: I can respond to that last argument.

So as the Court noted, defense arguments went on for about half an hour, and I tried to get in everything I needed

8187

to say in a short amount of time, but just 3002 -- by the way, they're -- the entirety of what we are talking about in these calls, to respond to Ms. Bormann's point, it's clear that the drugs are in Sarah's place. He's asking them where they are, he's asking what Stephan did with them, he's talking about the fact to Liggins and other people that Liggins went in there. He's telling Dip to go to Sarah's place, slide on Sarah tomorrow, get the drugs.

He's talking to Mr. Liggins in 3002, which I'm coming back to, but like, quote, in 3002-4 TR, "I don't give no fuck if that's her house. This our block." That's what he said. Mr. Roberson said that to this girlfriend, who we're not going to even talk about the identity of this person.

But in responding to Ms. Giacchetti's point, we don't believe that Mr. Liggins' name should be redacted here. Frankly, it's not even Liggins in the call. It says Murda. But what we are talking about is how and why this is relevant.

Throughout this case, in opening and through cross-examination of other people, we've heard from Team Roberson that he's Dipset and all of these things, and this is relevant to show that he considers Parkway Gardens our block when he's talking about Murda. Murda get in there. Murda get in there. Mmmm, I tell Murda, like, man, I don't give no fuck if that's her house, this our block on TY. Make her -- make they -- make his ass get the fuck on. Who is you? Where you

8188

from? Get the fuck off this block, dude, on TY.

The reference to Murda makes this relevant. So if we're talking about this our block without tethering it and anchoring to being Parkway Gardens and talking about people from Parkway, it's not relevant. He could be talking about our block, Dipset our block, 219 South Dearborn. But it's clear from the context of 3001 and 3002 what he's talking about is Parkway Gardens.

MS. GIACCHETTI: Judge, relevancy is different from hearsay. They're conceding it's hearsay as to my client. It's clear who Murda is through this entire trial. And so his name must be redacted from this.

MR. JULIEN: We are not conceding that it's hearsay. This is a statement from Roberson.

MS. GIACCHETTI: It's a statement that he said these things to Murda. Murda get in there. Murda get in there. I tell him, Murda, like, man. It is a statement. He is recounting something that he claims is in the past. They're putting it in for the truth of it, that he told Murda these things. It's absolutely hearsay.

MR. JULIEN: Whether he said it directly to Murda or whether he said it to someone else, saying that I said this to Murda, however you slice it, it's a statement that he made. It's not hearsay. If Murda --

MS. GIACCHETTI: As to my client, it's hearsay.

8189

MR. JULIEN: -- was on the call and he said, talking directly to him, these things that I wrote, it wouldn't be hearsay. It's not hearsay when he's talking to Ms. Doumas the next day saying, I said these things to Murda or whoever else he said them to.

MS. GIACCHETTI: Classic hearsay as to my client. It may not be hearsay as to Mr. Roberson. Classic hearsay as to my client.

(Defendants entering courtroom.)

MS. BORMANN: Judge, I just have one correction that I just caught. I made little notes for myself.

Mr. Julien just quoted my client as saying: Dip, slide on Sarah tomorrow and pick up the drugs. That's not what he said. That's at minute 8:40 on 3001.

He said: Dip, slide on Sarah tomorrow and she give you the $300 for me.

And then at 8:59, he says: Sarah, set up an account and put some money on my books. Set up an account for your phone.

So they're talking about picking up money for his jail account and to hire Mr. Greenberg.

MR. JULIEN: In your clipped version, we're not talking about money for books or anything like that, but it's clear from the context of these calls he's talking about how much money is with the drugs and the drugs themselves.

And now I'm looking at this call:  Yeah, slide on Sarah tomorrow, folk.

And again, this is 3001-4 TR.

She gonna give me -- she gonna give you 300 for me, and then when Stephan done with them bags, he gonna give you the other little 300.  Meaning, after Stephan sells the drugs they had been talking about in these earlier clipped versions.

MR. GREENBERG:  And they never paid me.

I was just kidding.

MS. BORMANN:  Judge, I don't know if you need time, or -- the witness isn't going to testify for a little while. I have one more thing that my client pointed out on my notes to me, and I just want to put it on the record.

At -- on the first phone call, which is 3001 at minute 16:58, Mr. Liggins is identified by the government as the speaker, and he says:  I don't want this shit.  I was finna give it to Drea.

So it's Mr. Liggins saying he doesn't want to have anything to do with this.

THE COURT:  Okay.  Does the government have, I guess, any -- do you intend to explain who is -- you know, just who is Sarah at any point?

MR. JULIEN:  So not necessarily when we're playing these calls.  I mean, I think we may talk about it in closing. But I'm not going to ask Special Agent Case to interpret

8191

anything that is being said on these calls, or I'm not going to direct Special Agent Case to any other speaker other than Mr. Roberson.

THE COURT: And, I'm sorry, you may have said this already, but what is the government's response to -- so how is the government going to explain that this call relates to Parkway Gardens?

MR. JULIEN: So in the call, he's talking about -- I'm not going to ask Special Agent Case to interpret anything. I think the jury will hear the words. I think they'll hear the context for this, and I think it's going to be clear from the context that they are talking about these things being in Sarah's place. It's already in the record that Roberson lived with his sister Sarah in Parkway Gardens.

So I don't think we need to tie that together while the witness is on the stand. And I can ask her, were you present when that testimony came out in court, but that is something that we'll tie together later on in argument.

MS. BORMANN: Judge, the problem the government has here is that in February of 2021, which is the relevant time period we're talking about, there is absolutely no evidence that somebody named Sarah -- no other connection to Mr. Roberson -- was living anywhere near Parkway Gardens. That's what we're talking about now. We're not talking August 2020. We're talking February of 2021. This all takes

place over a four-day time period that begins February 18th and ends, I think, on February 23rd was the last phone call.

MR. JULIEN: Judge, the evidence is in the record. It sounds like this is more of a weight argument. If they want to cross Special Agent Case on that. But he's talking to Sarah about being in her place and about someone named Murda going into Sarah's place.

So we think it's clear from the context that this is Parkway. I think we know -- and if they really want to push on this, we know where he was arrested right before then, which was in Parkway.

Now, I don't plan to elicit that, but I guess maybe we need to know if we have an issue with that, because I can elicit those details as well if there's going to be questions about the foundation here.

MS. BORMANN: Judge, he was not arrested in the apartment of Sarah Roberson.

MR. JULIEN: He was arrested -- well, I know where he was arrested because I know the circumstances leading to him hiding out in that person's apartment. We know how it went down.

But, again, this is another weight argument. Do I have to bring it out that he was arrested in Parkway Gardens? I can if it's going to be an issue that, in terms of relevance and what he's talking about Sarah living in Parkway and his

stuff being in Parkway.

MS. BORMANN:  Judge, where he was arrested has nothing to do with Sarah Roberson.  So it doesn't actually prove the thing that the government claimed it does.

And Mr. Greenberg and I both believe they would be introducing evidence through other witnesses which they chose not to call.  So we're stuck in this position where there's no "there" there.

THE COURT:  Okay.  So let me just back up.  So there are two calls that the government previously moved into evidence.  One is 3001.  The other is 3002.  Both of which are jail calls involving Mr. Roberson.  3001 is from February 22nd, 2021.  3002 is from February 23rd, 2021.

So these are both calls that were the day after each other in late February of 2021, which would be the kind of winter after the murder, which was in -- the shooting was August 4th, 2020.  So this is February 22nd and 23rd of 2021.  So just -- so that's just the time frame of the calls relative to the shooting.

The first call has Mr. Roberson, someone named Stephan, someone named Sarah, someone named Dip and Mr. Liggins.  The second call has Mr. Roberson -- I'm sorry, also in the first call was Mr. Roberson.

Then in the second call, that has Mr. Roberson and Lyndrea Doumas.

8194

These calls were previously admitted into evidence through Special Agent Doyle, although there's a dispute as to whether relevance and other objections were preserved. And the defense is contending that at the time these calls were admitted, really the only objection that was addressed was foundation. Really, it was just -- it was just that -- the only thing that had been established at that point was that Doyle could recognize Mr. Roberson's voice, and beyond that, other objections were preserved.

I -- you know, rather than trying to unpack all of the -- you know, the procedural issues of whether things were preserved or not, I think it's -- you know, it's always better to try to just reach the merits, so I'm going to just address the objections on the merits and not really reach the procedural issues of what was -- you know, what was actually preserved at the time.

So I'm just going to assume, without deciding what was actually -- what was preserved and not preserved and try to look at the merits.

So it's a relevance objection, first of all, and then there's also a kind of Santiago-style objection for co-conspirator statements that's being raised by Mr. Liggins. And so those are two different issues. One is relevance, and the second is hearsay, Santiago, co-conspirator statements.

So just taking the calls one at a time, the first

call, which is February 22nd, 2021, that has the larger number of participants, that is, Mr. Roberson, Stephan, Sarah, Dip, and Liggins, that call -- and I did listen to both of these calls in their entirety. The government wants to play particular clips from each of these calls, but I did listen to the full clip -- or the full call for both of these.

So the first call is among these various participants. It is discussing basically drug -- where are certain drugs that Mr. -- where are certain drugs and what happened to the proceeds of the sales of those drugs.

I do think from the overall context, having listened to the call, that it is very clear. And I right now, you know, trying to find the exact clip where this became clear is kind of tough. But having listened to the entire call, it is very clear that they are talking about drugs that are at Sarah's residence. And so -- and that basically Mr. Roberson's asking, you know, what happened to these drugs that he packaged at Dip's place but then ultimately brought to -- either brought to Sarah or Sarah transported, I don't recall. But basically these drugs were transported to Sarah's residence.

Sarah has them, or Sarah and Stephan have them, and Mr. Roberson is trying to figure out what happened to the drugs themselves and to the proceeds, and also referencing the fact that the -- either the drugs themselves or the proceeds

8196

were meant for Mr. Liggins ultimately, because he's sort of -- they're discussing what -- you know, what happened to these things.  Why did Mr. Liggins only get a certain number of bags when, in fact, Roberson started out with a certain number of bags, and then there's some bags that are -- that apparently went missing in the process somewhere along the line.

So basically that's what the content of the call is.

Then the issue is, is there any connection between any of the individuals on the call and anything about O-Block, either as a gang or as a place?  And that is the issue that Mr. Roberson is raising now.

I do think, having gone back to at least one of the transcripts that Mr. Julien just cited, that it is enough about this topic is in evidence to permit and give at least basic context for this.

I'm just looking at, in the questioning of Mr. Eady on page 4898, it asks about -- so Mr. Eady -- so the question is:  You know he was living there?

Answer:  Yes.

Question:  You know he was living with his sister, correct?

Answer:  Yes.

Question:  He didn't tell you give it to Dipset?

Answer:  No.

Question:  He said take it to my house, right?

Answer:  He just said take it to the O.

And so -- and then:

Question:  Right.

And that meant take it and put it up at my sister's, right?

Answer:  He just said take it to the O.

So based on that, I think -- and there's a little bit of other testimony on the prior page that is saying that -- the gist of it is that Parkway -- another name for Parkway is O-Block.  That is also in Eady's testimony.

So I think, based on all that, there is enough to -- for the jury to then draw an inference that this discussion in Exhibit 3001 is about the storage of drugs by Roberson at -- through his -- or through Sarah and/or Stephan at Parkway Gardens.

So I would overrule the relevance objection.

As to 3002, the relevance objection, I think that partly the reference to "this our block" is -- that makes this call relevant because it's evidence, again, of how Roberson views O-Block, potentially.  I mean, it take inferences to get there, but the jury is permitted -- there's enough for the jury to draw that inference if they so choose.

And in addition, this call is apparently referring to a similar issue of there are missing drugs from what Roberson originally possessed that were intended for someone he calls

8198

Murda, which there is enough in evidence for the jury to infer that that is Liggins if they choose.

And so I think, again, this is relevant for similar reasons as 3001, which is that it's talking about -- it is Roberson talking about drugs that were in his possession at one time and intended for -- either the drugs themselves or the proceeds were intended for Liggins.

So I think that both calls are relevant.

Also, the calls themselves are admissible against Roberson because they are statements by Mr. Roberson. The other participants' statements in the calls are admissible as context for Mr. Roberson's statements. And so that's -- that also supports the admission of the clips.

And so -- and I also do not think that these are excludable under -- or it's not that I lack the authority. I do have the authority to exclude them under 403 if that were appropriate. I just don't find that that type of exclusion is appropriate here because I think they are -- they have probative value on both the existence of the enterprise and potentially racketeering activity that the government also needs to prove, meaning drug transactions or drug distribution.

The fact that these are six months after the shooting does not make them irrelevant, because a conspiracy could extend past -- to the extent that the conspiracy is -- or the

enterprise that the government is alleging is O-Block, as opposed to a conspiracy to commit the murder on August 4, 2020, to the extent the government's alleging there was an ongoing enterprise of O-Block, then that could very well -- and the government could very well be alleging, I think they are alleging, that that would have extended past the murder itself and been going into this time frame of February 2021, that basically O-Block might still be trying to operate, might still be trying to use drug dealing to -- either by O-Block members or by people willing to distribute drugs in cooperation with O-Block.  And that would go -- that type of activity would go to support the activities of the enterprise.

So I don't think that the timing is a basis to rule it out either under relevance or 403.

In terms of whether these calls are admissible against any defendant other than Mr. Roberson, which is Mr. Liggins' objection, there are certain parts of 3001 that have Mr. Liggins' own statements, and so those would be admissible against Mr. Liggins, those particular statements.

As to Mr. Liggins' objection to 3002, which does not involve Mr. Liggins, that involves Mr. Roberson and Ms. Doumas -- and this would hold true for all other defendants other than Mr. Liggins as well -- I would find that that is a statement in furtherance of the conspiracy, meaning the broader conspiracy of O-Block, as opposed to the

8200

conspiracy to commit the murder, because it is furthering --
it is in furtherance of the activities of O-Block, at least
under the government's theory. It is advancing -- first of
all, there's the statement, this our block, and so that is
something that facilitates basically the understanding of the
alleged co-conspirators as to what is the nature of the -- of
what they're doing. And also it furthers the activities of
the conspiracy, to the extent the conspiracy is O-Block,
because it's furthering drug transactions that support -- that
financially support the alleged enterprise.

So I -- I guess I'm overruling the objections.

So one issue is just that, as admitted, these calls
were admitted in their entirety as opposed to just the clips
that are in the transcripts. I do think the portions that are
talking about Mr. Greenberg or, you know, potentially bond,
that I would consider ruling out, which means, can we clip the
calls somehow to excise that type of material?

I mean, as far as today for what you're playing in
court, as long as you're not playing that, that's fine. But
then we have to have a plan for what is, in fact, going back
to the jury. So maybe the answer to that is, whatever is
played is what's going back to the jury, or the answer to that
is something -- some larger excerpt is going back to the jury
than what you're playing in court.

But either way, I think there's a fair point that,

8201

you know, if it's talking about the representation in another case that that starts to get into 403.

MR. JULIEN: We are fine with just sending the clip versions back to the jury. It sounds like, though, Ms. Bormann may want to play other portions of the calls that do touch on those issues, and we would object to that as irrelevant and 403 and all of those things.

MR. GREENBERG: We are going to play other portions. We are going to play other portions of the calls, Judge, and probably get into what the discussion -- you know, why he wanted to raise money because he was trying to hire a lawyer.

I would ask that -- I mean, we can do it without mentioning me. I did not get hired on that case.

The -- so I would think the witness who they're going to put that into, we can just refer to a lawyer. You know, I wasn't going to play that portion, but I was going to say, is he saying he's trying to hire a lawyer. Because I think we're entitled to that to show that this is not just a for-profit business enterprise at that point. There's a purpose for the discussion.

But I don't think that portion should go back to the jury. I think that we should just be able to ask: You listened to this, and one of the things he's talking about is trying to hire a lawyer and get bond money together.

MR. KLING: My problem is that I want the jury to

8202

know that we are not the lawyers who they were seeking to hire with bond money. That ends up prejudicing Mr. Offerd in terms of the jury hearing that they're trying to get -- that this organization, purported organization, is trying to get bond money together in order to hire lawyers. I don't want this jury thinking, oh, that's who we have in front of us, that's why they're here, they're hired guns.

MR. GREENBERG: Well, and that's one of the reasons I want to get into it because there's been suggestions earlier that O-Block would post bond for people. So it's clearly relevant.

But when we're asking, we can say -- and it doesn't appear that he, you know, hired a lawyer. I mean, everyone knows he got a public defender on that case. To this day, he still has a public defender.

MR. KLING: We know that, you know that, Judge, but the jury does not.

MR. JULIEN: The jury does not, I agree with Mr. Kling on that.

So here's the problem -- by the way, we don't have to prove that O-Block was a for-profit enterprise. We just have to prove that they engaged in racketeering. Whether they were selling drugs or passing out drugs, it's still racketeering.

But I think once we start playing the portions that Mr. Greenberg is talking about -- and I know the jury is

8203

waiting, so I'll just be brief -- I think we're playing with fire here, talking about another case. As Mr. Kling mentioned, the jury doesn't know anything about this other case. And who's representing Mr. Roberson in that case and what the status of it is, and certainly what it is about, which is murder, I just think we're playing with fire, Judge.

MR. GREENBERG: None of which has to be gone into because the witness is here and the witness can be instructed what to stay away from. And so the questions would be as follows:

During this call, did you hear references to wanting to sell the drugs to raise money for bond?

Yes.

During this call, did you hear references to wanting to sell the drugs to get a lawyer?

Yes.

To the best of your knowledge, did Mr. Roberson ever post bond on that case?

No.

Did Mr. Roberson ever hire a lawyer on that case?

No.

Seems pretty simple.

MR. KLING: Again, my concern -- and without being negative with respect to Mr. Greenberg's remarks, my concern is if this jury believes that this purported organization

O-Block was getting money or selling drugs to try to hire lawyers, and we're lawyers sitting here in front of them, that prejudices Mr. Offerd.

MR. GREENBERG: That's the exact opposite, Richard, of what I just said. But that's okay.

MR. KLING: Okay.

MR. JULIEN: I'll just proffer, Judge, because this is coming in through Special Agent Case, these calls. She doesn't know anything about who was representing Mr. Roberson on that case. He can ask -- if you overrule our objection, he can ask the questions and the answers are going to be what they're going to be, but she's not reviewed the docket. She just indicated to us she doesn't know what the status of that case is and who represents him.

So I don't know where the evidence is going to come from that it's -- you know, who the lawyer is, that it's public defender or whatever about that case.

I know those things because I've looked at the docket, but I'm not going to get on the stand.

MR. GREENBERG: So she's your agent here sitting in court. Why don't you just tell her that, and I won't, you know, make an objection to the foundation for her knowledge. I mean, this -- you're making something out of nothing because you're trying to keep the truth from the jury again.

MR. JULIEN: No, I think you're trying to get

evidence in front of the jury without a basis to get it in front of them or a witness to get it in front of them.

And, your Honor, you do rule how you think is appropriate. I'm just telling you what her answers are going to be, that she can only testify as to what she knows.

MR. GREENBERG: Judge, as long as she doesn't refer to it being a murder case, which I don't think she would have to, we will be happy to present her with a document to let her know what it is.

Mr. Julien knows what it is. I know what it is. We all know what it is. This is an argument over something that really we should all be able to agree on. You know, the rules provide for sort of working around problems, but this is certainly one of them.

MR. JULIEN: That's our position, your Honor.

MR. KLING: And, Judge, finally, although we have an agreement of continuing objections unless we voice objection, Mr. Offerd would agree with Ms. Giacchetti's argument and Ms. Bormann's argument regarding the admissibility of Mr. Roberson's statements, and we would object to them going in on 403 grounds as to Mr. Offerd.

MR. BARNETT: Of course, I would join. I think that's what we agreed, your Honor.

THE COURT: Okay. And I understand that argument to be adopted by all defendants.

8206

But I guess, for the same reasons I gave before, I will overrule that objection.

And on the issue of whether -- whether Mr. Roberson can get into the topic of using the money to hire a lawyer, I -- I do think it starts to get -- I guess I'm going to sustain the government's objection to that topic because of 403, and it starts to be too much sidetracking, and it is potentially prejudicial for the reasons Mr. Kling gave.

MR. GREENBERG: So you're going to allow the evidence to go in that he's selling drugs to sell drugs to raise money, and you're not going to allow us to get into the reason why he was trying to raise money and why he sounds so desperate on the phone call? You're not going -- I mean, this -- it's proof that -- yeah, it's proof that this isn't for O-Block selling drugs.

I don't understand, Judge. All the time in trials, they keep stuff out because, you know, we're going to redact this. All we're doing is asking that we redact my name from the conversation. And so you're saying we can redact it, but we can't get into the fact that he was trying to do this to get -- you know, to hire a lawyer, and I mean, that's ridiculous, with all due respect, Judge.

THE COURT: But, see, I understand your argument. And I do, normally, when there is part of a conversation played, for a number of reasons, partly for completeness and

8207

partly because for the reasons you're articulating, I would let it in ordinarily.

But here, we have an objection by Mr. Kling, which I think is well founded, that there is a risk of prejudice from inferences about, well, what about all the lawyers that are here in court.

And so it's just every call like this is so individualized and depends on particular issues, and that is an issue here that is not -- would not be present if --

MR. GREENBERG: Well, his client --

THE COURT: -- it were a different issue.

MR. GREENBERG: Judge, his client has nothing to do with this call. Mr. Kling, with all due respect, didn't hear what I said. And I would move to withdraw as Mr. Roberson's counsel then so that I can be called as a witness during Mr. Roberson's case to explain that I wasn't hired on the other case and that he remained in jail.

Because that's what's going to have to happen because, you know, the government doesn't want this in because they know that it brings out the truth. That's what happened. The call's about getting money to hire a lawyer. The call's about trying to get bond money. They stood up and they said O-Block raises bond money for people. O-Block didn't raise bond money for anybody in this case.

The other case that Mr. Roberson had before this,

8208

which was a gun case, he did bond out on. The Chicago Community Bond Fund posted that bond money for him, which we also are planning on introducing. That is a public charity that posts bond for people.

They don't have a shred of evidence that O-Block posted bond for anyone. All these guys have spent a lot of time in jail, and they couldn't bring one person into this courtroom to say that they ever posted bond for anybody. Not one person. They couldn't bring one bond slip in here to show that anyone ever posted bond.

And now you want to allow them to introduce evidence that my guy's trying to sell drugs to get bond, and we're going to keep it out because -- bond and hire a lawyer because Mr. Kling, for some reason that defies the imagination, is objecting on behalf of his client who has nothing to do with these calls, isn't mentioned on these calls or anything like that?

So I can't bring up that it's not related to O-Block because Mr. Kling, sitting back there and has some crazy theory about why it prejudices his client because he doesn't want everyone to know that -- everyone to think that we're hired or appointed on this case? It has nothing to do with this case. It doesn't show anything at all with this case. It's a different case. It's not this case. He's sitting in the Cook County Jail. He's not sitting in the federal jail.

It's before this case is charged.

I mean, they're going to -- they're going to get the stuff. They're going to know this, and you're going to keep it out?

MS. GIACCHETTI: Judge, on behalf --

MR. KLING: Judge, how about an instruction that none of the lawyers in this case were hired with any O-Block money that was sought or any money that anybody sought to get.

MS. GIACCHETTI: Judge, on behalf of Mr. Liggins, I have to agree with Mr. Roberson's counsel. There is no reason -- and part of Mr. Roberson's cross-examination is certainly related to Liggins to -- I have to disagree strongly with Mr. Kling. It has nothing to do with any of the other lawyers here.

And to stop -- to curtail crucial cross-examination, the right to confront this evidence on behalf of both Roberson and Liggins because of some idea that it impacts any other lawyer in this case, Judge, I don't agree with that. And I want the record clear that I agree with Mr. Greenberg that this ruling is -- because Mr. Greenberg is going to do the cross-examination that primarily impacts Mr. Liggins also, that it is absolutely violating these defendant Roberson and Liggins' constitutional right to cross-examine and confront the evidence against them.

MR. KLING: Judge, Mr. Offerd will withdraw his

8210

objection, but I'm still going to request an instruction to the jury that no lawyers in this case were hired from O-Block.

So we withdraw the objection based on the articulate statement of Mr. Greenberg.

MS. GIACCHETTI: The point is there was no money.

MR. BARNETT: The point is that's not true.

MR. GREENBERG: That's true. You were hired.

MR. BARNETT: That's correct.

MR. GREENBERG: But were you hired with O-Block money?

THE COURT: Okay. So we need to move forward with the jury. And this witness is coming later, so I'll give some more thought to this issue on what exactly the cross can get into and come back to it at another point.

MS. DOMPH: And, Judge, Mr. Thomas concurs with Mr. Greenberg.

THE COURT: Okay. Thanks.

I was going to say, are we ready for the witness and then the jury? You know, we have --

Actually, if the witness could just hold off for one second and step back out for one second, please.

I'm just thinking about the timing of the breaks. We've now taken almost an hour with this whole argument, and so should we take a break now and then go straight through lunch, as opposed to trying to start now, then take a break

8211

after, like, 20 minutes?

MS. DOMPH: No.

MR. SPIELFOGEL: Let's go to it.

MS. GIACCHETTI: Judge, go right ahead. I am going to go out and come back, but counsel will be here for Mr. -- my client. But please do not delay. Let's go on this witness now.

MS. WALGAMUTH: The government would agree that we don't need a break before the lunch hour. I don't know of any -- if the jurors need a few minutes, but I know they've been waiting for some time, so maybe they've taken their break.

THE COURT: Okay. So I think though -- so I just need a break for two minutes.

MR. GREENBERG: Judge, why don't we start at 10:30?

MS. WALGAMUTH: Yes, your Honor.

MR. GREENBERG: Why don't we start at 10:30?

THE COURT: That sounds good.

MS. BORMANN: Six minutes.

MS. WALGAMUTH: Thank you, Judge.

(Recess from 10:25 to 10:31 a.m.)

MS. WALGAMUTH: Judge, may the witness take the stand?

THE COURT: Yes.

MS. WALGAMUTH: Thank you.

THE COURT: All right. Are we ready for the jury?

MS. WALGAMUTH: Yes, your Honor.

THE CLERK: All rise.

(Jury enters courtroom.)

THE COURT: Good morning, everyone. Thank you for your patience.

We're going to resume with the government's case.

MS. WALGAMUTH: Your Honor, the government calls Davon Brinson to the stand.

(Witness sworn.)

DAVON BRINSON, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. WALGAMUTH:

Q. Good morning, sir.

A. Good morning.

Q. Can you please state and spell your name for the record?

A. Davon Brinson, D-A-V-O-N, B-R-I-N-S-O-N.

Q. And how old are you, Mr. Brinson?

A. 39.

Q. Mr. Brinson, were you shot on Oak Street on August 4th, 2020?

A. Yes.

Q. I'd like to ask you some questions about that day.

So turning to the afternoon of August 4th of 2020, did you travel down to Oak Street that afternoon?

Brinson - direct by Walgamuth

8213

A. I did.

Q. Why did you go to Oak Street that day?

A. I was actually going to return an item that I had bought from that store.

Q. And what store are you referring to?

A. Dolce & Gabbana.

Q. Approximately what time did you get downtown to the Oak Street area?

A. May have -- I may have been in that area around maybe 3:00, because before I get into Dolce & Gabbana, I was at the Louis Vuitton store, and I went to Dolce & Gabbana right after.

Q. And when you went downtown, did you tell anyone in advance that you had plans to go to Oak Street?

A. No.

Q. So I want to first talk about the Louis Vuitton store you just mentioned.

Did you go to Louis Vuitton before you went to Dolce & Gabbana?

A. I did.

Q. And did you make a purchase at Louis Vuitton?

A. I did.

Q. Did you receive a shopping bag with your purchase?

A. I did.

MS. WALGAMUTH: Your Honor, I'd like to show the

witness only what's been marked for identification as Government's Exhibit 201-132.

THE COURT:  Okay.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, do you see a photo on your screen?

A.  I do.

Q.  Do you recognize that photo?

A.  Yeah, that's the bag I had.

Q.  Is that the bag from Louis Vuitton?

A.  Yes.

Q.  Is this a true and accurate copy -- or a photograph of the bag you had from Louis Vuitton?

A.  Yes.

MS. WALGAMUTH:  Your Honor, I think at this time the government would move to admit Government's Exhibit 201-132.

THE COURT:  It's admitted.

(Government's Exhibit No. 201-132 received in evidence.)

MS. WALGAMUTH:  Permission to publish?

THE COURT:  Yes.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, I'm going to show you the photo we just discussed, 201-132, as well as two other admitted exhibits. I'm going to switch to that now.  201-131.

Is that another photograph of the shopping bag from your purchase?

A.   Yes.

Q.   And in 201-131, as well as 132, do these photos depict your shopping bag after the shooting?

A.   Yes.

Q.   What did you do after you left Louis Vuitton with your purchase?

A.   I was parked in the 15-minute flashers at Louis Vuitton, so I had been in there so long so I had to get in my car and move.

So I moved and I parked in front of the Dior store. I found a park there. I got out, and that's when I got out the car and I walked toward Oak Street and Rush.

Q.   So you parked your car by the Dior store and walked towards Oak Street and you were walking on Rush, is that correct?

A.   Yes.  I had to walk down Rush to get to Oak.

Q.   And when you were walking towards Oak Street, did you have your Louis Vuitton bag with you?

A.   Yeah.  I took it with me because I didn't want to leave it in the car, somebody bust a window or something.

MS. WALGAMUTH:  Your Honor, I'd like to show to the witness and publish to the jury what has been admitted as Government's Exhibit 2016.

THE COURT:  Okay.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, I'm going to show you -- I paused Government's Exhibit 2016 at the zero-second mark.

Do you recognize the intersection shown on this video?

A.  Yes.

Q.  Is that Rush and Oak Street?

A.  It is.

Q.  And is the red line I just drew on the screen, is that Rush Street?

A.  Yes, that's Rush Street.

Q.  And this second red line I've drawn to the left side of the screen, is that Oak Street?

A.  It is.

MS. WALGAMUTH:  I'm going to move this video forward to about the 2-minute-47-second timestamp.  I'm going to hit play here and play it for about 20 seconds.

(Video played.)

MS. WALGAMUTH:  Now, I've paused the video at about the 2-minute-58-second mark.  I'm going to zoom in.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, do you recognize anyone in this portion of the video?

A.  Yes.

Q.  Who do you recognize?

A.  Myself.

Q. Can you -- you've got a touch screen in front of you. Can you circle or mark yourself on the screen, please?

A. (Witness complied.)

MS. WALGAMUTH: Thank you.

Let the record reflect that the witness has identified himself with a yellow circle in about the center of the screen.

BY MS. WALGAMUTH:

Q. And is that the Louis Vuitton bag we just discussed in your hand, Mr. Brinson?

A. Yes.

Q. Can I direct your attention to the timestamp on this video? Does it say that it's 4:08 p.m. on August 4th of 2020?

A. Yes.

Q. Is that what the timestamp says?

A. Yes.

MS. WALGAMUTH: Now, I'm going to play it for a few more seconds until you go off screen, then I'm going to ask you a few more questions.

(Video played.)

MS. WALGAMUTH: I've stopped it at the 3-minute-10-second mark of Government's Exhibit 2016.

BY MS. WALGAMUTH:

Q. Did you just walk off screen in that video?

A. I did.

Q. And where are you headed at this point?

A. To the Dolce & Gabbana store.

Q. And as you were headed to the Dolce & Gabbana store, did anything unusual happen on Oak Street?

A. The incident where -- the incident where some young man was -- he was being chased by somebody right in the middle of the street.

By the time I got to the Prada store, that's when it all started happening. He was being chased. Nobody got shot. He didn't shoot the gun, anything like that. Some guy was just running in the middle of the street screaming.

And like I said, he didn't shoot him or anything like that. And the guy ran off, and I guess the guy that was chasing him ran off as well.

Q. So I want to pull back up 2016, and I'm going to ask you a few more questions about that.

And you said the Prada store. Is the Prada store in August of 2020, was that on Oak Street?

A. Yes.

MS. WALGAMUTH: Let me just get back to where we were. So I've stopped Government's Exhibit 2016 at about the 3-minute-and-7-second mark.

BY MS. WALGAMUTH:

Q. And do you see yourself in the left side of the screen crossing towards Oak Street?

A.   Yes.

Q.   Which side of the street is the Prada store?

A.   On the side that I'm walking toward, as I'm walking across.

Q.   So is it on this side of the street?

A.   Yes.

Q.   So off camera of this view?

A.   Yes.

Q.   And I want to break down what you just said.  You said you saw a young man being chased in the street; is that correct?

A.   Yeah.

Q.   So let's talk about the young man first.

Can you describe what the young man was wearing or what he looked like?

A.   I don't know what -- I can't remember what he looked like. I just know he had a white shirt on.

Q.   Do you recall the young man's race?

A.   Black.

Q.   Is it fair to say you didn't get a good look at that young man?

A.   No.

Q.   And you said you saw someone chasing him; is that correct?

A.   Uh-huh.

Q.   Where did that person come from, if you know?

A.   He was in a car.

Q. Was that car on Oak Street?

A. Yeah, it was parked.

Q. Was it parked in a parking spot, or was it in the road on Oak Street?

A. No, it was parked, like, on the -- it was legally parked, so it was parked on the sidewalk.

Q. So parked against the sidewalk?

A. Yeah.

Q. And did you see the man with a gun leave that car?

A. I didn't see him with the gun when he got out. I didn't see it until the altercation started when he started chasing him.

Q. So can you describe a little bit more about the altercation? You said the young man with the white shirt was being chased?

A. Uh-huh.

Q. By the man with -- you saw who had a gun?

A. Yeah. I didn't see him hop out. I didn't see the gun until after, you know, the chase started. And that's what kind of made me kind of like duck to the side 'cause I didn't know what was going on.

Q. And the man with the gun, did you see the gun?

A. I -- when he was running in the middle of the street, that's the only time I seen it.

Q. Can you provide any description about the man you saw with

the gun?

A.  No.

Q.  After that -- and you said there was a chase and they ran into the street; is that correct?

A.  Uh-huh.

Q.  What happened after -- did you see what happened after the chase or during the chase?

A.  He just chased him for a little while.  The guy was screaming, like zigzagging in the street, chased him for a while.  Like I say, he didn't pull the trigger.

And then the guy ran off across the street, and I'm, like, kind of like ducked down 'cause I don't know what's going on.  So I don't know exactly which way the guy ran, but I just know he ran the opposite of where I was, and the other guy took off running, got in the car, and they took off.

Q.  Okay.  And I want to make sure I understand what guy is which.  So you said the first guy, you didn't see which way he went running.  Was that the young man in the white shirt?

A.  Yeah.  He was originally running in the street, and then he just -- he was out of my view after a while.

Q.  Okay.  And then you said the man with the gun, he got back into a car?

A.  He took off, they took off.

Q.  Car took off?

A.  Yeah.

Q. And what did you do? You said you ducked down when you saw this happening. What did you do after that incident, after you saw the car take off with the man with the gun?

A. I mean, after they took off, I just assumed it was over, so it was kind of just weird seeing it. Kind of just gathered myself. And I don't remember exactly what I did after that, but I know I -- I still end up going to, you know, the Dolce & Gabbana store.

Q. Did you at some point cross away from the incident, away from where that chase occurred?

A. I -- I'm not -- I don't recall.

MS. WALGAMUTH: I'd like to show you what's been marked as -- and admitted as Government's Exhibit 2030.

And, your Honor, I'm going to publish this to the jury as well.

BY MS. WALGAMUTH:

Q. So I'm at the 3-minute-31-second timestamp of Government's Exhibit 2030.

Now, Mr. Brinson, looking at this video, does this appear to show the same intersection of Rush and Oak that you were just reviewing?

A. Yes.

Q. And do you see yourself in this clip?

A. Yes.

Q. Can you circle yourself on the screen, please?

A.  This is me here (indicating).

MS. WALGAMUTH:  Let the record reflect the witness has circled a yellow circle in the middle left-hand side of the screen reflecting a man with a yellow bag.

I'm just going to clear that.

BY MS. WALGAMUTH:

Q.  I want to direct your attention to the timestamp here.  Do you see the timestamp at the bottom of the screen?

A.  Yes.

Q.  Does that say 4:09:21 p.m.?

A.  Yes.

Q.  So that's about a little less than a minute from 4:08 when you crossed over towards Prada?

A.  Yeah.

MS. WALGAMUTH:  I'm going to play this for a few seconds and then ask you some questions.

(Video played.)

MS. WALGAMUTH:  Now, I've stopped the video at the 3-minute-46 timestamp of Government's Exhibit 2030.

I'm going to zoom in.

BY MS. WALGAMUTH:

Q.  Is this you here, Mr. Brinson?

A.  Yes.

Q.  With the orange Louis Vuitton bag?

A.  Yes.

Q.   And what are you doing?

So we just saw you cross Oak Street and walk to this crosswalk.  Do you recall what you were doing at this point?

A.   I think -- I think after that incident, I may have been in a, like, deciding like should I just leave or should I go to the store.  And I think I may have been, like, heading back toward my car right here.

I don't remember exactly, but I think that's what I might have been doing, like, just debating on leaving.

Q.   And you appear to be walking across the street, not running.

At this point, were you concerned that that gun incident was still ongoing, or did you --

A.   Well, I wasn't running 'cause I didn't personally feel concerned.  I mean, I wasn't involved in it, so I didn't feel like I had a reason to, you know, be concerned about it.  But I was concerned enough to where I was debating on just leaving.

Q.   And at this point, had you seen the man with the gun get in the car and that car leave Oak Street?

A.   Yeah, they took off.

Q.   Now, do you recognize anyone else in this zoomed-in image?

A.   Just the guy that ran up to me while I was walking towards the car.

Q.   And is the guy that ran up towards you, is he pictured

right here as well?

A. White shirt.

Q. And is that the same guy or a different guy than the young man --

A. That's the guy that was being chased.

Q. That was the guy that was being chased?

A. Yeah, he didn't have the gun. He was being chased.

Q. Did you have any interaction with this man in the white shirt who was being chased?

A. Just at that moment right there when he ran up to me.

Q. What was the exchange? Can you describe that, please?

A. He -- he just asked me, the first thing he said was: Can I get in the car with you? And I was, like, I didn't drive. He was like, come on Bro, please, Bro, let me get in the car with you. I'm, like, well, I didn't drive. Then he's, like, where did they go? I'm, like, they gone. He, like, where? I said, I don't know.

Q. So -- and I just want to clarify. Had you -- did you know who this man was?

A. Never seen him before.

Q. So this is a stranger who approached you?

A. Yeah.

Q. And you're not by your car at this point, are you?

A. No. My car is parked in the direction toward where I'm walking.

Q.  So do you have any understanding that this man knew you even drove to Oak Street that day?

A.  No.  I think just him being scared what was going on, it was like first -- I guess maybe I was the first person he felt comfortable with asking, you know, asking that.  But, no, he didn't know me, I didn't know him.

Q.  And you decided not to offer him a ride?

A.  Absolutely not.

Q.  Fair to say, you didn't want to get involved?

A.  Yeah, that's exactly -- that's the reason why.

Q.  Now I'm going to play a few more seconds about this and ask you some more questions.

        Before I do that, I'm just going to note the timestamp here.  Is this 4:09:36 p.m. on August 4, 2020?

A.  Yes.

        (Video played.)

BY MS. WALGAMUTH:

Q.  So I've paused the video at the 3-minute-55-second timestamp.

        Looks like the man ran away?

A.  Uh-huh.

Q.  Is that your recollection?

A.  Yeah.

Q.  So after this interaction where he asked if he could get in the car and you said you didn't drive, did you have any

further interaction with this man in the white shirt?

A. Uh-uh, not that I recall.

Q. I want to just note, did I just zoom in on you,
Mr. Brinson?

A. Yes.

Q. So we see the yellow -- I see the yellow bag, is that the
Louis Vuitton bag you've been carrying from your purchase?

A. Yes.

Q. So is there another bag in your hand in this?

A. Yeah. That's the Dolce & Gabbana bag with the T-shirt
that I had to go and exchange.

Q. So you had a Dolce & Gabbana bag because you were making a
return that day?

A. Yeah, I had the wrong size. I had bought it the week
before in Atlanta, and it was the wrong size. And so they
have a 7-day policy for an exchange, so I figure while I'm at
the Louis Vuitton store making that purchase, I might as well
return this shirt as well.

MS. WALGAMUTH: I'm just going to continue to play
this, and then I'll ask some more questions.

(Video played.)

MS. WALGAMUTH: Just go back.

So, Mr. Brinson, I'm going to pause this at about the
4-minute and 9-second mark of this Government's Exhibit 2030.

BY MS. WALGAMUTH:

Q. Is that you in the bottom left-hand corner of the screen?

A. Yes.

Q. And where are you headed at this point?

A. At this point, I'm like, you know what, I'm just going to go get this over with. So I'm headed back toward the Dolce & Gabbana store.

Q. So at this point, did you feel comfortable running that errand on Oak Street?

A. I -- I did. At first I was kind of, like, torn, but then after the car left and then he ran off, I'm, like, you know what, you know, let me go ahead and just make this purchase -- I mean, make this exchange. It shouldn't be that long.

Q. And so you're walking off the screen in this video. Did you just immediately walk up to Dolce & Gabbana?

A. Yeah, I walked directly to Dolce.

Q. And when you arrived at Dolce & Gabbana, did you immediately enter the store?

A. No. I was directed by a security guard to get in line. They had a line outside the store.

Q. Was there anyone else in line with you when you got in line at Dolce & Gabbana?

A. Yeah, it was two people in line. There was a young lady and a young man in line.

Q. Who did you get in line behind?

A. The young man.

Q. And when you got in line behind that young man, did you recognize him from anywhere?

A. No.

Q. Fair to say, you didn't know that person in front of you?

A. No, I didn't.

Q. Sitting here today, do you know who the man was that's sitting -- that was in front of you in line?

A. I do now, yes.

Q. Who is that man?

A. FBG Duck.

Q. I'm going to show you a video and publish to the jury what's been admitted as Government's Exhibit 2030, a different portion.

Mr. Brinson, I've got on my screen, and you should see on your screen, Government's Exhibit 2030 at the 67-minute-46-second timestamp.

Do you recognize the store that is captured in this video?

A. Yes.

Q. What store is that?

A. Dolce & Gabbana.

Q. Is Dolce & Gabbana in the upper center of the screen?

A. Yes.

MS. WALGAMUTH: I'm going to play this video for a few seconds. I want you to let me know if you recognize

Case: 1:21-cr-00618 Document #: 505 Filed: 01/31/24 Page 70 of 308 PageID #:12582
Brinson - direct by Walgamuth
8230

yourself in the video.

(Video played.)

A.  Yes.

Q.  Let me zoom in.

Did I just zoom in to the Dolce & Gabbana store?

A.  Yes.

Q.  And can you please circle yourself?

A.  (Witness complied.)

MS. WALGAMUTH:  Let the record reflect the witness has made a circle in the center of the screen around a man in dark clothing with an orange bag.

BY MS. WALGAMUTH:

Q.  Is this you approaching Dolce & Gabbana to get in line?

A.  Yes.

Q.  I'm just going to zoom in up here.

Do you see a timestamp on this video?

A.  Yes.

Q.  And what does the timestamp say?

A.  4:11 p.m.

Q.  4:11 p.m. on August 4th?

A.  Yes.

Q.  Now, when you were waiting in line at Dolce & Gabbana, did a shooting occur?

A.  Yes.

Q.  Can you describe what happened while you were waiting in

Brinson - direct by Walgamuth

8231

line and that shooting occurred?

A. Got to the line. I asked them had they been in line for a long time. Nobody responded, so I just got in line.

I think I was on, like -- may have been, like, scrolling social media or something like that, just waiting, and had my head down.

And I heard gunshots and I looked up, looked up quickly, and it was, like, these guys running toward me with -- like, shooting, and we took off running the opposite way. The people that were left in line, we took off running the opposite way.

Q. I think you said that you saw guys, plural, running towards you?

A. Yeah. I know it was more than one. I don't know how many though.

Q. So more than one shooter was running towards you?

A. I didn't even -- I couldn't even tell the guns or anything. I just saw people running towards us, so -- and I'm hearing gunshots, so I'm assuming, like, that's where the gunshots were coming from.

Q. Were you able to see the faces of the shooters?

A. No.

Q. Were you able to tell if they were wearing masks on their faces?

A. No, I can't recall.

Q. Is it fair to say that you wouldn't be able to recognize the shooters if you saw them today?

A. No.

Q. And you said you took off running, and I believe you testified that the other person -- or people in line took off running. Who else was in line with you when the shooting occurred?

A. It was just me and FBG Duck in line. The young lady had literally just went in the store.

Some people came out. You know, because of the COVID rules, you can only have so many people in the store. So they let some people out, and the young lady that was in front of him, she went in. So now it's just me and him in line.

Q. And as you hear the shooting, you start running, I think you said the person FBG Duck ran in the same direction as you; is that correct?

A. Yeah, because they were coming from one direction, so we had to run the opposite direction.

Q. As you were running, do you recall which way you tried to run?

A. Yeah, I tried to, like -- I didn't want to run straight, 'cause you're an obvious target, you're just running straight. So I tried to duck in between two cars, and I was ducking in between the two cars, like, there was somebody coming from around the opposite side of the car.

So, like, there were people in front of us and then people in back of us.

Q. So they were surrounding you when you were trying to cut between the cars?

A. Yeah.

Q. And you said "us." Was FBG Duck behind you?

A. Yeah. He may -- yeah, he was behind me, yeah.

Q. Were you shot?

A. I was.

Q. How many times were you shot?

A. Three times.

Q. Do you recall being shot as you were running or after you fell to the ground or both?

A. I felt the first shot as I was running. I felt that one. By the time I got on the ground, I didn't know how many times I had been shot.

Q. And where did you fall, if you recall?

A. Right off the sidewalk. And I didn't even make it to the street. Soon as I was ducking in between the cars off the sidewalk, I got hit again, and I just fell right there.

Q. Do you recall if the shooting continued after you fell to the ground?

A. Yes, it did.

Q. The shooting did continue after you fell?

A. Yeah.

MS. WALGAMUTH: I'm going to show you some video of Dolce & Gabbana at the time of the shooting.

Your Honor, I've got Government's Exhibit 2000, which has been admitted, up and I'm going to go to the timestamp 9:26.

(Video played.)

MS. WALGAMUTH: Now I paused it at about 9:27 on the timestamp.

BY MS. WALGAMUTH:

Q. Mr. Brinson, do you see Dolce & Gabbana in this view?

A. Yes.

Q. A bit closer than the other footage we just -- closer in zoom than the footage we just looked at?

A. Yes.

Q. And do you see yourself in line in this image?

A. I do.

Q. I'm going to zoom in right here.

Are you in line with the yellow bag?

A. Yes.

Q. And is there someone in line in front of you?

A. Yes, FBG Duck.

MS. WALGAMUTH: I'm going to play this video for about 20 seconds.

(Video played.)

MS. WALGAMUTH: I'm going to stop the video at the

9-minute-and-47-second timestamp.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, are you captured in this video being shot?

A.  Yes.

MS. WALGAMUTH:  Your Honor, may I briefly unpublish for the jury?

THE COURT:  Yes.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, I'd like to show you a photo from right after the shooting.  Okay?  Are you prepared for that?

A.  Yeah.

Q.  I've shown you what's been marked for identification as Government's Exhibit 403-1A.

Mr. Brinson, do you see that on your screen?  Does this show you after the shooting?

A.  (Nodding.)

Q.  Is this a fair and accurate picture -- I'm sorry, I didn't hear your answer.

A.  Yes.  Sorry.

Q.  Is this a fair and accurate photograph of you after the shooting?

A.  Yes.

MS. WALGAMUTH:  Your Honor, at this time, the government would like to admit Government's Exhibit 403-1A.

THE COURT:  It's admitted.

(Government's Exhibit No. 403-1A received in evidence.)

MS. WALGAMUTH:  May we publish to the jury?

THE COURT:  Yes.

BY MS. WALGAMUTH:

Q.  Mr. Brinson, now that the jury has seen this photo, can you please identify yourself in this photograph?

You can touch your screen if that's easier.

A.  Yeah.  I'm in all black.

Q.  And do you recognize the other person captured in this photo?

A.  This is FBG Duck.

Q.  Is FBG Duck in the blue outfit?

A.  Yes.

Q.  And is this approximately your position after you fell when you were shot?

A.  Yes.

Q.  In your recollection, is this approximately where FBG Duck was after the shooting?

A.  Yes.

Q.  Mr. Brinson, you said you were shot three times.

Can you describe to the jury what your injuries were from the shooting?

A.  I got shot in the chest, the back, and right leg.  I had damage to my pancreas, nerve damage, my left leg, and I had three surgeries.

Q.  Were you in the hospital for a number of days?

A.  Yes, a little over 30 days.

MS. WALGAMUTH:  No further questions for this witness, your Honor.

Thank you, Mr. Brinson.

(Counsel conferring.)

CROSS-EXAMINATION

BY MR. BOYLE:

Q.  Good morning, sir.

A.  Good morning.

Q.  How are you?

A.  Pretty good.

Q.  My name is Patrick Boyle.  I'm one of the attorneys for Mr. Ralph Turpin.

Okay.  I'm going to ask you questions about August 4th of 2020.  I believe it was your testimony that you decided to go downtown to Oak Street to do some shopping that day; isn't that correct?

A.  Correct.

Q.  And I believe it was your testimony that you got down there around 3:00 p.m.?

A.  Yeah, somewhere around there, yes.

Q.  Okay.  And I believe, you know, around Oak Street, there's kind of these loading zones where, if you throw your hazards on, you can park for like 15 or 30 minutes; isn't that true?

Case: 1:21-cr-00618 Document #: 505 Filed: 01/31/24 Page 78 of 308 PageID #:12590
Brinson - cross by Boyle
8238

A.   Yes.

Q.   And so you did that.  I believe you first parked by the Bloomingdale's?

A.   By Louis Vuitton.

Q.   Oh, okay.  By the Louis Vuitton shop?

A.   Yes.

Q.   Okay.  Then you started walking, I assume, correct?

A.   No, I moved my car to Dior, and I walked from Dior to Oak and Rush.

Q.   Okay.  But, I mean, again, I think you wanted to go to two shops that day, correct, at least?

A.   I was --

Q.   You had --

A.   I was leaving Louis Vuitton and then going to Dolce.

Q.   Right.

     You had the Louis Vuitton -- you went to Louis Vuitton that day and bought a bag or a purse --

A.   Yes.

Q.   -- isn't that correct?

A.   Yes.

Q.   Okay.  But you came down to Oak Street with the shirt you wanted to return to Dolce & Gabbana.

A.   Yes.

Q.   So that's why we see that very distinctive kind of yellow-orange Louis Vuitton bag, correct?

A.   Yes.

Q.   And you also have the dark Dolce & Gabbana bag.

A.   Yes.

        MR. BOYLE:  Okay.  So perhaps I could get the assistance of my co-counsel, if possible.

BY MR. BOYLE:

Q.   During your direct examination, you were shown a video that captured the events on Oak Street that day; isn't that true?

A.   Yes.

Q.   And I believe I'm referring to Government Exhibit 2016, which is already in evidence.

        MR. BOYLE:  May we publish, please?

        THE COURT:  Yes.

BY MR. BOYLE:

Q.   Now, Mr. Brinson, we're going to play this video again. And can you tell me if you see someone running essentially right under that green street sign?  I think you're going to see the gentleman in the white T-shirt running.  Okay?

A.   Okay.

Q.   And when you see him run down by Hermes, can you tell us, and we'll stop it there?

A.   Okay.

        MR. BOYLE:  Thank you.

     (Video played.)

BY MR. BOYLE:

Q.  Do you see him running?

A.  Yes.

        MR. BOYLE:  Pause it.

BY MR. BOYLE:

Q.  Okay.  And that's the gentleman you described during direct testimony as kind of running frantically down the street?

A.  Yes.

Q.  And you testified he was screaming?

A.  Yes.

Q.  Okay.  Do you remember what he was screaming?

A.  No, he was just screaming.

Q.  Okay.  Now, at this point, we don't see you on this camera, correct?

A.  Uh-huh.

Q.  Where are you, if you could kind of give us an idea? Where do you think you were where you saw this?

A.  At this point, I should be by the Prada store.

Q.  Okay.  And that's that really big shop right across the street from Hermes, correct?

A.  Yes.

Q.  Okay.  So you're essentially off camera to the left side, is that fair?

A.  Yes.

Brinson - cross by Boyle

8241

Q.   And you're directly across the street from Hermes staring at that gentleman in the white T-shirt?

A.   Yes.

Q.   Okay.  At that point, had you already seen the other individual with the gun?

A.   They had already taken off.

Q.   But -- correct.  But when you first saw the gentleman in the white T-shirt running, he was running from another guy with a gun, correct?

A.   No.  He was running back this way.  He was running down Oak Street initially.

Q.   Right.  Correct.

A.   The chase was down Oak Street.

Q.   Right.

A.   Like the guys took off, and he ran back that way.

Q.   Right.

     It was your testimony that it was another individual with a pistol, right, a handgun?

A.   Yes.

Q.   How close to the gentleman in the white T-shirt did this guy get to him?

A.   He got pretty close.  If he wanted to shoot, he could have.

Q.   Okay.  And that was -- you were almost surprised that you didn't hear a gunshot, right?  Is that fair?

A.  Yeah.

Q.  But did you hear anything, like a jamming, anything metallic?

A.  No.

Q.  Okay.

A.  Just the screaming.

Q.  Okay.  Just the screaming.

And, I mean, was he within a couple of feet of the guy in the white T-shirt?

A.  I don't know exactly how close he was, but he was pretty close.

Q.  Okay.  And he had his arm extended?

A.  Yeah.

Q.  Like this?

So it was basically shoulder, head length or head height?

A.  Yes.  He's pointing at him.

Q.  At the white T-shirt man?

A.  He's pointing at the guy in the white T-shirt.

Q.  Okay.  And then I believe it's your testimony that the individual with the gun jumped back into some vehicle?

A.  Yes.

Q.  Can you describe the vehicle?

A.  I don't remember what kind of vehicle it was.  It was just a dark-colored vehicle.

Q. Understood.

And he jumped in as a passenger, right? Do you remember that?

A. Yeah, it had to be the passenger side because it was my side of the street.

Q. Understood.

And then that car took off?

A. Yeah.

Q. But you weren't sure where it went, right?

A. No.

MR. BOYLE: Okay. Can we continue playing the video, please.

(Video played.)

BY MR. BOYLE:

Q. Now, do you see the man in the white T-shirt running. He tried to get into Hermes. Now he's running on Rush Street, is that fair?

A. Yeah.

Q. I think you described it as zigzagging?

A. Yeah.

Q. He's running in front of cars. He doesn't even seem to care about the oncoming traffic, is that fair?

A. Looks like it.

Q. Okay. We see him running back now, correct? He ran just in front of that bicyclist?

A.   Yeah.

Q.   Is he running back to the Hermes store?

A.   Yes.

Q.   He just tried to open the doors, but they're locked?

A.   Yes.

Q.   And now he's standing in front of Hermes?

A.   Uh-huh.

Q.   Now, can you let us know when you see yourself --

     (Video played.)

          MR. BOYLE:  Oh, can we pause it, please?

BY MR. BOYLE:

Q.   Sir, is that you with the Louis Vuitton bag or no?

A.   That is.

Q.   Okay.  That's you.

          So you're crossing over to that side of Oak Street
away from the Prada shop, correct?

A.   Correct.

Q.   I mean, were you concerned about the guy in the white
T-shirt?  Were you checking to see if he's okay?

A.   No.  I didn't know him.

Q.   Okay.  But you're -- so you're walking over to that side
of the street now, right?

A.   Uh-huh.

          MR. BOYLE:  Okay.  Can we keep playing?

          (Video played.)

BY MR. BOYLE:

Q.  The gentleman is still running.  He's standing right in the middle of the street?

A.  Uh-huh.

Q.  And he approaches you.

        MR. BOYLE:  Can we pause it?

BY MR. BOYLE:

Q.  Now, you testified about this on direct.  You had a brief conversation with this gentleman, correct?

A.  Correct.

Q.  I believe it was your testimony that you believe you were the first person he felt comfortable talking to, right?

A.  Correct.

Q.  And do you remember what he asked you?

A.  He asked me could he get in the car with me.

Q.  He wanted to get a ride?

A.  Yeah.

Q.  He wanted to get out of there?

A.  Yeah.

Q.  Okay.  And obviously there's no judgment here.  I think -- you didn't want to get involved, correct?

A.  Correct.

Q.  All right.  So you told him, I'm sorry, Bro, I don't have a car, or some words to that effect?

A.  I told him I didn't drive.

Q. Okay. You didn't have a car down there, or you didn't drive?

A. I told him I didn't drive.

Q. Okay. But he was -- I mean, he was begging, correct? Is that a fair word?

A. He asked a couple times.

Q. Okay. I believe you testified he was scared?

A. Yeah.

Q. Desperate?

A. I would think so, to ask a complete stranger to get in the car with him.

Q. Panicked?

A. Yeah.

Q. And he asked you several times, right?

A. Twice.

Q. I mean, at some point, did he even offer you some money just to get out of there?

A. No.

Q. Okay. I thought he had, but that's -- but he was asking you, could you please get him a ride away from Oak Street, correct?

A. Correct.

MR. BOYLE: Can we just play it for --

(Video played.)

BY MR. BOYLE:

Q.  Now, at this point we see you walking west across the street.  You're walking west on Oak.  You've now crossed the intersection at Rush, correct?

A.  Correct.

Q.  Now, you turn around.  I think on direct, you're kind of debating, you know, should I hang out here?  Should I take off?  But you think you decided, I'm just going to run these errands and get out of here, correct?

A.  Correct.

Q.  Okay.  So you've now crossed over to the other side.

(Counsel conferring.)

MR. BOYLE:  Can we just please go back, I think it's to the 4:56.  We can just play it.

(Video played.)

MR. BOYLE:  Thank you.

BY MR. BOYLE:

Q.  Now, do you still see the white T-shirt guy -- you're probably looking at yourself, but we kind of see the white T-shirt guy still moving around there under that green sign?

A.  Yeah.

Q.  Okay.  And then you're looking right back, basically directly at him; isn't that true?

A.  Looks like it.

Q.  And did you see him, like, get into some store, get some kind of shelter?

A.  I don't recall.

Q.  Okay.  And then if we keep playing it, you then walk back to the other side of Oak Street, and then you begin your walk to Dolce & Gabbana, is that fair?

A.  Yes.

MR. BOYLE:  Okay.  Thank you, sir.

I think we can unpublish now.  Thank you.

BY MR. BOYLE:

Q.  And I believe you said that at some point, you told the man in the white T-shirt that -- he asked you, where did those guys go?  Meaning the guy with the gun.  Was that your understanding?

A.  Uh-huh.

Q.  And you told him they took off, correct?

A.  Like they gone.

Q.  But he asked, well, where did they go?

A.  I said I don't know.

Q.  And you said you don't know.

Okay.  And they were in a car, right?

A.  They were in a car.

Q.  Okay.  But at that point, you at least were hoping that things were back to normal?

A.  Yeah.

Q.  And you thought that, you know, Oak Street in the middle of the day was a pretty safe place to be, despite what just

happened?

A.   Yeah.

Q.   Okay.  Because there's always a large police presence by those shops and restaurants?

A.   Normally.

Q.   Right.  And a lot of these shops, especially during the pandemic, had armed security guards working the doors, right?

A.   A lot of them did.

        MR. BOYLE:  Okay.  Could I have one moment, sir?

        THE WITNESS:  Sure.

        MR. BOYLE:  Thanks.

    (Counsel conferring.)

BY MR. BOYLE:

Q.   So, again, when you saw the man with the gun running behind the man in the white T-shirt, do you remember -- I think I asked you how close did he get?

A.   I'm not -- he was pretty close.  I couldn't give you an exact measurement of how close he was.

Q.   Okay.  But he had the gun aimed directly at the white T-shirt man at this level?

A.   He had it aimed at him.  I don't know what level it was, but he was aiming at him.  He had the gun out and extended, aiming at him.

        MR. BOYLE:  Understood.  Thank you, sir.

        THE WITNESS:  No problem.

Case - direct by Julien

8250

THE COURT: Further cross?

MR. KLING: Mr. Offerd has none, Judge.

MS. GIACCHETTI: No, Judge.

MR. BARNETT: No.

MS. DOMPH: No.

THE COURT: Okay. Any redirect?

MS. WALGAMUTH: No, your Honor. Thank you.

THE COURT: Okay. Thank you very much, sir. You may be excused.

(Witness excused.)

THE WITNESS: Thank you.

(Witness exits courtroom.)

THE COURT: The government may call its next witness.

MR. JULIEN: Thank you, Judge.

The government recalls FBI Special Agent Christine Case.

(Witness sworn.)

CHRISTINE CASE, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION (Recalled)

BY MR. JULIEN:

Q. Good morning, Special Agent Case.

A. Good morning.

Q. Did you testify before us on November 13th and November 14th?

A. Yes.

Q. Have you been here in the courtroom every day before then and since then?

A. Yes.

Q. I want to ask you some questions right now about the Camtasia video that we talked about. It's Government Exhibit 2000.

Generally speaking, I want to ask you about it at a high level. Approximately how many times would you say that you've watched the Camtasia video?

A. Dozens.

Q. How many times have you been watching it and have seen something in it that you didn't notice before?

MR. GREENBERG: Objection, Judge.

MS. DOMPH: Objection. Relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. Many times.

BY MR. JULIEN:

Q. Did you notice everything there was in that video that was relevant to your investigation on the first time you watched it?

A. No.

MS. DOMPH: Objection, Judge.

MR. SPIELFOGEL: Can we have a sidebar on this, please?

THE COURT:  Okay.

(Proceedings heard at sidebar:)

MR. SPIELFOGEL:  Your Honor, what is the relevance of how many times she watched it and that she saw different things in it when she watched it?  What is the relevance of that?

These were shown to witnesses in this case.  They've testified as to what they saw.  Each time they viewed it, sometimes they didn't see anything, sometimes they saw something, but what does that have to do with what this agent saw or didn't see or how many times she viewed this video?  It's totally irrelevant.

MS. DOMPH:  It's improper bolstering.  They're taking an FBI agent that says she watched it many times, and she can see things now after seeing it many times.

What she does is irrelevant, and this is improper bolstering, and we object.

MR. BARNETT:  And clearly we went through this the first time, and the reason was that it was a summary to explain to the jury -- to explain the Camtasia video so they could get an idea of what was going on.  And we strongly objected to identifications through backdoor testifying by an agent who has way more credibility than a normal person.  Now we're doing it again.

Now the jury has seen everything.  Now they're aware,

the identifications have been testified to. This is clearly bolstering, and it's totally irrelevant. She's not an identification witness, and the government is using her as such.

MR. KLING: And the jury will see the video, Judge. It's up to what the jury sees in the video, not what she sees in the video.

MR. BARNETT: Clearly.

MR. JULIEN: May I respond?

THE COURT: Yes.

MR. JULIEN: So that was the last question I was going to ask on that topic anyway. As we discussed at length, it's a complicated video in the sense that it's a summary and lots of things were happening.

And I asked these questions because what I am going to have her do, similar to what we did with the Camtasia video, is we're going to go through what is Government Exhibit 2030, the East Oak Street summary video. Similarly, there's a lot going on. No one has gone through it. It look a lot of time to go through the Camtasia video. I'm going to try to power through 2030.

But I want the jury to understand here's why I'm we're doing this. It's why I'm going frame by frame, and I'm asking you to narrate what it is you're seeing because there's a lot happening in 2030 now, which I'm going to get to at the

Case - direct by Julien

8254

end of her direct examination, but so they understand, and we can talk about this in closing, there are lots of moving pieces and here's why we did this the way we did it.

THE COURT: Okay. And so I think as an explanation for that, where the government is going with it, it is -- it's fine. And so I'm going to overrule the objection.

I wouldn't dwell on this topic, but if that's it, then I think it's fine.

(Proceedings heard in open court:)

MR. JULIEN: The objection --

THE COURT: The objection is overruled.

BY MR. JULIEN:

Q. Special Agent Case, I do want to ask you a couple of questions -- more questions about the Camtasia video, but a little bit -- in a little bit of a different area.

So I'm going to show you what's admitted in evidence as Government Exhibit 2000.

MR. JULIEN: And may we publish, your Honor?

THE COURT: Yes.

MR. JULIEN: Government Exhibits 2000-C, D and E.

BY MR. JULIEN:

Q. During your direct examination back on the 13th and the 14th, do you remember me asking you questions about those three exhibits?

A. Yes.

Q.   And do you remember saying that Government Exhibits 2000-D -- C, D and E, what was depicted in them was relevant to your investigation?

A.   Yes.

Q.   All right.  So I'm going to ask you now about what's admitted in evidence as Government Exhibits -- so that's D and that's E.  I want to ask you about Government Exhibits 528-1, 528-2, and 528-3, which are also admitted in evidence.

So that's Government Exhibit 528-1, Government Exhibit 528-2, and Government Exhibit 528-3.

Special Agent Case, do you know if these pictures were taken in approximately October of 2021?

A.   Correct.

Q.   And these pictures being Government Exhibits 528-1, 2 and 3?

A.   Correct.

Q.   In what way was Government Exhibit 2000-C, 2000-D and 2000-E relevant to your investigation?

A.   The pattern marking on the hoodie.

Q.   In what way was the pattern marking on the hoodie relevant to your investigation?

A.   They are --

Q.   I'm showing 2000-D right now.

A.   You can see there's white stripes on the right side of that hoodie in that image, which appears similar with the

Case - direct by Julien

8256

stripes in the other pictures we've seen.  You can also see the stripes here again on the sleeve.

Q.  So here again, we're talking about 2000-E?

A.  Correct.

Q.  Was there anything relevant to your investigation about 2000-C?

A.  Yes.  There appears to be sort of an X pattern on the back of that hoodie.

Q.  So now I'm showing Government Exhibit 528-2.

Were those stripes on the sleeves that you were referring to?

A.  Yes.

Q.  And do you see -- I'm flipping to 528-3 -- anything on the back of the hoodie?

A.  Yes.

Q.  Is that the X that you were referring to?

A.  It appears so, yes.

MR. JULIEN:  Special Agent Case, at this time, I want to read a stipulation to the jury.

MR. JULIEN:  May we publish, your Honor?

THE COURT:  Yes.

MR. JULIEN:  This is a stipulation, Stipulation No. 13.

It says:  On October 13, 2021, Marcus Smart was in possession of a black hooded sweatshirt that reads, "Get Back

Gang Not From 63rd."

Law enforcement recovered the hoodie from Marcus Smart on that day. This hooded sweatshirt has been marked as Government Exhibit 103. Law enforcement has been in possession of Government Exhibit 103 since October 13, 2021. A proper chain of custody has been maintained as to Government Exhibit 103.

And this stipulation is signed by all of the parties.

May I approach, your Honor?

THE COURT: Yes.

(Exhibit tendered to witness.)

BY MR. JULIEN:

Q. Special Agent Case, I've just handed you what's marked as Government Exhibit 103. What is Government Exhibit 103?

A. The Get Back Gang hoodie.

Q. Is it in a brown paper bag as I've just handed it to you?

A. Yes.

Q. Would you mind taking out Government Exhibit 103 and whatever other contents are in that bag.

A. (Witness complied.)

Q. And are you showing Government Exhibit 103, the front of the hoodie, to the jury in the courtroom right now?

A. Yes.

Q. What's depicted -- and if you could get back closer to the microphone. What is depicted on the front of Government

Exhibit 103 as you're showing it?

A. Appears to be a street sign for 63rd Street with a, like, no 63rd symbol in front of it.

Q. Is there anything written on either the back or the sleeves?

A. Yes.

Q. Let's talk about the sleeves.

What, if anything, is written on the sleeves?

A. On the sleeve, it says, "GBG Get Back Gang."

Q. Is there anything written on the back of Government Exhibit 103?

A. Yes.

Q. And what's written on the back?

A. "King Von, Levon James."

Q. Is there anything else in the bag, Government Exhibit 103, as I've handed it to you?

A. Yes.

Q. What's in the bag?

A. This appears to be a pouch from Icebox Jewelry.

Q. Thank you, Special Agent Case. I'll take that stuff back from you.

I want to switch topics and ask you about Duck and Cashae Williams going downtown on August 4th, 2020.

Has there been any indication in your investigation that Duck and Cashae traveled downtown on August 4th, 2020,

with anyone else?

A. No.

Q. I want to change gears and ask you some questions about a historical cell site for Mr. Ralph Turpin.

Were you present in the courtroom when Mr. Adams asked Special Agent Bauer whether he analyzed any historical cell site records for Mr. Turpin?

A. Yes.

Q. Did FBI pursue a historical cell site warrant for Turpin's location on August 4, 2020?

A. No.

Q. Why not?

A. His identity wasn't in question.

Q. Was Mr. Turpin's location on August 4, 2020, in between let's say 4:00 and 4:30, was that something that was in question by the FBI?

A. No.

Q. Similarly --

MR. JULIEN: May we unpublish, your Honor?

THE COURT: Yes.

MR. JULIEN: All right. Your Honor, may we republish?

THE COURT: Yes.

BY MR. JULIEN:

Q. Special Agent Case, I'm showing you what's admitted in

evidence as Government Exhibit 800-2. Have you seen Government Exhibit 800-2 before?

A. Yes.

Q. What is it?

A. These are phone records for the phone utilized by Ralph Turpin.

Q. So on page 275 of Government Exhibit 800-2 -- and I'm directing your attention to a line that's item 4804.

And were you present in the courtroom when Special Agent Doyle was testifying?

A. Yes.

Q. Who do you understand the originating number for this call that's highlighted here in line 4804, who the user of this phone to be?

A. D Thang, Dontay Banks.

Q. And the recipient?

A. Ralph Turpin.

Q. I'm going to ask you about the time conversion here.

So we have 21:18:36 in what's a connection date and time column, and it says UTC.

Do you understand what time 21:18:36 would have been in daylight time in the Central time zone in August of 2020?

A. Minus five hours, so 2100 hours minus 5.

Q. Would that have been 4:18 p.m. and 36 seconds?

A. Correct.

Case - direct by Julien

8261

Q.  I'm going to ask you some more questions about this -- this line that we're looking at, 48-4.

Do you understand what the ET is a reference to?

A.  Elapsed time.

Q.  And what the 2 minutes and 18 seconds, what that is a reference to?

A.  That the phone call elapsed for 2 minutes and 18 seconds.

Q.  Coming over to the right of this entry, do you have some understanding of what the MT is a reference to over here?

A.  Mobile terminating, I believe.

Q.  And what does that mean?

A.  That the call was incoming.

Q.  An incoming call from the user D Thang's phone to Mr. Turpin's phone?

A.  Correct.

Q.  I'm going to ask you about one more page in these records.

So I've gone down to page 799.  Does this appear to be a page depicting data usage from August 4th, 2020?

A.  Yes.

Q.  I want to ask you about lines 11928 here, and then 11930 here.

Starting with 11928, does this appear to be data usage at -- based on that UTC time conversion that you just gave to us, data usage at about 4:12 p.m. on August 4th, 2020?

A.  Yes.

Q. Does it appear that data was being used for about 6 minutes and 4 seconds?

A. Correct.

Q. And coming down to 11930, based on that time conversion that you just gave us, minus 5, does this appear to be data usage at about 4:21 p.m. and 15 seconds?

A. Yes.

Q. Data usage for about 9 minutes and 18 seconds?

A. Yes.

MR. JULIEN: May we unpublish briefly, your Honor?

THE COURT: Yes.

BY MR. JULIEN:

Q. Special Agent Case, I want to switch topics and ask you about a couple of cars. Kenneth Roberson's car, the car that was registered to Kenneth Roberson on August 4, 2020, and the Ford Fusion that was registered to Tacarlos Offerd on August 4th, 2020.

Are you aware of fingerprint and DNA swabs that were taken from both of those vehicles -- well, fingerprints and DNA swabs from the Chrysler and a DNA swab from the Fusion?

A. Yes.

Q. Do you know, for example, if an Arizona Tea bottle was swabbed for either DNA or fingerprints that was in the Chrysler?

A. It was swabbed, yes.

Q.  Was it swabbed for both DNA or fingerprints or for DNA?

A.  I believe just swabbed for DNA.

Q.  Do you know if that swab was ever submitted to the laboratory?

A.  It was not, to my knowledge, no.

Q.  Do you know if there was some fingerprints that were taken from inside of the Chrysler after it was processed by CPD?

A.  Correct.

Q.  Do you know where those fingerprints were taken from?

A.  Yes.  One fingerprint was lifted from the navigation screen, and the other fingerprint was --

MR. KLING:  Judge, may we have a sidebar?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MR. KLING:  She is not the person who took the fingerprints.  All of this testimony is hearsay.

MR. JULIEN:  So this was inquired into on cross-examination, I think by Mr. Greenberg, of the evidence technician, Mr. Warzocha.  And all I'm asking her is in summary fashion whether some things were submitted to a laboratory.  As the case agent, she would know that.  Or if some results were received from the laboratory.  Again, as the case agent, she would know that.  She's not -- certainly not an expert.

What I expect for her to say just in very summary

fashion, there were no suitable fingerprints that were able to be analyzed, and then we'd move on to a different topic.

The Ford Fusion, it's kind of a similar thing. They swabbed or dusted a wrapper. No prints on the wrapper. There was suspected blood stain in the back seat, and they swabbed and did send that to the lab, and it turns out it was not blood, and there was one contributor to whatever it was, but you can't tell what it is. And then I'm moving on to a different topic.

MR. KLING: Judge, you can call it summary, you can call it whatever you want. She is not the person who did it. Any of the information she has is based on hearsay testimony of other individuals. Whether they crossed before or not is also irrelevant.

MR. BARNETT: Also, I'd like to add on to that that what's the purpose of this? There's no -- what is the government trying to -- what's the relevance of tests that did not come back positive?

THE COURT: So I think the relevance is that it came up before on -- in the cross of the -- one of the witnesses, and I think it was the fingerprint evidence technician. You know, the Arizona Tea bottle, what happened with that, what happened with fingerprints. And so I definitely see the relevance and --

MR. BARNETT: However -- I'm sorry, go ahead. Sorry,

Judge.

THE COURT: And it is not hearsay because there's no statement being recounted. And the real objection is personal knowledge or foundation, and as the case agent, she has enough personal knowledge of what was submitted to the lab. And, you know, why not to testify to this issue.

So I am going to overruling the objections.

MR. BARNETT: Your Honor, but the Fusion, what's the -- where was the cross on the Fusion? Nobody ever questioned that.

MR. KLING: And she has no personal knowledge, Judge, other than what other people told her. That's hearsay.

THE COURT: It is -- she can have reviewed records herself as part of her job as the case agent.

I think if it gets into a lot of details, then maybe that starts to present an issue. But the level that she's spoken about so far is fully within her personal knowledge as a case agent.

And I -- I just think once the whole topic of fingerprints and how come this was fingerprinted or not fingerprinted, or taken to the lab or not sent to the lab comes up, then it's fair to get into all of this. And I'm not going to draw a line about which fingerprints were taken and which weren't.

And so this is fair, and I'm overruling the

objections.

MR. BARNETT:  Thank you.

MS. DOMPH:  Judge, can I just put one thing on the record?

You cannot use a case agent to clean up your case. So under the guise of somebody cross-examined about this, we're going to put this agent on and have her contradict everything.  No, they have to put on someone that was involved in the chain of custody of the fingerprints.  No, they can't ask her a question which got by me and -- did your investigation reveal that no one else was in the car with Duck?  Investigation reveal?  That's hearsay.  She wasn't present.

They're putting this agent on to clean up their case. She doesn't have personal knowledge of the things she's testifying to.  She just testified to phone records and she dissected them and she interpreted them.  Every other case I'm in, you have to have someone from T-Mobile, from Sprint, from Verizon.  She can't interpret those.

And this is what they're doing, Judge.  And I just want to make a record.  If I have to keep on objecting, I will.

MR. BARNETT:  I agree, your Honor, so I will object as well when necessary.

MR. KLING:  If she made the decisions to gather the

evidence and she is the one who made those determinations and she's the one who delivered it, that's fine, but she's testifying to what other people told her years before she got involved in the case. She didn't even get involved until 2023.

MS. GIACCHETTI: Judge, I have read the entire case file, and I have personal knowledge of none of it. She is no different than that. She may personally have done things. When she went and took photographs, she has personal knowledge. But the fact -- she can't say whether there were suitable fingerprints. That's a decision by a fingerprint expert.

She -- it's not personal knowledge just because she reads it, just because she's the case agent, any more than I have personal knowledge of what happened because I read it.

MR. JULIEN: Your Honor, respectfully, what my colleagues are saying is not correct. Investigative steps taken and not taken has been a topic that has been inquired to on cross-examination by multiple witnesses. Every single topic that I've addressed so far with Special Agent Case has been something that's been inquired to on cross-examination, including what we're discussing right now, the DNA. But prior to that, Mr. Turpin's phone records and why historical cell site warrant wasn't written, so on and so on.

MR. KLING: Judge, if she took the investigative

steps, that's fine, but she didn't. She is getting all of her information from other people either first or second or third hand. She has no idea, other than what other people told her.

MR. BARNETT: And just to make a record, the government just said that there was cross-examination as to certain aspects of this testimony. There was absolutely no cross-examination regarding that Fusion. I know, because I didn't do it. And so that is not an excuse to open up the door to the Fusion.

The Chrysler and the Fusion are two different -- two different automobiles. There is nothing to rebut, nothing that I opened up on cross, because I didn't cross.

So where is the evidence? Why is it necessary to go into the evidence regarding what was in the Fusion and what they failed to find? I think that is completely -- one, for the reasons Mr. Kling and Ms. Giacchetti are talking about, and, two, it is totally irrelevant and prejudicial. There's no reason for it. None whatsoever. It's -- it never came up.

THE COURT: Okay. So everyone has preserved the objections. And I -- just yesterday there were cases that we were looking at that say that law enforcement can explain the course of the investigation, and that is not hearsay.

And, yes, there becomes a -- there is a point where when it gets into a lot of subjective impressions, then it can cross that line, but we have not yet crossed that line. And

all these topics are appropriate because they came up, even --
I'm not drawing the line so finely as the Fusion versus, you
know, what specifically was fingerprinted. I think once the
topic of fingerprinting has come up, this is fair.

So the objections are preserved and overruled.

MR. BARNETT: Thank you, your Honor.

(Proceedings heard in open court:)

THE COURT: Okay. Overruled.

You may proceed.

BY MR. JULIEN:

Q. Special Agent Case, we were talking about two fingerprints
lifted from the navigation in the Chrysler and the rear driver
interior vent window. I don't remember if you answered the
question or not, but could you tell us what happened with
those prints or what -- what happened?

A. The two prints recovered from the Chrysler 300 were not
suitable for comparison.

MR. GREENBERG: Judge, now I'm going to object. Can
we --

MR. KLING: May we have a sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MR. GREENBERG: Judge, now she's telling you what a
fingerprint technician's report said without the fingerprint
technician testifying. That should be stricken. That's

completely improper.

MR. KLING: That's a violation of *Crawford v. Washington*, Judge. We have the right of confrontation.

MR. GREENBERG: Yeah, that's like why doesn't she tell us what the autopsy said and the drug test said and all that, too. I mean, that's -- to even ask that is -- and make us object is completely unethical.

MR. JULIEN: It's not, your Honor. And the whole point is there was no analysis. That's -- it wasn't done because there wasn't anything suitable to analyze. That's the point.

MR. GREENBERG: She's not the one who makes that decision. If they'd have called the fingerprint person and they wanted to do it, we could have questioned them about why they reached that conclusion. This is beyond wrong. I can't -- I don't even think you're going to find a case, Judge, I know, that says this, because it's like -- I almost fell out of my chair when I just heard this one.

MS. GIACCHETTI: Judge, as I said before the question was asked about suitability, suitability is determined by the fingerprint expert, not by the agent. She didn't look at it and go, oh, it was not suitable. She had to send it out to an expert, and now we have, in addition to everything else, a *Crawford* problem.

THE COURT: So, I mean, the government can bring the

fingerprint person in rebuttal, so, you know, you can consider that. I --

MR. KLING: Judge, most respectfully, rebuttal to what?

MS. DOMPH: Yeah.

MR. KLING: We're not putting on evidence with respect to fingerprints.

THE COURT: It came in during cross of the fingerprint person earlier.

MR. GREENBERG: But that doesn't mean they get to call him -- they can call them in their case-in-chief, they didn't. Now they have an agent who's saying what they read in a report.

MR. KLING: And Mr. Offerd's confrontation rights are clearly --

MR. GREENBERG: There's two U.S. Supreme Court cases on this issue, Judge, where they can't do this.

MR. KLING: There's a bunch. There's *Melendez-Diaz v. Massachusetts.* There's *Bullcoming v. New Mexico.* I can go through the list if you want. It's clearly a violation of *Crawford v. Washington.*

MR. GREENBERG: First-year law student, they can't do it.

MR. JULIEN: So we don't agree with that, but here's where I'm going with this, Judge -- and maybe I'll just

Case - direct by Julien

8272

withdraw the question.

They didn't really care about fingerprints and DNA from either car. The only reason we're talking about it right now is because it was inquired upon on cross-examination.

What I intend to ask next is: Was the FBI interested in who was in both cars at a specific period of time on a specific date, and do fingerprints and DNA necessarily give you that information? And the answer is going to be no, which is why we're talking about the video.

MR. GREENBERG: So we would like to strike the last answer, Judge, and have the jury told to disregard it.

MR. KLING: And who is the FBI, Judge?

MS. GIACCHETTI: And, Judge --

MR. KLING: Whether she was --

THE COURT: Actually, can everyone stop talking at the same time? This is giving me -- bringing me back to where we were the first time the agent was, and we need to stop the long sidebars and not have people talk at the same time.

So going forward, I'm going to -- I'm going to make a ruling without going on the sidebar unless someone really specifically requests it and I think it's urgent.

MS. GIACCHETTI: Judge, I'm objecting to the next question. What the FBI thought was important to do or not do is incredibly irrelevant. Well, we didn't need DNA or fingerprints because they're not that good evidence. She

absolutely can't -- now she's bolstering her case, in addition. What -- her opinion about what the FBI thinks is important is irrelevant and should not be elicited here.

MR. KLING: And who is the FBI? Did her supervisor tell her that? Somebody else's supervisor? We don't even know where she's getting that information.

THE COURT: Okay. I think she can testify to it because this all came up on cross of the fingerprint expert. The government is allowed to somehow respond to that issue.

Let's -- let me just go back to the last question to assess the request to strike.

So that's where she said what happened with the prints from -- the two fingerprints from the Chrysler, and she said the two prints recovered from the Chrysler 300 were not suitable comparison -- were not suitable for comparison.

And there's an objection that the defense wants that stricken because that's something that you want to be able to cross-examine the fingerprint technician on or someone from the lab. And so that's fine.

I'll strike that last question and answer and tell the jury to disregard it, and then we'll proceed.

(Proceedings heard in open court:)

THE COURT: Okay. The last -- so sustained.

The last question and answer are stricken, and the jury should disregard that.

Case - direct by Julien

8274

BY MR. JULIEN:

Q. Special Agent Case, was the FBI interested who was in the Chrysler 300 and the Ford Fusion on a specific date during a specific period of time?

MS. DOMPH: Objection, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes.

BY MR. JULIEN:

Q. Do fingerprints and DNA evidence necessarily inform law enforcement of that, who was in a vehicle on a specific date during a limited period of time?

A. It doesn't give you --

MS. DOMPH: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. It doesn't give you a time. It gives you -- if you find prints in a car, it tells you somebody was in this car, touched something in that car. It doesn't give you a time.

BY MR. JULIEN:

Q. I want to switch topics a little bit, Special Agent Case.

Did you and Special Agent Dixon drive separately from the Gold Coast to Midway Autohaus on December 8th of this year?

A. Yes.

Q.  Where did you leave from in the Gold Coast?

A.  68 East Oak Street.

MR. KLING:  Judge, I would request a sidebar.  I'm sorry, but it is critical.

THE COURT:  Okay.

(Proceedings heard at sidebar:)

MR. KLING:  Judge, I'm going to move *in limine* to bar her from testifying to any test rides that she took.  In order for experiments to be admissible, they have to be under substantially the same conditions.

The incident on August 4, 2020 was during COVID. Traffic conditions were completely different.  She has no idea whether traffic lights were working.  She has no idea what traffic was on there.  We don't know whether there were fires which interfered.  The conditions are completely different. She should not be allowed to testify to an experiment which doesn't approximate the conditions on August 4th.

THE COURT:  Okay.  All those issues are for cross. So the objection's overruled.

(Proceedings heard in open court:)

THE COURT:  Overruled.

You may proceed.

BY MR. JULIEN:

Q.  Special Agent Case, what time did you both leave?

A.  4:26 p.m.

Q. How long did it take you to get there?

A. 59 minutes.

Q. Which way did you go?

A. Took 55 south to south on Harlem.

Q. How long did it take Special Agent Dixon to get there?

A. I believe it was approximately one hour and 13 minutes.

Q. Do you know which way he went?

MR. KLING: Objection, Judge, hearsay.

THE COURT: Overruled.

BY THE WITNESS:

A. Essentially took 290 west, then took Harlem all the way down south.

BY MR. JULIEN:

Q. Special Agent Case, I want to again change gears. I want to and ask you about testimony of Tiffany Huff, the second day of her testimony on December 13th, 2023.

Were you present in the courtroom when that testimony occurred?

A. Yes.

Q. Did you hear Ms. Huff say, among other things: That's because I got pictures in my phone?

A. Yes.

Q. Did you hear Ms. Huff say: It's a screenshot in my phone?

A. Yes.

Q. Did you hear Ms. Huff say: Because I can go back in my

pictures?

A.   Yes.

Q.   Did you serve Ms. Huff with a subpoena on the same day?

A.   Yes.

Q.   Were among the things requested in that phone pictures from August 4th, 2020?

A.   Correct.

Q.   Was the return date yesterday, December 8, 2023?

A.   Yes.

Q.   Were any pictures produced in response to that subpoena?

A.   No.

Q.   Special Agent Case, I want to change gears again, and I want to ask you about some recorded jail calls.

So right now, I want to talk about Government Exhibit 3001.  And at a high level, do you know whether Government Exhibit 3001 -- have you listened to it before?

A.   Yes.

Q.   Do you know if it's a jail call from Mr. Roberson on February 22nd, 2021, starting at about 8:54 p.m.?

A.   Don't recall the time exactly, but, yes, it sounds right.

Q.   Were some transcripts prepared transcribing things that occurred on that call?  So 3001-1 TR, 3001-2 TR, 3001-3 TR, 3001-4 TR, 3001-5 TR and 3001-6 TR?

A.   Yes.

Q.   Did you listen to the call and compare what was

transcribed in those draft transcripts?

A. Yes.

Q. Did you have an opportunity to make changes to the draft transcripts?

A. Yes.

Q. Were you the one who ultimately approved the transcripts of what is on the clips that we just referred to? So 3001-1, through 6.

A. Yes.

MR. JULIEN: Your Honor, I know that Government Exhibit 3001 in its entirety is in evidence. At this time I'm going to move to admit what are clips, so a smaller subset, 3001-1, 3001-2, 3001-3, 3001-4, 3001-5, and 3001-6, and publish those clips with the corresponding transcripts.

MR. GREENBERG: Judge, while we have no objection to that, you actually ruled earlier today that the entirety of 3001 is not in evidence. But we have no objection to the clips.

MS. GIACCHETTI: Actually, we object to the clips and to the transcripts, Judge.

MR. GREENBERG: Well, yeah, we have the objections we raised on the clips earlier, but we understand your ruling.

MR. JULIEN: That's fine. And just as a point of clarification, Government Exhibit 3001 in its entirety and 3002 are, in fact, in evidence.

MR. GREENBERG:  We can sort it out at lunch time, Judge.

THE COURT:  Okay.  So I will admit the clips.  So that would be 3001-1 through 6.  And, I'm sorry, did you just move in the --

(Government's Exhibits No. 3001-1, No. 3001-2, No. 3001-3, No. 3001-4, No. 3001-5, and No. 3001-6 received in evidence.)

MR. JULIEN:  I'm going to publish the transcripts. I'm not moving the transcripts into evidence.

THE COURT:  Okay.

MR. JULIEN:  And, your Honor, at this time, just to save time, I'm going to do the same thing with 3002-1 through 4.  I'm going to move those clips in evidence and seek permission to publish the corresponding transcript.

MR. GREENBERG:  And we would have the same objections we discussed earlier.

MS. GIACCHETTI:  Same objection.

THE COURT:  Okay.  And so 3002-1 through 4 are admitted over the objection.  And -- okay, so you may proceed at this point.

(Government's Exhibit No. 3002-1, No. 3002-2, No. 3002-3, and No. 3002-4 were received in evidence.)

MS. GIACCHETTI:  Judge, can I have a sidebar very quickly?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MS. GIACCHETTI:  Judge, I think it's important that the jury be instructed that the transcripts are only for their aid, and that the evidence is the recording itself.  There's, I think, a standard transcript instruction that basically tells them that, and that it's what they hear that's the evidence, not is what is on the transcript.

THE COURT:  Okay.  Any issue with that from the government?

MR. JULIEN:  I don't want to spend a lot of time on it, your Honor.  I think the instruction is fine.  I think the jury gets it at the end of the case.

I'll just note that I don't think that instruction has been given with the transcript for 2031, so we'd be doing this a little bit differently.

At the end of the day when you instruct them, they're going to get that instruction.  I just don't think it's appropriate to treat those two exhibits and transcripts differently, even though ultimately I agree with the principle because it's in the instruction.

THE COURT:  Okay.  I don't recall it being requested before, and so that may be why we didn't give it before.  But, I mean, it is a standard pattern instruction, so I -- it's 3.14.

So I think it's fair. It will take just a minute. I'll just say: You will hear a recorded conversation. This is proper evidence that you should consider together with and in the same way you consider the other evidence.

You are also seeing a transcript of the conversation to help you follow the recording as you listen to it. The recording is the evidence of what was said and who said it. The transcripts are not evidence. If you notice any differences between what you heard in a conversation and what you read in the transcripts, your understanding of the recording is what mattered.

In other words, you must rely on what you heard, not what you read. And if you could not hear or understand certain parts of the recording, you must ignore the transcripts as far as those parts are concerned.

I think that's -- I'll just tell them that.

And then as far as just the long clip -- or not clip, the long entirety of the call 3001, 3002, I just haven't said anything on that point. I know there's an objection to it. I just -- because we still need to figure out what exactly is going to get clipped, I don't want to get into that right now, so I'm just not --

MR. GREENBERG: Judge, after he finishes with this witness, I think I'm going first on the cross. It's going to be really long. So I suggest we take a lunch break after the

direct, and then we don't need another sidebar.

THE COURT: Okay.

MR. JULIEN: I'm not going to finish the direct before lunch break, so that's fine. He can have his time in the afternoon.

THE COURT: And also we need to follow up on the outstanding issue about what parts of the recordings can be played, so that makes sense.

(Proceedings heard in open court:)

COURT SECURITY OFFICER: Your Honor, one of the jurors needs a break.

THE COURT: Okay. So let's take -- let's go ahead and take a break now.

I also think that, given the time, we should probably just take the lunch break now. So let's come back in an hour.

Actually, let's say 1:00 -- yeah, let's come back in an hour, 1:05.

Thank you, everyone.

Please don't discuss, research or read news about the case. Thank you.

(Jury exits courtroom.)

THE COURT: Okay. Reminder to the witness, you're on the stand. Please don't discuss your testimony with anyone.

THE WITNESS: Yes, your Honor.

THE COURT: Why don't we just talk quickly about the

8283

issue of what can be played on cross. And we can come back a little bit early to address this, if necessary.

MR. GREENBERG: On cross or on direct?

THE COURT: On cross.

So I earlier ruled that the call clips can be played on direct, and that was for the reasons I gave before, and so I don't want to repeat all of that.

But then there was this outstanding issue that we left where, Mr. Greenberg, you were asking to play other portions of the calls that relate to Mr. Roberson using the money for --

MR. GREENBERG: I wasn't going to play those, Judge. I was just going to ask the agent, is there discussion on the call about this.

THE COURT: Okay.

MR. GREENBERG: I was intentionally not going to play them, because I think that if I played them, it would be -- you need to call beep to get -- so I'm assuming that, you know, that the government wouldn't object that the call itself is the best evidence or whatever because there's issues with playing the actual call.

So I just was going to ask her generally, was there a discussion on the call about using this money to hire a lawyer and to post bail.

THE COURT: Okay. So then --

8284

MR. GREENBERG: I'm not going to play it.

THE COURT: Okay.

MR. GREENBERG: There's only one portion of a call I think that I'm going to play, and that has nothing to do with any of the areas that have been discussed. It's a longer portion than the clip the government wants to play of one of the calls.

THE COURT: Okay. So then I guess on the issue of can you ask about using the money to hire a lawyer and post bail, the issue there was, there had been at one time an objection by Mr. Kling that, okay, now this is prejudicial because it's raising a potential inference that money -- you know, this sort of money is going to fund other --

MR. GREENBERG: Judge, not to interrupt you, the question is going to be -- is going to be -- he was in jail for a different case? Yes. I hope not a different -- I mean, I don't think she has to say what the case was. And there's a discussion on the call about this.

She doesn't have to say, yes, it was a murder case, or we'll all be back here doing this again.

MR. KLING: Judge, and I withdrew the objection.

THE COURT: Yes. And I was about to acknowledge that you had withdrawn the objection and other counsel, I guess, sort of joined in Mr. Greenberg's point.

And so I will allow those questions on cross.

8285

So that's just -- I wanted to give you that update.

MR. GREENBERG: Okay. Thank you.

THE COURT: Okay. Any other issues before -- should we come back early at all? Are there things we need to deal with?

MR. JULIEN: The government does not have other issues.

MR. BARNETT: We're okay, your Honor, I think.

THE COURT: All right. Thanks, everyone.

(Court adjourned, to reconvene at 1:05 p.m.)

8286

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
-vs-                               )  Case No. 21 CR 618
                                   )
CHARLES LIGGINS, KENNETH           )  Chicago, Illinois
ROBERSON, TACARLOS OFFERD,         )  December 19, 2023
CHRISTOPHER THOMAS, MARCUS         )  1:14 p.m.
SMART and RALPH TURPIN,            )
                                   )
                    Defendants.    )

VOLUME 37
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:    MR. JASON A. JULIEN
                       MR. SEAN HENNESSY
                       MS. ANN MARIE E. URSINI
                       MS. CAITLIN S. WALGAMUTH
                       Assistant U.S. Attorneys
                       219 S. Dearborn Street
                       Chicago, IL 60604
                       (312) 353-3500
                       jason.julien@usdoj.gov
                       sean.hennessy@usdoj.gov
                       annmarie.ursini@usdoj.gov
                       caitlin.walgamuth@usdoj.gov

For Defendant          MS. CYNTHIA LOUISE GIACCHETTI
Liggins:               Law Office of Cynthia Giacchetti
                       53 West Jackson, Suite 1035
                       Chicago, IL 60604
                       (312) 939-6440
                       Cg@cgdefense.com


            * * * * * * * * * * * * * * * * * *


        PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
              TRANSCRIPT PRODUCED WITH A COMPUTER

8287

APPEARANCES:    (Continued)

For Defendant                MR. GREGORY T. MITCHELL
Liggins:                     Law Office of Gregory T. Mitchell
                             19150 Kedzie Avenue, Suite 205
                             Homewood, IL 60430
                             (708) 799-9325
                             Mitchlaw00@sbcglobal.net

For Defendant
Roberson:                    MR. STEVEN GREENBERG
                             Greenberg Trial Lawyers
                             53 West Jackson, Suite 315
                             Chicago, IL 60604-6060
                             (312) 879-9500
                             Steve@greenbergcd.com

                             MS. CHERYL T. BORMANN
                             Cheryl Bormann
                             53 West Jackson, Suite 315
                             Chicago, IL 60604-6060
                             (312) 588-5011
                             Cheryl.t.bormann@gmail.com

For Defendant Offerd:        MR. JOHN SOMERVILLE
                             9924 S. Walden Parkway
                             Chicago, IL 60643-1702
                             (773) 505-1706
                             Jville62@gmail.com

                             MR. RICHARD S. KLING
                             Chicago-Kent Law Offices
                             565 W. Adams, 6th Floor
                             Chicago, IL 60661
                             (312) 906-5075
                             Rkling@kentlaw.iit.edu

For Defendant
Thomas:                      MS. ELLEN R. DOMPH
                             Law Offices of Ellen R. Domph
                             53 West Jackson, Suite 1544
                             Chicago, IL 60604
                             (312) 922-2525
                             Edomph@gmail.com

                             MR. KEITH ALLAN SPIELFOGEL
                             190 S. LaSalle Street, Suite 540
                             Chicago, IL 60603
                             (312) 236-6021
                             Spielfogel@sbcglobal.net

8288

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com

                          MS. MICHELLE MARIN
                          Criminal Defense Lawyer of Chicago
                          53 West Jackson Boulevard
                          Chicago, IL 60604
                          (312) 719-0376
                          Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com

                          MR. JOSHUA B. ADAMS
                          Law Offices of Joshua B. Adams, PC
                          900 W. Jackson Blvd., Suite 7 East
                          Chicago, IL 60607
                          (312) 566-9173
                          Josh@adamsdefenselaw.com

Also Present:             Ms. Christine Case, FBI
                          Mr. Domonique Dixon, FBI




Court Reporter:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                     Official Court Reporter
                  United States District Court
            219 South Dearborn Street, Suite 2328A
                   Chicago, Illinois  60604
                   Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov

(Proceedings heard in open court; jury out:)

THE COURT: Are we ready to resume?

MR. JULIEN: We are, your Honor.

MR. BOYLE: My co-counsel had to appear before a judge very briefly, but I'm okay to commence.

THE COURT: Okay.

(Mr. Adams enters courtroom.)

MR. BOYLE: Or get coffee, one of the two.

THE COURT: Okay. So, I think we are now ready for the jury.

(Jury enters courtroom.)

THE COURT: All right. Thanks, everyone.

Resuming with the testimony, please.

MR. JULIEN: Thank you, your Honor. I never moved Government Exhibit 103 into evidence, which is the Get Back Gang hoodie and the blue Icebox bag, so I would move those into evidence -- they were shown to the jury. I physically handed them to Special Agent Case. But I would move that into evidence.

THE COURT: Okay. That's admitted.

(Government's Exhibit No. 103 received in evidence.)

CHRISTINE CASE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

DIRECT EXAMINATION (Resumed)

BY MR. JULIEN:

Q. So, Special Agent Case, when we left off, we were talking

about some jail call transcripts. And I think what you said was with respect to 3001-1, -2, -3, -4, -5, and -6, that you essentially approved those transcripts?

A. Correct.

Q. Is the same thing true with the transcripts for 3002-1, -2, -3, and -4?

A. Correct.

MR. JULIEN: And, your Honor, I don't know where we left off with this. I think I moved to admit 3001-1 through 6 and 3002-1 through 4, but I'm going to move to admit Government Exhibit 3001-1 through 6 and 3002-1 through 4, and seek to publish 3000 -- those exhibits along with the transcripts.

I think you might have instructed the jury on that, but I just want to make sure they're in evidence.

MR. GREENBERG: You did this.

THE COURT: They are admitted.

I'm sorry. Are you about to play --

MR. JULIEN: Yes.

THE COURT: Let me just let the members of the jury know. So, you will -- you have recorded conversations, and this is proper evidence that you should consider together with and in the same way you consider the other evidence.

You are also being shown transcripts of the conversations to help you follow the recordings as you listen

to them.  The recordings are the evidence of what was said and who said it.  The transcripts are not evidence.

If you notice any differences between what you hear in a conversation and what you read and -- in the transcripts, your understanding of the recording is what matters.  In other words, you must rely on what you heard, not what you read.

And if you could not hear or understand certain parts of a recording, you must ignore the transcripts as far as those parts are concerned.

And with that, let me turn back to the government.

MR. JULIEN:  Permission to publish, your Honor?

THE COURT:  Yes.

BY MR. JULIEN:

Q.  Special Agent Case, I'm going to place for you, so the jury sees now, on the left side of the screen, Government Exhibit 3001-1, along with 3001-1TR on the right side.

Do you see that?

A.  Yes.

Q.  All right.  I'm going to play Government Exhibit 3001-1, and I'll ask you some questions about it.

(Audiotape played.)

BY MR. JULIEN:

Q.  So, we just listened to Government Exhibit 3001-1.  Does this clip essentially tell you who the call is from?

A.  Yes.

Case - direct by Julien

8292

Q.  So, I'm going to move on to Government Exhibit 3001-2. Similarly, do you see a transcript, 3001-2TR, on the right side that I was just scrolling a little bit?

A.  Yes.

Q.  Okay.  I'm going to play for you Government Exhibit 3001-2, and I might ask you some questions as I play it.

(Audiotape played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 3001-2 at the 1-minute-51-second mark.

Did you hear in summary Mr. Roberson refer to $600 worth of work, $600 worth of drugs, and $600 worth of coke on Government Exhibit 3001-2?

A.  Yes.

Q.  All right.  I'm going to resume playing.

(Audiotape played.)

BY MR. JULIEN:

Q.  So, Government Exhibit 3001-2 ended at the 4-minute-20-second mark.

Special Agent Case, other than the portion that I played to you before when I paused at the 1-minute-51-second mark, did Mr. Roberson again make reference to coke on Exhibit 3001-2?

A.  Yes.

Q. So, I'm going to play Government Exhibit 3001-3.

(Audiotape played.)

BY MR. JULIEN:

Q. Did you hear someone say, "Stephan has your weed"?

A. Yes.

Q. All right. I'm going to resume playing Government Exhibit 3001-3.

(Audiotape played.)

BY MR. JULIEN:

Q. So, I paused 3001-3 again. Did you hear Mr. Roberson say, "Hey, Sarah"?

A. Yes.

Q. I'm going to resume playing.

(Audiotape played.)

BY MR. JULIEN:

Q. So, I'm going to play Government Exhibit 3001-4 now.

(Audiotape played.)

BY MR. JULIEN:

Q. So, Government Exhibit 3001-4 ended after 12 seconds.

Special Agent Case, did you hear Mr. Roberson say to the called party, among other things, to slide on Sarah tomorrow?

A. Yes.

Q. All right. I'm going to play Government Exhibit 3001-5.

(Audiotape played.)

BY MR. JULIEN:

Q. So, I paused Government Exhibit 3001-5 at the 2-second mark.

Special Agent Case, did you hear Mr. Roberson say, "Hey, Murda"?

A. Yes.

Q. So, I'm going to keep playing the exhibit.

(Audiotape played.)

BY MR. JULIEN:

Q. Special Agent Case, I'm going to play the last clip from this call. It's 3001-6.

(Audiotape played.)

BY MR. JULIEN:

Q. So, I've paused Government Exhibit 3001-6 at the 15-second mark.

Special Agent Case, did you hear Mr. Roberson say, among other things, "So, you never went through all the zip, all the bags"?

A. Yes.

Q. Okay.

(Audiotape played.)

BY MR. JULIEN:

Q. So, Special Agent Case, I'm going to switch now to Government Exhibit 3002-2.

And similar to Government Exhibit 3001-1, would this

introductory portion 3002-1 essentially be a recording letting you know that this is a call from Kenneth Roberson?

A. Yes.

Q. So, I'm going to move on to 3002-2. And I'm going to play Government Exhibit 3002-2 now.

(Audiotape played.)

BY MR. JULIEN:

Q. Special Agent Case, did you hear Mr. Roberson say, among other things, "So, Murda come over there, I guess Murda come get the shit. So Murda, they only gave Murda 12 bags"?

A. Yes.

Q. I'm just going to move on to Exhibit 3002-3. And I'm going to play it now.

(Audiotape played.)

BY MR. JULIEN:

Q. So, Special Agent Case, did you hear Mr. Roberson say, among other things, "with 17 bags up there already, how the fuck you all give Murda only 12 bags? Where the other $600 worth of my shit at? Do you hear what I'm saying"?

A. Yes.

Q. So, moving on to the last clip in this portion, Government Exhibit 3002-4, which I'm going to play now.

(Audiotape played.)

BY MR. JULIEN:

Q. Special Agent Case, did you hear Mr. Roberson say, among

other things, "I tell them, Murda, like, man, I don't give no fuck if that's her house. This our block on TY. Make her -- make they -- make their ass get the fuck off. Who is you? Where you from? Get the fuck off this block, dude. I'm TY"?

A. Yes.

MR. JULIEN: May we un-publish for a moment, your Honor?

THE COURT: Yes.

BY MR. JULIEN:

Q. All right. Special Agent Case, I'm showing you what's marked as Government Exhibit 814, 812, and 813.

Have you seen Government Exhibits 814, 812, and 813 before?

A. Yes.

Q. What are they?

A. Text message exchanges that were captured on Roberson's review -- the review of Roberson's phone.

Q. At some point in the investigation, did the FBI come into possession of a cellphone from Mr. Roberson?

A. Yes.

Q. And based on your understanding of the investigation, was that a cellphone that Mr. Roberson acquired sometime after August 4th, 2020?

A. To my knowledge, yes.

Q. And based on your knowledge of the investigation, do these

text messages that are depicted or reflected in Government Exhibits 814, 812, and 813, are they messages that were retrieved from the extraction or review of the cellphone that we're talking about right now, the one that was acquired after August 4th, 2020?

A.   Correct.

Q.   And do these depictions or representations in Exhibits 814, 812, and 813 fairly and accurately depict or represent these text messages from the last time you saw them?

A.   Yes.

MR. JULIEN:  Your Honor, at this time, I move to admit Government Exhibits 814, 812, and 813 into evidence.

THE COURT:  They're admitted.

(Government's Exhibits No. 814, No. 812 and No. 813 received in evidence.)

MR. JULIEN:  Permission to publish?

THE COURT:  Yes.

BY MR. JULIEN:

Q.   So, Special Agent Case, I'm going to have to zoom in on some of these, but you should have Government Exhibit 814 in front of you.

Who do you understand to be communicating -- or let me rephrase the question.

From which device do you understand the messages to be sent from, the ones in green on the right or the ones in

Case - direct by Julien

8298

blue on the left?

A.   The phone is being sent from the green messages.

Q.   So, the ones in green on the right, these would be messages that were sent from the device that FBI came into possession of?

A.   Yes.

Q.   So, I'm going to zoom in on two messages on the right-hand side, and I'm going to direct your attention to the second one.

Do you see a date here?

A.   Yes.

Q.   What's the date?

A.   December 10th, 2020.

Q.   And do you see a message here?

A.   Yes.

Q.   What does the message say?

A.   "This Kenny Mac.  This my new number."

Q.   So, now I want to show you Government Exhibit 812.

And I'm going to zoom in.  I know this is kind of small, but I'm going to zoom in on the first message here.

Do you see a date for this message?

A.   Yes.

Q.   What does it say?

A.   November 22nd, 2020.

Q.   And do you see an e-mail address up here?

A.  Yes.

Q.  What's the e-mail address?

A.  KennyMac276@icloud.com.

Q.  Do you see a message?

A.  Yes.

Q.  What does the message say?

A.  "LOL.  Why you scared of Parkway?  This the safest place to be."

Q.  And is there -- without reading what it says, is there some response to the message?

A.  Yes.

Q.  Is there a green message on the right in response to that message in blue?

A.  Yes.

Q.  And what does it say?

A.  "It's not my block.  This just my second home."

Q.  Is there a date of this?

A.  Yes.

Q.  What's that?

A.  November 22nd, 2020.

Q.  So now I'm going to show you Government Exhibit 813.

    Do there appear to be a series of messages in Government Exhibit 813?

A.  Yes.

Q.  All right.  Is there a message -- without reading the

Case - direct by Julien

8300

contents of it, is there a message on the left side in blue?

A. Yes.

Q. Does it appear that there's a message in green on the right in response to that message?

A. Yes.

Q. And what does the message in green that I just zoomed in on say?

A. "Dipset I'm OTF, though."

Q. And what is the date of this message?

A. December 14th, 2020.

Q. Does it appear that the user of the device that FBI came into the possession of sent a follow-up message?

A. Yes.

Q. And what does that message say?

A. "The O my second home."

Q. And what's the date of this message?

A. December 14th, 2020.

Q. Special Agent Case, I'm going to show you what's already admitted in evidence as Government Exhibit 702. And I'm going to zoom in on the left side of Government Exhibit 702.

Earlier when we were talking about Government Exhibit 800-2, I asked you some questions about UTC time conversions. Do you remember that?

A. Yes.

Q. Are you able to do a UTC time conversion for the messages

Case - direct by Julien

8301

that are depicted here in Government Exhibit 702?

A.   Yes.  You just subtract five hours.

Q.   So, I want to ask you about this first message where I'm dragging my mouse underneath it in approximately the middle of the page.  Do you see a timestamp that says, "2020-8-5," and then, "14:56:57," in UTC?

A.   Yes.

Q.   What time would this be in Central Daylight Time?

A.   Central Time 9:56.

Q.   How about the one above it where it's from a user to OTF Kenny Mac that says, "I know you ain't take your car to go do this shit"?

A.   14:57 UTC, so 9:57 Central Time.

Q.   And there were a couple of messages above that, and I'll ask about them in summary fashion.

     The next message that says, "Unsend that shit," what time would this be?

A.   9:57.

Q.   And this one?

A.   9:57.

Q.   And the one that says, "FTD"?

A.   9:57.

Q.   A.m.?

A.   Correct.

     MR. JULIEN:  May we un-publish, your Honor?

THE COURT: Yes.

BY MR. JULIEN:

Q. Special Agent Case, I'm going to show you a series of photographs, starting with Government Exhibit 506-1, 506-5, 506-7, 506-3. Let's just start with those.

Do you know -- let me ask it a different way. Were these photographs taken in approximately October of 2021?

A. Yes.

Q. Do you know who the person depicted in these photographs is?

A. Yes.

Q. Who do you understand the person depicted in these photographs to be?

A. Charles Liggins.

Q. Are these, what I'm showing you, 506-1, 5, 7, 3, those four pictures, are those pictures of Mr. Liggins's tattoos?

A. Yes.

Q. Bear with me one moment.

So now I'm showing you Government Exhibit 529-3, 529-6, 529-1, 529-4, and 529-2.

Were these photographs similarly taken in approximately October of 2021?

A. Yes.

Q. And who do you understand the person to be depicted in Government's Exhibit 529-3, 6, 1, 4, and 2, to be?

A.   Marcus Smart.

Q.   Is what I just showed you Government Exhibits 529-3, 6, 1, 4, and 2, are these photographs of Marcus Smart's tattoos?

A.   Yes.

MR. JULIEN:   Your Honor, at this time, I move to admit Government Exhibits 506-1, 506-5, 506-7, 506-3, 529-3, 529-6, 529-1, 529-4, and 529-2.

THE COURT:   They're admitted.

(Government's Exhibits No. 506-1, No. 506-5, No. 506-7, No. 506-3, No. 529-3, No. 529-6, No. 529-1, No. 529-4, and No. 529-2 received in evidence.)

MR. JULIEN:   Permission to publish?

THE COURT:   Yes.

BY MR. JULIEN:

Q.   All right.  So, Special Agent Case, I'm showing you and the jury what's now admitted as Government Exhibit 506-1.  And I'm going to zoom in there.  Can you make out what that says?

A.   It appears to say, "Keto."

Q.   And switching to 506-5, I'm going to zoom in here.  Can you make out what that says?

A.   It appears to say, "World."

Q.   So now I'm showing you what's admitted as 506-7.  Can you make out what that says?

A.   Yes.

Q.   And what does it appear to say?

Case - direct by Julien

8304

A.   Sheroid.

Q.   I'm showing you 506-3, and I'm going to zoom in here.  Can you make out what that says?

A.   Yes.

Q.   What does it say?

A.   "O-Block Glock Boss."

Q.   So now I'm showing you what's admitted as Government Exhibit 529-6.  Does this appear to be Marcus Smart with tattoos on his right arm?

A.   Yes.

Q.   So, I'm going to show you Government Exhibit 529-3 and 529-1 together, but I'm going to ask you about this portion of Government Exhibit 529-3 specifically when I come back to it.  So, that's 529-3.

And now this is 529-1.  And again, I'm going to circle the portion that I'm going to focus your attention on there.  I just made a circle on the right side in red.

So, starting with 529-3, are you able to make out at least some of what is written here that I just zoomed in on?

A.   Yes.

Q.   And what do you see here?

A.   The first part of what appears to say, "Sheroid."

Q.   And how about here in Government Exhibit 529-1?

A.   It looks like the latter half of the word, "Sheroid."

Q.   So now I'm showing you Government Exhibit 529-4.  And what

Case - direct by Julien

8305

do you -- do you see something right here where I'm hovering my mouse?

A.  Yes.

Q.  What does this appear to say?

A.  "O-Block."

Q.  And do you see a name here where I'm hovering my mouse?

A.  Yes.

Q.  What does that appear to say?

A.  "J Money."

Q.  How about here up at the top where I'm hovering my mouse?

A.  "T Roy."

Q.  So now I'm showing you Government Exhibit 529-2.  Does this appear to depict the same right arm, just a higher-up version of it?

A.  Yes.

Q.  Can you still see the O-Block tattoo here?

A.  Yes.

Q.  And what does this appear to say on Marcus Smart's shoulder?

A.  "I'm a top HK."

Q.  Special Agent Case, I'm going to show you what's admitted in evidence -- and I'm not going to ask you questions about video depictions yet, necessarily, but I'm showing you what's admitted as Government Exhibit 2030.

        Have you seen and reviewed Government Exhibit 2030

before today?

A. Yes.

Q. Actually, before I do that, let me ask you this, just real quick. Were you here in the courtroom when the Meta stip, Stipulation No. 14, was read?

A. I can't recall.

Q. Did you get some Facebook records -- or I should say Meta subscriber information from Mr. Ralph Turpin?

A. Yes.

Q. Were those Facebook and Instagram subscriber records?

A. I believe so, yes.

Q. And would that have been in about April of this year?

A. Correct.

Q. Are those Government Exhibits 712 and 713?

A. Yes.

MR. JULIEN: Your Honor, at this time, these are subject to a stipulation, No. 14. I'd move to admit 712 and 713 into evidence.

MR. BOYLE: No objection.

THE COURT: They're admitted.

(Government's Exhibit No. 712 and No. 713 received in evidence.)

BY MR. JULIEN:

Q. Now, Special Agent Case, I do want to come back to Exhibit 2030 now. What is Government Exhibit 2030?

A. This is a compilation video from Oak Street.

Q. Is it similar to the Camtasia video in the sense that it is a summary of different source videos that are put together?

A. Correct.

Q. Does it contain small portions of underlying footage?

A. Correct.

Q. Is it in chronological order all of the time as depicted in Government Exhibit 2030?

A. No.

Q. And why is that?

A. There's other camera angles, so you'll go back in time a little bit to see the same time, but from a different angle.

Q. Now, does Government Exhibit 2030 have approximately eight sources that are summarized in Government Exhibit 2030?

A. That sounds about right.

Q. So, I want to show you what's admitted in evidence as Government Exhibit 2014. So -- and I played this -- I wasn't necessarily intending to, but I played it to the 6-second mark.

Is Government Exhibit 2014 something that is a part of Government Exhibit 2030?

A. Yes.

Q. It's just a smaller portion of it?

A. Correct.

Q. How about Government Exhibit -- what's admitted in

evidence as Government Exhibit 2016?  Is this -- and I played it to the 1-second mark.  Is a portion of Government Exhibit 2016 contained on Government Exhibit 2030?

A.  Correct.

Q.  A smaller portion of what would be the raw footage?

A.  Correct.

Q.  How about Government Exhibit 2027?  I played that to the 1-second mark.  Would this be a part of Government Exhibit 2030?

A.  Correct.

Q.  Just a small portion of it?

A.  Correct.

Q.  What about Government Exhibit 2028, which I played for about 1 second?  Would this be a part -- a small portion of it be a part of Government Exhibit 2030?

A.  Yes.

Q.  How about Government Exhibit 2029-1?  Would this be a -- a small part of this be a part of Government Exhibit 2030?

A.  Yes.

Q.  So now I'm showing you Government Exhibit 2029-2.

Would a small part of this be a part of Government Exhibit 2030?

A.  Yes.

Q.  And Government Exhibit 2029-3, would a small part of this be a part of Government Exhibit 2030?

Case - direct by Julien

8309

A.  Yes.

Q.  Finally, Government Exhibit 2031, I played that for apparently less than 1 second, but would a small part of that be a part of Government Exhibit 2030?

A.  Yes.

Q.  Now, Special Agent Case, have you reviewed all of those raw videos that I just showed you, Government Exhibit 2014, 2016, 2027, 2028, 2029-1, 2029-2, 2029-3, and 2031?

A.  Yes.

Q.  Are there any skips in any of those videos?

A.  No.

Q.  So now I'm going to play Government Exhibit 2030.  And just throughout, I'm going to play portions of it; and I'll pause at times, and I'll ask you some questions.  Okay?

     (Video played.)

BY MR. JULIEN:

Q.  So, I paused Government Exhibit 2030 at the 5-second mark, and I'm going to draw a circle in red somewhat at the top right.

     Do you see someone in what appears to be a white shirt and someone in a red shirt walking east on Oak Street in that portion of Government Exhibit 2030 that I just played?

A.  Yes.

Q.  Does there appear to be some sort of sign here?

A.  Yes.

8310

Q.   Could you tell the jury approximately what it is we're looking at in the area where I just made these two circles?

A.   The entrance to Milani Boutique.

Q.   And as we talked about on the 13th and the 14th, do you have to go down some stairs in order to get to Milani?

A.   Correct.

Q.   And if you were looking at Milani from the east to the west, would there be some kind of electronic sign sticking out on the sidewalk approximately in front of -- so, let's say you were east looking west, would there be a sign in between where you're looking and the stairs that go down to Milani?

A.   Yes.

Q.   Does that appear to be what's depicted here in Government Exhibit 2030 at the 5-second mark where I've made these two circles?

A.   Yes.

Q.   All right.  I'm going to play this.  By the way, we talked about this earlier, I think on the 13th or the 14th.  But there's a timestamp here in Government Exhibit 2030.  And from this footage that we're looking at, do you know whether or not this particular timestamp in this footage from this vantage point is correct?

A.   It has an offset of 6 minutes.

Q.   Meaning that -- the offset in which way?  It's 6 minutes slow or 6 minutes fast?

A.  6 minutes slow, so you have to add 6 minutes to get to the real time.

Q.  So, from this vantage point, when the timestamp says 3:53, it's approximately 3:59?

A.  Correct.

Q.  All right.  I'm going to resume playing Government Exhibit 2030 from the 5-second mark.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 at the 18-second mark.

Do you see someone, like, a figure that I've just zoomed in on, that appears to be with a white shirt and a dark-colored jacket of some sort?

A.  Yes.

Q.  Is that Duck?

A.  Yes, it appears to be.

Q.  All right.  I'm going to resume playing Government Exhibit 2030 to about the 1-minute-25-second mark.

By the way, I'm just pausing it again at the 22-second mark.

Is it approximately 4:04 p.m. now when Duck is walking up to a car and getting in the passenger side?

A.  Correct.

(Video played.)

BY MR. JULIEN:

Q. So, I've paused Government Exhibit 2030 at the 1-minute-27-second mark.

Special Agent Case, is it approximately 4:05 p.m., according to this timestamp?

A. Yes.

Q. And what just occurred up in the top portion of 2030 that we were just talking about?

A. The Mazda pulled off with Duck in it.

Q. When we talk about a purple Mazda, Special Agent Case, based on your knowledge of the investigation, did you know who was driving a purple Mazda with Duck as the passenger on August 4th, 2020?

A. Yes.

MS. DOMPH: Objection.

THE COURT: Overruled.

BY MR. JULIEN:

Q. Do you know who was driving the purple Mazda with Duck as the passenger?

A. Yes.

Q. Who was that?

A. Cashae Williams.

Q. I'm going to resume playing Government Exhibit 2030 from the 1-minute-27-second mark.

(Video played.)

BY MR. JULIEN:

Q. So, I've paused Government Exhibit 2030 at the 1-minute-32-second mark, and I'm going to draw a circle up here in red.

Did you see someone appearing to wear a white shirt and blue jeans exiting from behind the sign that we were talking about a little earlier?

A. Yes.

Q. And is it now approximately 4:07 p.m.?

A. Correct.

Q. All right. I'm going to resume playing Government Exhibit 2030 from the 1-minute-32-second mark.

(Video played.)

BY MR. JULIEN:

Q. So, I've paused Government Exhibit 2030 at the 1-minute-45-second mark, and I'm drawing a circle here to the far left of the screen.

Does it appear that the purple Mazda reached the corner of Oak Street and Rush Street?

A. Yes.

Q. And according to the timestamp, is it approximately 4:05, getting close to 4:06 p.m.?

A. Yes.

Q. All right. I'm going to resume playing Government Exhibit 2030.

(Video played.)

BY MR. JULIEN:

Q.  All right.  So, I paused Government Exhibit 2030 at the 2-minute-24-second mark.

Did you see the Mazda make a -- what would be a right-hand turn north onto Rush Street?

A.  Yes.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 now at the 2-minute-32-second mark.  Can you tell the jury what time it is, according to this timestamp?

A.  4:08:22 p.m.

Q.  Do you see the purple Mazda driving through the intersection of Rush and Oak, now headed east on Oak?

A.  Correct.

Q.  All right.  I'm going to resume playing this for about 8 seconds.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 at the 2-minute-41-second mark.  Did you see someone in white run across the street in the portion of 2030 that I have enlarged here?

A.  Yes.

Case - direct by Julien

8315

Q.  All right.  I'm going to resume playing Government Exhibit 2030; but right now, is it still 4:08 p.m.?

A.  Correct.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 now at the 3-minute-32-second mark.

Special Agent Case did you just see Davon Brinson enter the left side of the frame here?

A.  Yes.

Q.  All right.  I'm going to resume playing the exhibit.

(Video played.)

BY MR. JULIEN:

Q.  I've paused Government Exhibit 2030 at the 3-minute-46-second mark.  Does it appear that Mr. Brinson and the person in the white shirt and blue jeans are now in close proximity?

A.  Yes.

Q.  According to the timestamp, what time is it?

A.  4:09:35 p.m.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 now at the 4-minute-4-second mark.

Does it appear that the person in the white shirt and

blue jeans ran east down Oak possibly in the vicinity of Moncler?

A.   Yes.

Q.   And does it appear that Mr. Brinson is beginning to double back and is also walking down Oak Street east?

A.   Correct.

Q.   And according to the timestamp here at the bottom, what time is it?

A.   4:09:54 p.m.

Q.   So, I've paused Government Exhibit 2030 here at the 4-minute-8-second mark.

     Without getting into the specifics, Special Agent Case, based on your familiarity with the investigation, are you aware that two 9-1-1 calls were made at approximately 4:09 p.m.?

A.   Correct.

Q.   And was just the upshot of those calls people reporting a man with a gun on Oak Street?

A.   Correct.

Q.   All right.   I'm going to resume playing Government Exhibit 2030.

     (Video played.)

BY MR. JULIEN:

Q.   So, I've paused Government Exhibit 2030 at the 4-minute-21-second mark.

I've made a circle in red at the top right, and do you see a figure in red exiting from behind that sign that we were talking about?

A. Yes.

Q. And according to this timestamp, is it approximately 4:09 p.m.?

A. Correct.

(Video played.)

BY MR. JULIEN:

Q. So, I've paused Government Exhibit 2030 at the 4-minute-39-second mark, and I've made a circle here in red.

Do you see a vehicle where I've just circled?

A. Yes.

Q. Approximately what time is it, according to this timestamp?

A. 4:09:37 p.m.

Q. And could you tell what kind of vehicle it is that I just made that circle over?

A. It's --

Q. I'll keep playing.

A. Yeah.

That's the Mazda as discussed before.

Q. So, at about the 4-minute-46-second mark or 4-minute-47-second mark is when you realized that it's the Mazda?

Case - direct by Julien

8318

A.   Yeah.

Q.   And now it's still around 4:09 p.m.?

A.   Correct.

     (Video played.)

BY MR. JULIEN:

Q.   So, I've paused Government's Exhibit 2030 at the 5-minute-35-second mark.  Does it appear that the purple Mazda has parked?

A.   Correct.

Q.   According to this timestamp, what time is it now?

A.   4:10:33 p.m.

     (Video played.)

BY MR. JULIEN:

Q.   So, I've paused at the 5-minute-53-second mark.

     Does it appear that someone just exited from the purple Mazda?

A.   Yes.

Q.   And according to this timestamp, is it 4:10 p.m.?

A.   Correct.

     (Video played.)

BY MR. JULIEN:

Q.   So, I've paused at the 6-minute-54-second mark.  And I've just made a circle there in red.

     Does that appear to be a person carrying an orange bag?

A.   Yes.

Q.   What time is it, according to this timestamp?

A.   4:11:51 p.m.

Q.   Pausing at the 7-minute-4-second mark.

     Did the person with the orange bag appear to stand in line behind Duck in front of Dolce & Gabanna?

A.   Yes.

Q.   So, pausing at the 7-minute-21-second mark, so, would this be an instance of the video not being in chronological order?

A.   Correct.

Q.   Is this vantage point further west down Oak Street than the vantage point we were just looking at?

A.   Correct.

Q.   And according to this timestamp, is it about 4:10 p.m.?

A.   Correct.

Q.   Do you see someone over here on the right side carrying an orange bag?

A.   Yes.

     (Video played.)

BY MR. JULIEN:

Q.   So, I've paused at the 7-minute-28-second mark.

     Did you just see someone in a red shirt appearing to walk in the vicinity of Moncler?

A.   Yes.

Q. According to this timestamp, what time is it now?

A. 4:12:11 p.m.

(Video played.)

BY MR. JULIEN:

Q. Special Agent Case, based on your review of Mr. Turpin's phone records, Government Exhibit 800-2 we were talking about earlier, page 275 at the line that we were talking about, did Mr. Turpin receive a phone call from the phone number primarily used by D Thang at approximately 4:18 p.m.?

A. Yes.

Q. And did Mr. Cabrera begin recording the Moncler video at approximately 4:13 p.m.?

A. Yes.

Q. Is the 13:06 mark of 2030 where I have it paused right now consistent with it being approximately 4:18 p.m.?

A. Correct.

(Video played.)

BY MR. JULIEN:

Q. And based on what we just talked about it, would it be consistent with the Moncler video ending at about -- I paused at the 14:03 mark, but the Moncler video ended at about 4:19 p.m.?

A. Approximately, yes.

Q. And according to where I have Government Exhibit 2030 paused right now, what time is it?

8321

A.  4:19:05 p.m.

(Video played.)

BY MR. JULIEN:

Q.  I've paused Government Exhibit 2030 at the 14-minute-25-second mark.

Do you see, where I've just made a circle, someone in a white shirt and someone in a red shirt somewhat walking in tandem?

A.  Yes.

Q.  What time is it?

A.  4:19:27 p.m.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused at the 14:35 mark.  Did you see those two people, the one in white and the one in red, cross over Oak Street?

A.  Yes.

Q.  So now they're on the north side of the street?

A.  Correct.

Q.  Were you present yesterday when Mr. Dent testified that Mr. Turpin drove a silver car to Oak Street?

A.  Yes.

Q.  Was this the car he identified?

A.  Yes.

Q.  And I've just made a circle on the left side of the screen

Case - direct by Julien

8322

in red, is that right?

A.  Correct.

        (Video played.)

BY MR. JULIEN:

Q.  So pausing at the 15:02 mark, did the figure in the white shirt and the figure in the red shirt walk over to the vehicle that was identified as Mr. Turpin's vehicle?

A.  Yes.

Q.  Pausing at the 15:05 mark, are two police officers now crossing the street?

A.  Yes.

Q.  And pausing at the 15:08 mark, does it appear that those two police officers are walking over to the person in the red shirt and the person in the white shirt?

A.  Yes.

        (Video played.)

BY MR. JULIEN:

Q.  Pausing at the 15:50 mark, did it appear that someone in a light-colored suit came over and began speaking with the officers?

A.  Yes.

        (Video played.)

BY MR. JULIEN:

Q.  And at the 16:12 mark, did it appear that the car that was parked behind the vehicle that was identified as Mr. Turpin's

vehicle pulled out and left?

A.  Yes.

Q.  Did it appear from your review of the footage that there was anything obstructing this vehicle from pulling out and leaving?

A.  Not that I'm aware of, no.

Q.  And what time is it now, according to this timestamp?

A.  4:21:14 p.m.

(Video played.)

BY MR. JULIEN:

Q.  So, pausing at the 17-minute-17 mark, do you see someone in a white T-shirt and blue jeans in the frame there?

A.  Yes.

Q.  So, I've paused at the 17-minute-31-second mark.

Do you remember during your direct examination on the 13th and the 14th of November, you and I talked a lot about a window that was in front of what was Escada in August of 2020 and is now Hermes?

A.  Yes.

Q.  Is this, hang on, approximately that window that we were talking about?

A.  Yes.

Q.  And did you see the person in the white T-shirt and blue jeans walk over and stand in front of that window?

A.  Yes.

(Video played.)

BY MR. JULIEN:

Q.  Pausing at the 17-minute-42-second mark, do you see someone in a red T-shirt and black shorts entering the bottom of the frame here?

A.  Yes.

(Video played.)

BY MR. JULIEN:

Q.  And pausing at the 17-minute-54-second mark, does it appear that the person in the red T-shirt went over and also stood in front of the window?

A.  Yes.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused Government Exhibit 2030 at the 18-minute-and-11-second mark.

Special Agent Case, are you able to tell when the shooting is about to begin based on a couple of things that are moving around on the screen?

A.  Yes.

Q.  For example, this white what appears to be a Toyota, making a U-turn, is that some indicator that the shooting is about to begin?

A.  Yes.

Q.  How about an SUV that made a U-turn up here?

Case - direct by Julien

8325

A.   Correct.

Q.   Any other?

A.   Eventually, right before when you see a lady on a bicycle, that's one of the things that I would anchor to it as well.

Q.   Is that the lady on the bicycle where I've paused it at the 18-minute-13-second mark?

A.   Correct.

        (Video played.)

BY MR. JULIEN:

Q.   So, pausing here at the 19-minute-23 mark, does it appear that the person in the red T-shirt and the person in the white T-shirt reappeared?

A.   Correct.

Q.   And they began walking closer to the scene of the murder?

A.   Correct.

        (Video played.)

BY MR. JULIEN:

Q.   Pausing at the 20-minute-6-second mark.

        Do you see the person in the white T-shirt and the person in the red T-shirt?

A.   Yes.

Q.   Does it appear that they're now leaving the scene?

A.   Correct.

        (Video played.)

BY MR. JULIEN:

Case - direct by Julien

8326

Q. So, I've paused at the 20-minute-25-second mark.  Do you see the person in the white T-shirt and blue jeans enter into the frame on the right?

A. Yes.

Q. Does it appear that they're holding something in their right hand?

A. Yes.

Q. Holding it kind of up to their face?

A. Yes.

Q. What is it we're looking right here at the bottom of -- at the 20-minute-25-second mark?

A. 50 East Oak Street, the stairway on the left leading down is -- those are the stairs that go down to Milani Boutique.

        (Video played.)

BY MR. JULIEN:

Q. Pausing at the 20:40 mark.

        Did the person in the red T-shirt appear at the end of the frame there?

A. Yes.

        (Video played.)

BY MR. JULIEN:

Q. And pausing at the 20:50 mark, is this the white car that we talk about as one of the anchors before the shooting's about to begin?

A. Yes.

(Video played.)

BY MR. JULIEN:

Q. So, pausing at the 21:19 mark, does this appear to be the two police officers and the person in the light-colored -- maybe I won't call it a suit, the light-colored outfit from Le Colonial?

A. Yes.

Q. And this, is this that window that we've been talking about?

A. Yes.

(Video played.)

BY MR. JULIEN:

Q. So, I've paused it at the 22:01 mark.

Is that the person in the white T-shirt and blue jeans?

A. Yes.

(Video played.)

BY MR. JULIEN:

Q. Pausing at the 22:05 mark, does it appear that they have an object in their right hand that's close up to their head?

A. Yes.

Q. And did it appear in between the 22:01 mark and the 22:05 mark that the person appeared to be animated?

A. It's a little hard to tell from this clip, so I can't say.

Q. I'll resume playing.

Case - direct by Julien

8328

(Video played.)

BY MR. JULIEN:

Q. Did the person in the white T-shirt and blue jeans stop and stand in front of that window we've been talking about?

A. Yes.

Q. And I paused at the 22:24 mark.

(Video played.)

BY MR. JULIEN:

Q. I'm pausing at the 22:47 mark.

Did the person in the red T-shirt enter the right of the frame here?

A. Yes.

(Video played.)

BY MR. JULIEN:

Q. And where I've got it paused at the 23:15 mark, did it appear that the person in the red T-shirt has joined the person in the white T-shirt standing in front of that window we've been talking about?

A. Yes.

(Video played.)

BY MR. JULIEN:

Q. I've paused at the 25:24 mark. Has it been three minutes exactly in run time since that person in the white T-shirt stopped and stood in front of that window?

A. Yeah, just about.

Q.  Have either the person in the white T-shirt or the person in the red T-shirt moved in any way that you could notice since they began standing in front of that window?

A.  No.

(Video played.)

BY MR. JULIEN:

Q.  Now, I've paused at the 25:29 mark.

Do you see other people kind of running to the right and on the left of the screen?

A.  Yes.

Q.  Did it appear that the person in the white T-shirt and the person in the red T-shirt started running with everyone else?

A.  No.

(Video played.)

BY MR. JULIEN:

Q.  And here at the 26:28 mark, is the person in the white T-shirt and the person in the red T-shirt beginning to walk closer to the murder?

A.  Yes.

(Video played.)

BY MR. JULIEN:

Q.  Here at the 27:14 mark, are the two in the white T-shirt and the red T-shirt appearing to now start leaving?

A.  Correct.

(Video played.)

Case - direct by Julien

8330

BY MR. JULIEN:

Q. So, pausing at the 28:13 mark, do you see two people that I've just circled there in red at the top of the screen?

A. Yes.

Q. Is the person on the left Duck?

A. Yes.

Q. Is the person on the right carrying an orange bag?

A. Yes.

Q. Does it appear that there is a purple car right here where I've just circled?

A. Yes.

Q. Does it appear that the driver's window is down?

A. Yes.

Q. So, pausing -- and I want to direct your attention to here.

     Do you see anything that's relevant to your investigation, in what I've just circled in red and zoomed in on?

A. Yes.

Q. And what's that?

A. It appears to be like a white square or tag on the back of a hoodie.

     MR. SPIELFOGEL: Your Honor, we would ask for a brief sidebar, please.

     THE COURT: Okay.

(Proceedings heard at sidebar:)

MR. SPIELFOGEL:  Your Honor, I'm just about certain I know the answer to this question; but in an abundance of caution, I just want to make sure that Mr. Julien doesn't intend to lead this witness into any kind of mention as to characteristics of alleged shooters in this situation.

MR. JULIEN:  No.

MR. SPIELFOGEL:  Thank you.

MR. JULIEN:  And by the way, I'm almost done with this direct, about two more minutes.

THE COURT:  Okay.  Thanks.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q.  So, we're paused at the 28:33 mark, and I'm going to resume playing from there.

(Video played.)

BY MR. JULIEN:

Q.  So, I've paused at the 29-minute-12-second mark.  I know we talked about this already, and we've talked about it on the 14th; but is this how you know that this camera -- among other things, is this how you know that it's 6 minutes behind?

A.  Yes.  And the time offset is listed in the CPD GPR report.

Q.  And the time offset noted that it was 6 minutes behind?

A.  Yes.

Q.  So, this is paused at 4:26 -- rather 4:20 p.m.  Is this

about when the shooting is about to happen?

A.   Correct.

Q.   Which occurred at 4:26 p.m.?

A.   Correct.

     (Video played.)

BY MR. JULIEN:

Q.   Now, do you see, pausing at the 29:57 mark, the person in the white T-shirt and red T-shirt beginning to enter the frame here?

A.   Yeah.  You can see the red shirt, and as you keep playing it, you'll see a white shirt.

     (Video played.)

BY MR. JULIEN:

Q.   Pausing at the 30-minute-6-second mark, does it appear that the person in the red T-shirt is pointing?

A.   Yes.

Q.   And does it appear that the person in the white T-shirt still has a dark object in his hand?

A.   Yes.

Q.   Up towards his head area?

A.   Yes.

     (Video played.)

BY MR. JULIEN:

Q.   Pausing at the 30-minute-8-second mark, did it appear that the person in the white T-shirt kind of lifted up on his

tiptoes?

A.   It appears so, yes.

(Video played.)

MR. JULIEN:  May I have one moment, your Honor?

THE COURT:  Sure.

MR. JULIEN:  Thank you, your Honor.  Nothing further.

THE COURT:  Okay.  Let's go on the sidebar quickly.

(Proceedings heard at sidebar:)

THE COURT:  Should we take a break now?

MR. GREENBERG:  Judge, are you planning on going until 5:00 o'clock today?

THE COURT:  I think we can go -- yes, we can go a little bit later today.

MR. GREENBERG:  I mean, maybe I can do a few minutes and then take a break, if you want.

THE COURT:  That's fine.

MR. GREENBERG:  Like 3:15?

THE COURT:  That sounds fine.

MR. GREENBERG:  Okay.

(Proceedings heard in open court:)

MR. GREENBERG:  False alarm.

THE COURT:  Cross.

MR. GREENBERG:  Thank you, Judge.  One second.

CROSS-EXAMINATION

BY MR. GREENBERG:

Q. Good afternoon, Agent Case. How are you today?

A. Good afternoon.

Q. The end is near, right?

A. Hopefully, yes.

Q. All right. So, I wanted to ask you before we take our break just some sort of basic questions. Okay?

You talked a lot about people who were out on the street the day of the shooting, right?

A. Yes.

Q. And you've been with the FBI for how long?

A. Approximately five years and some change.

Q. Before that, as I understand it, you were a police officer of some kind?

A. Yes.

Q. How long were you a police officer?

A. Approximately two years.

Q. Okay. So, you've got about seven years of working on crimes, right?

A. Yeah.

Q. Have you ever been to the scene of a shooting right after the shooting took place?

A. No.

Q. Okay. Have you ever learned about the scene of a shooting after a shooting took place?

A. Yeah.

Case - cross by Greenberg

8335

Q. Okay. Would it be a fair statement that people tend to congregate and look at what's going on?

A. Yeah.

Q. On that video that you were just shown, this compilation video, there are people who come running out of different stores, right?

A. Yep.

Q. And they go sort of walking up the street to see what happened, right?

A. Yes.

Q. And I think we heard -- I don't remember the -- I think her name was Kelly, the hairstylist, the hair colorer?

A. Kelsey.

Q. Kelsey. I'm sorry. It was a long time ago. Kelsey came out of the Charles Ifergan to see what had occurred, right?

A. Yes.

Q. So, it's not unusual that people would walk up the street to see what happened, right?

A. No.

Q. Would it be fair to say that on the South and West Side of Chicago, shootings, unfortunately, are frequent?

A. Yes.

Q. People who live in those neighborhoods often complain that they hear gunshots all night, right?

A. I can't speak for them, but there's obviously a lot of

shootings down south.

Q. All right. Well, we're not talking downtown. We're talking in the neighborhoods.

A. Yeah. Sorry. I said down south.

Q. Oh, down south. I'm sorry. So, people that live in those neighborhoods tend to probably see more violence than -- than people would like to, right?

A. I would assume.

Q. I mean, any violence is more than we'd like to, right?

A. Probably.

Q. All right. In the course of your investigation, you learned about a lot of people that had died, didn't you?

MR. JULIEN: Objection. Vague.

MR. GREENBERG: I'll rephrase it, Judge.

BY MR. GREENBERG:

Q. You did some investigation of Duck's group or gang or whatever you want to call it, STL, right?

A. Like the investigation in general or --

Q. Well, did you look into what STL was?

A. Yeah. I've learned about it throughout the course of the investigation.

Q. All right. And throughout the course of the investigation, you learned that quite a few people who were associated with STL have died, right?

A. Yeah.

Q. Did you look into what Lamar was or Lamron?

A. Lamron.

Q. Lamron.

A. I'm aware of what it is.

Q. You learned about it, right?

A. Um-hum.

Q. People in Lamron have died, right?

A. Yeah. I don't know specific names of who's who off the top of my head right now, but --

Q. And certainly, sitting through this trial, we've heard about a bunch of people who died, right?

A. Yes.

Q. So, again, would it be a fair statement that people who lived in these neighborhoods probably see more death than -- than, you know, we'd like?

A. Yeah.

Q. Maybe they're a little bit callous, more callous than we would want to be?

        MR. JULIEN: Objection. Calls for speculation.

        THE COURT: Sustained.

BY MR. GREENBERG:

Q. Okay. So, it got pointed out to you that the man in the red and the man in the white didn't take off running when there was the shooting, right?

A. Right.

Case - cross by Greenberg

8338

Q.  But you don't know why they didn't take off running; is that fair?

A.  I mean, I --

Q.  You don't know?

A.  I have my own reasons --

Q.  Right.  You have a theory, right?

A.  Right.

Q.  You have a theory that they were there to watch the shooting; that's your theory, right?

A.  Correct.

Q.  They knew it was going to happen, right?

A.  Correct.

Q.  But you don't have a single phone call from them to anyone here, right?

A.  No.

Q.  I'm sorry.  I didn't hear that.

A.  No.

Q.  No, that's not right?

A.  Are you talking about phone calls specifically to the defendants from Ralph Turpin?

Q.  Yeah.

A.  Around that time, no.

Q.  You don't have any phone calls, right?  You don't have any text messages?

A.  Well, whose phones are we talking about?

Q. We're talking about from Mr. Turpin. You don't have any.

A. Not that I'm aware, no.

Q. Well, you're the FBI, right?

A. Yes.

Q. You work for -- you have all the resources in the world at your fingertips, don't you?

A. I mean, we have what we have.

Q. You're not the, you know, little suburban police department. You have the resources of the United States government, correct?

A. Sure.

Q. You can get a subpoena issued, right?

A. Yes.

Q. You can get a search warrant, right?

A. Yes.

Q. You can get people's phone records, right?

A. Yes.

Q. You can get people's Facebook records and Instagram and all that; we heard about all that in this trial, right?

A. Right. And some --

Q. You can get video from things, right?

A. Yes.

Q. You can get GPS records, correct?

A. Yes.

Q. And, in fact, you got some of the GPS stuff in this case,

right?

A. Historical cell site data, yes.

Q. Okay. So, you can get all of that information, and I take it you got all the information you could in relation to this case, right?

A. Yep.

Q. And, in fact, as we've been sitting here on trial, you've tried to get more information, right?

A. Right.

Q. In fact, while we were on trial, things come up, and so you guys issued additional subpoenas, requested additional information, right?

A. Yes.

Q. So, all of that information, in that universe of information, you don't have a single text message from Ralph Turpin to anyone sitting here?

A. I do not, no.

Q. Ever, right?

A. Not that I'm aware, no.

Q. Well, if anyone was going to be aware of it, it would be you, wouldn't it?

A. We also didn't do a search warrant on his phone, so I don't have text messages.

Q. Okay. So, your excuse is you didn't do your job?

A. No.

Case - cross by Greenberg

8341

Q. Okay. You could have done a search warrant, right?

A. I mean, you have to meet certain standards.

Q. Right. You have to have a reason to believe you might find something, right?

A. Right.

Q. So, you didn't bother because you didn't think you'd find anything, right?

A. This is before my time here, so I can't speak for what was done before I was here.

Q. You could have done it in your time here, right?

A. I'm not sure.

Q. You could have done it last week; come on.

A. Probably not, no.

Q. Probably not?

A. I can't get a search warrant in a week.

Q. You can get a search warrant in a day. You can get a search warrant in an hour. What are you talking about?

A. That's not my experience.

MR. JULIEN: Objection to the form of the question and move to strike it.

THE COURT: Sustained, and I'll strike that.

BY MR. GREENBERG:

Q. Have you ever gotten a search warrant?

A. Yes.

Q. Okay. What's the longest it ever took you to get a search

Case: 1:21-cr-00618 Document #: 505 Filed: 01/31/24 Page 182 of 308 PageID #:12694
Case - cross by Greenberg
8342

warrant?

MR. JULIEN: Objection. Relevance.

MR. GREENBERG: Oh, no.

THE COURT: Overruled.

MR. GREENBERG: Thank you.

BY MR. GREENBERG:

Q. What's the longest it ever took you?

A. Weeks.

Q. Weeks?

A. Yes.

Q. What's the shortest it ever took you?

A. 12 hours maybe.

Q. Okay. So, you can do it, right?

A. Those were two different things, though, so -- it just depends. There's varying circumstances.

Q. But you didn't even try?

A. I did not get a search warrant for Turpin's phone, no.

Q. So, as you sit here now, the answer is you don't have a single text message from Ralph Turpin to anyone here, right?

A. Yes.

Q. You don't have a single phone call from Ralph Turpin to anyone here, correct?

A. I don't believe so, no.

Q. You don't have a single Instagram message from Ralph Turpin to anyone here?

Case - cross by Greenberg

A.  No.

Q.  Or a Facebook message, right?

A.  Right.

Q.  Let's go a little beyond that.  How about photos?  You can get photos, can't you?

A.  What kind of photos?

Q.  Well, you can get photos that people take?

A.  Could you elaborate, please?

Q.  Sure.  In this case, did you ever get images from people's phones?

A.  Phones that we had search warrants on, yes.

Q.  Okay.  Did you get images from Facebook?

A.  Yes.

Q.  Did you get images from Instagram?

A.  Yes.

Q.  And you got images -- you got pictures that Mr. Roberson had taken, right?

A.  Yes.

Q.  You got pictures that other people sitting here on the defense tables have taken, right?

A.  Yes.

Q.  You didn't get any pictures I took, but I mean the defendants.

A.  Correct.

Q.  At least I don't think you got my pictures.

Okay. So, you got defendants' pictures, right?

A. Yes.

Q. All right. Do you have any pictures where Ralph Turpin is in a picture with anybody sitting here?

A. I don't believe -- I can't recall, no.

Q. You can't recall?

A. I don't believe I've seen any, no.

Q. You haven't seen any. Not you don't believe. You haven't, right?

A. I don't believe I have.

Q. Okay. So, no social media, no text messages, no phone calls, correct?

A. Correct.

Q. Okay. Yesterday, I think it was yesterday, they're all starting to blur a little bit, Adonnis Dent testified, right?

A. Yes.

Q. And Adonnis Dent, as I understand it, is the guy in the red shirt, correct?

A. Correct.

Q. All right. Pretty noticeable, a guy in a red shirt, isn't it?

A. Yes.

Q. Pretty noticeable, a guy in a white shirt, isn't it?

A. Yes.

Q. I mean, they stand out on that video, right, the guy in

Case - cross by Greenberg

8345

the white shirt, the guy in the red shirt, right?

A. Yes.

Q. So, Adonnis Dent talked to you, didn't he?

A. Yes.

Q. And you were able to ask whatever you wanted of Adonnis Dent, right?

A. I suppose so, yes.

Q. Adonnis Dent is with Turpin out on the street, isn't he?

A. Yes.

Q. And he's talking to Turpin, isn't he?

A. Yes.

Q. And he's standing with Turpin, isn't he?

A. Yes.

Q. And he's walking up the street with Turpin, isn't he?

A. Yes.

Q. And he's pointing right after the shooting, isn't he?

A. Yes.

Q. And Adonnis Dent didn't get charged with anything, right?

MR. JULIEN: Objection. Relevance. Move to strike.

THE COURT: Sustained, and I will strike that.

MR. GREENBERG: I'm sorry, Judge. Can we have a sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MR. GREENBERG: What possibly could be the basis of

that objection and you striking that?

MR. JULIEN: It's not relevant.

THE COURT: The charging decisions against who they charged are totally irrelevant.

MR. GREENBERG: They're totally relevant, Judge. They go to bias, prejudice, and absolutely that someone was there and present and didn't get charged is one of the most relevant things you could possibly have, especially after they just went all -- through all this about what he was doing. I didn't --

MR. JULIEN: It's absolutely irrelevant. And him saying, "Nuh-Uh," doesn't change the fact that it's irrelevant, your Honor.

THE COURT: I mean, I also think there's a 403 issue. If you get to get that question answered, I'm going to let in all kinds of information about why he wasn't charged, and that's going to be a whole other -- I mean, do you want to let all that in?

MR. GREENBERG: Sure.

MR. JULIEN: Judge, it's just not relevant.

THE COURT: I think it's just very -- a charging decision is just not --

MR. GREENBERG: I'll rephrase it.

THE COURT: Yeah.

MR. JULIEN: There's no rephrasing about why someone

was or wasn't charged, your Honor. It's either relevant or it's not. And whether or not Mr. Dent was charged with a crime doesn't make it more or less likely that Mr. Turpin or any of the other people over there across the room are guilty of what we've charged them with.

THE COURT: Right. I agree with that. And so I just am going to adhere to the ruling.

(Proceedings heard in open court:)

BY MR. GREENBERG:

Q. Okay. So, you -- you talked to Mr. Dent, right?

A. Yes.

Q. And you asked Mr. Dent what happened, right?

A. Yes.

Q. And you asked Mr. Dent about what Mr. Turpin was doing out there, right?

A. On Oak Street?

Q. Yeah.

A. Yes.

Q. And Mr. Dent answered your questions, didn't he?

A. He gave us answers, yes.

Q. He gave you -- do you think he was lying to you?

MR. JULIEN: Objection.

THE COURT: Sustained.

BY MR. GREENBERG:

Q. He gave you answers. Did you have any reason to doubt his

answers?

MR. JULIEN: Objection. Same objection.

THE COURT: Sustained.

BY MR. GREENBERG:

Q. Well, you spoke to Mr. Dent, right?

A. Yes.

Q. You prepared reports from what Mr. Dent told you, right?

A. Yes.

Q. You sat here while Mr. Dent testified, right?

A. Yes.

Q. And certainly, if you thought that Mr. Dent was testifying falsely, you would have said something, right?

MR. JULIEN: Objection, your Honor. Can we have a sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MR. JULIEN: This is just so out of bounds. It's not relevant, and if I started asking the agent who she thought was and wasn't telling the truth, people over there would hit the ceiling that we were vouching and doing all sorts of things because it's not appropriate for the government to be opining who is telling the truth and who's not because that would be bolstering and vouching.

Your Honor, this is just not a relevant line of questioning.

THE COURT: Yeah. I agree it's irrelevant; and I sustained a couple of objections already, so I would just ask that you move on from this.

MR. GREENBERG: So, we don't get to respond?

THE COURT: I mean, well, feel free and respond now.

MR. GREENBERG: Judge, asking about statements they took from a witness who was out there on that day who was standing there with Mr. Turpin and didn't get charged is absolutely completely relevant to this case.

And asking if she sat there -- you know, she implied that Mr. Dent gave answers, and in her answer, she implied that he wasn't necessarily being honest. So, I should be able to ask her if, you know, lying to an FBI agent is a crime, isn't it? And all of those kinds of questions.

MR. JULIEN: This whole line --

MR. GREENBERG: This is cross-examination.

MR. KLING: And it's in the course of her investigation, Judge.

MR. JULIEN: This cross-examination and the line of questioning is not relevant, your Honor. It's not relevant for all the reasons that we stated. And in fact, there's an instruction that being present at the scene of the crime essentially means nothing. This is an irrelevant line of questioning, your Honor.

THE COURT: I guess it is true that if the government

were asking about her assessments of his credibility, then, you know, there would be a lot of -- there would be a lot of objections. And I just -- having her opine on the credibility of another witness just does not strike me as relevant or proper.

I mean, there are other things that you can ask, but I guess when it comes to her subjective interpretations of -- and her beliefs as to who was credible and, you know, why some people didn't get charged, they're kind of -- those are similar.

MR. GREENBERG: Judge, I'll ask it a different way that I think the government won't be offended by.

MR. JULIEN: We're going to object. Your Honor, just imagine they put on cases over there, and I re-call Special Agent Case and say, "Hey, do you think Dr. Loftus was lying? Do you think Lana Batko was lying or not credible?" All of these things, it's clearly not appropriate.

MS. DOMPH: And, Judge, let me just put this on the record. The difference here is that she gave an answer to Mr. Greenberg that suggested she believed he was lying. What she said when he asked the question is, "He gave -- he gave answers." And demeanor matters, Judge. And now she opened that door. I agree you can't ask a witness whether someone's credible, but she opened the door by her sarcasm and her demeanor.

MR. JULIEN: We don't agree with that, your Honor. The whole line of questioning is not appropriate. It just wasn't at the level where I could make an objection that would be sustained. I saw where he was going with it. But now we're at the point where I'm objecting because it's not relevant.

THE COURT: I really just -- I think it is irrelevant. It is also 403 when we start getting into her assessments of different witnesses' credibility, so I would just sustain the objection.

(Proceedings heard in open court:)

BY MR. GREENBERG:

Q. Agent, Mr. Dent testified after receiving immunity, correct?

MR. JULIEN: Objection. Misstates the record.

THE COURT: Overruled.

BY THE WITNESS:

A. He didn't get immunity.

MR. GREENBERG: Didn't Dent get immunity?

MR. JULIEN: No.

MR. GREENBERG: I'm sorry. Oh, I'm mistaken then. Okay. I'm mistaken. I'm sorry. It's hard to keep them all straight.

BY MR. GREENBERG:

Q. All right. Mr. Dent talked to you about what happened

Case - cross by Greenberg

8352

that day, correct?

A.  Yes.

Q.  And Mr. Dent appeared as a witness, right?

A.  Yes.

Q.  And he appeared for witness prep, correct?

A.  We visited him for a prep, yep.

Q.  He what?

A.  We visited him for a prep.

Q.  You visited him for a prep.  Okay.  And you talked to him about what occurred out there that day, right?

A.  Yes.

Q.  And when you were prepping him and -- did you talk to him before the witness prep day also, and I mean anyone from the government?

A.  Personally, I think that was the first time I met with him in person.  I don't know about the other agents off the top of my head.

Q.  Okay.  But when he was prepped, he was asked questions, right?

A.  Yes.

Q.  Talked to about what he was going to be asked about, right?

A.  Yes.

Q.  And he was being asked about what Mr. Turpin was doing out there that day, right?

A.   Yes.

Q.   And then he came to court, and he testified about it, right?

A.   Yes.

Q.   All right.  And other people testified about what Mr. Turpin was out there doing that day, right?  We just heard today, Mr. -- the gentleman with the Louis Vuitton bag.

A.   But he doesn't know what Turpin was doing on the street.

Q.   Well, he testified about what happened with Turpin that day.

A.   Right, yes.

Q.   All right.  So, the other day when Mr. Somerville was up here and saying someone pointed a gun at his head and so forth, and, you know, trying to get that in the video, you can't actually see that in the video, right?

        MR. JULIEN:  Objection.  Move to -- the form of this question, I object to, your Honor.

        THE COURT:  Overruled.

BY MR. GREENBERG:

Q.   You can't see that in the video, correct?

A.   Correct.

Q.   All right.  And -- but the gentleman came today, and he said someone was chasing Turpin down the street pointing a gun, right?

A.   Yep.

Case - cross by Greenberg

8354

Q. So, have you gone and looked for that video?

A. Yes.

Q. All right. And did you find it?

A. Nope.

Q. You couldn't find that, is that right?

A. Correct.

Q. All right. But there was audio where people called in to 9-1-1 and said they saw that, correct?

A. Correct.

Q. Okay. What did you do to try and figure out who did that?

A. We went back and reviewed all the raw footage. I tried to look for the two vehicles that Turpin described. He described a Durango, and then he described a Porsche. I looked for other people running. I looked at -- I just reviewed the raw footage from the start again.

Q. There were people who were out there that day, right?

A. Yes, there were people on Oak Street.

Q. Did you go interview those people?

A. No. I came on this case years later.

Q. Okay. Do you know if those people are alive or dead?

A. No. I mean, I don't know what people -- which people. There were a lot of people on Oak Street, so --

Q. Well, let's talk about the guy in the white -- it looks like the linen jacket and the slacks. Do you know who that is?

A.   I believe that's the Le Colonial employee, Joe King.

Q.   Right.  I think it was the manager of Le Colonial?

A.   Something like that, I believe, yes.

Q.   Have you spoken to that individual?

A.   I have not, no.

Q.   There were people -- I think we heard a bunch of stuff about because it was COVID, there were security guards outside of the stores, right?

A.   Right.

Q.   And there were a bunch of stores along the street there that had that.  There was Chanel and Hermes and all of these stores had people out there, right?

A.   Right.  A lot of stores had security guards.

Q.   We had, I think, an off-duty Chicago police officer, maybe I'm misremembering again, but came in and said he was a security guard somewhere, I think Chanel?

A.   Correct.

Q.   Did you ask any of those people about the earlier incident?

A.   I did not interview those people about that incident, no.

Q.   All right.  But the whole thing here is Turpin called to get people to do something to Duck, right?

A.   Right.

Q.   But you have no evidence of the call, you have no evidence of the text, and you didn't speak to anyone who was out there

to see what was going on?

A.  We have evidence that we presented, and the jury can put it together for themselves.

MR. KLING:  Judge, I'm sorry.  I'm having trouble hearing back here.  If she can speak closer to the mic.

THE COURT:  Okay.  Please do.

BY MR. GREENBERG:

Q.  I'm sorry.  Can you repeat that?

A.  We have the evidence that we've presented, and the jury can piece it together for themselves.

MR. GREENBERG:  Judge, you said 3:15?

THE COURT:  Yes, or any time, but whatever's good.

MR. GREENBERG:  Yeah, this is fine.

THE COURT:  All right.  So, let's take a break now for the next 15 minutes.  Please, again, no discussing, researching, or reading news during the break to the jury.

And to the witness, you're on the stand, so please don't discusses your testimony.

(Jury exits courtroom.)

THE COURT:  Anything to discuss?

MR. JULIEN:  No, your Honor.

THE COURT:  Okay.  See you back shortly.

(Recess had from 3:20 to 3:39 p.m.)

THE COURT:  All right.  Ready to resume with the jury?

MR. GREENBERG: They want to complain about something I want to do again, Judge.

MR. JULIEN: Your Honor, could we have the witness step out?

THE COURT: Sure.

(Witness excused from courtroom.)

MR. KLING: Judge, can I inquire, is this a sidebar or just the witness out?

MR. JULIEN: Just the witness out.

Judge, we've learned over the break that -- I don't know if it's Mr. Greenberg or other defense counsel, but one of defense counsel that's going to cross-examine this witness is going to seek to introduce 911 calls that were made on August 4th, 2020. I don't know which calls, but presumably the ones -- the 4:09. The calls from around 4:09.

So, the calls are hearsay. We can't think of any other purpose for which they're being offered other than the truth to establish facts that, frankly, are already in evidence. Mr. Brinson testified earlier today that he saw someone pointing a gun at -- you know, he doesn't know Mr. Turpin, but certainly what he was describing would have been consistent with someone pointing a gun at Mr. Turpin. And I don't again know which 911 calls they're going to seek to introduce, but --

(Brief pause.)

Case - cross by Greenberg

8358

MR. JULIEN:  I was listening for the timestamp.

The calls are hearsay.  There's no basis to admit them.  I think it's clear they're seeking to admit them for the truth of what's in the calls.

The agent wasn't on the scene that day.  She obviously didn't hear the calls and do anything in response to what was on the calls.  Officer Humphrey testified that 911 calls aren't even routed directly to an officer; they go to a call taker who sends them to dispatch, and then officers are dispatched.  But the calls themselves are hearsay.

MR. KLING:  Judge, may I respond?

THE COURT:  Yes.

MR. KLING:  They are hearsay.  There's no question about it.  But there are two exceptions to the hearsay rule, 803(1) and 803(2), which allow them in for the truth of the matter asserted.  803(1) is present sense impression:  A statement describing or explaining an event or condition made while or immediately after the declarant perceived it.  These are people who called in and said, I saw a guy running down the street with a gun.

Excited utterance:  A statement relating to a startling event or condition -- which I don't think seeing somebody with a gun can say is not a startling event or condition -- made while the declarant was under the stress of excitement that it caused.

Those are both hearsay exceptions. Mr. Julien is right, they are hearsay; but they're admissible because they're exceptions to the hearsay rule.

MR. JULIEN: So --

MR. KLING: Aside from other arguments we have regarding their admissibility and opening up the door in the course of the investigation.

MR. JULIEN: I don't know, having heard these calls, that present sense impression is going to get them over the hump. I think there's a sufficient gap between what they're reporting happened in the past tense when they're speaking to the 911 dispatch. So, it's really a question of whether they're excited utterances, and I don't think they are.

But here's the bigger problem. There's going to have to be a foundation that the declarant was under an excited state when they were reporting this information. I just don't know that that's going to come from these calls. You have one call at 4:09 where it's someone in Moncler who didn't even see it and they're talking to a patron inside and they're trying to, like, well, what is the patron saying, and there's this whole back-and-forth. Then the employee sends someone downstairs to find the person who saw what it is. I don't think they ever get on the phone in that call. In another call there's someone in the shop. It doesn't sound like they're excited to me.

Case - cross by Greenberg

8360

I don't know how that foundation is going to be laid that these are excited utterances. And if they're not, they're hearsay.

MR. KLING: Judge, you can use your common sense and experience. If somebody calls and says, hey, somebody's running down the street with a gun, number one, they clearly qualify as present sense impression because it's made immediately when it happened or right after the incident.

But with respect to excited utterances, there's no timeline on how long the excited utterance has to be before the person calls, as long as the person is still, quote, under the stress of excitement that it caused. I don't think anybody in their right mind can suggest that if you see somebody with a gun and call the police, that's not an excited utterance.

MS. BORMANN: Judge, I have a case. It's United States vs. Boyce. It can be found at --

MR. KLING: Cheryl, we can't hear you back here.

MS. BORMANN: I'm sorry.

I've got to get the citation here. Sorry about this. I have a case. It's found at 742 F.3d 792. It's a Seventh Circuit case from 2014. In it, the issue was whether or not it was a criminal defendant -- Boyce was a criminal defendant and the government sought to introduce the 911 tape of the victim calling that her husband, the defendant, had a gun.

Case - cross by Greenberg

8361

And, so, the Seventh Circuit ruled that it is an excited utterance and it was properly admitted against a defendant, who, frankly, has much greater rights than the government does here.

In addition, just a little hat off to Professor Kling, the concurrence notes that it is not only admissible under the rule for excited utterances, but it's also admissible as a present sense impression.

So, Mr. Kling is right on all counts, but it's definitely under Seventh Circuit --

MR. KLING: Judge, I can quote the committee comments, as well, which support the propositions that I've just stated.

MR. JULIEN: That call may have been an excited utterance and a present sense impression, but, again, it's been a while since I've listened to these calls. I think -- in fact, I'm certain -- in at least one of them, the person who called isn't the person who saw whatever they purport to have seen, and I don't know that the person who saw it ever joins the call in that one. And I think that may be true in the call from the salon also. It's one of my customers says they saw X, Y and Z. So, there are actually a couple layers of hearsay.

From a practical perspective, I don't know how we're going to suss this out because the way that the system works

in here, they're going to have to be admitted and published, and then we're going to start listening to them and I'm going to start objecting and move to strike them.

MS. BORMANN: Judge, they all happened within moments of what the government has laid out is their timeline of events. And whether the person actually saw it or whether the person had somebody run in and tell them, call 911, call 911, somebody just held a gun to me, it's still a startling event. And that's the basis of excited utterance.

MR. JULIEN: That is not a foundation for an excited utterance. The person perceiving it, that's the foundation for it, your Honor. As Mr. Kling indicated, it is the person who still must be under the stress, or whatever, of the event. But, again, from a practical perspective, I don't know how you're going to rule on this -- again, we're just finding out about it -- without us hearing these calls and deciding that it is or it isn't an excited utterance.

MS. BORMANN: Mr. Julien, when I see somebody holding a gun to somebody else, regardless of whether it's me, it's excited. I get excited. If I called 911, it would be an excited utterance.

MR. KLING: Let me also quote the committee comment: Participation by the declarant is not required. A non-participant may be moved to describe what he perceives, and one may be startled by an event in which he is not an

actor.

MS. BORMANN:  Exactly.

MR. BOYLE:  Right, Judge.  I think that's really what you're going to be hearing in these calls.

One of the callers is Joe King of Le Colonial Restaurant.  We've heard about him repeatedly.  On direct examination today, the agent was asked about 911 calls and did she listen to 911 calls as part of this investigation.  And she said, yes, I did.  So, it goes back also to that exception this morning about learning things in the course of the investigation.

We've heard about Joe King.  We've heard about the man in the light-colored suit at Le Colonial.  We've heard about the officers who responded to the scene, Humphrey and Brown.  We see Joe King jog over to those officers.  He's obviously excited.  He wants them to come to Le Colonial to do this investigation because he has four women patrons who saw this event moments earlier.  And he needs them -- they're hysterical, they're crying.  They need to be talked to.

The other call is from an employee at Moncler, which is obviously at the heart of the government's case against my client.  And he calls 911, which I asked the security guard about.  And this is direct evidence of this that he called 911 describing my client and Mr. Dent in his shop.  I think the jury deserves to hear that.

MR. JULIEN: So, a couple things. That last call is definitely not an excited utterance. What he's talking about, and it's somebody that they disclosed to us last night on their witness list, that call came in at 4:12 p.m. And what that person was saying was, hey, there are two people in my store and here's what they're saying and they won't leave. He didn't see anything. That's not -- definitely not -- an excited utterance. And the present sense impression is there are these guys, Mr. Turpin and Mr. Dent, in the store who won't leave, which is kind of bringing us back to the calls at 4:09. It's a call from a salon and a call from Joe King.

They didn't call Joe King. They didn't disclose Joe King as a witness. Maybe they could. They chose not to. But in any event, Joe King didn't see what it is that these patrons saw.

And, again, I don't think the person in the salon saw it either. It's like, hey, here's a person in the salon saying X, Y, and Z. Maybe that person joins the call. Maybe they don't. But, certainly, this call at 4:12 is not an excited utterance or a present sense impression of what occurred vis-a-vis someone pointing a gun at Mr. Turpin.

THE COURT: How long are each of these calls?

MR. GREENBERG: Short. Want to hear them?

MR. BOYLE: About two-and-a-half, three minutes each.

THE COURT: Sure, yeah. I think we might as well

Case - cross by Greenberg

8365

just play them.  Yeah.

MR. BOYLE:  Just so your Honor knows, I don't think this was the government's suggestion, but this idea that -- Joe King has been interviewed by the FBI.  The Michael from Moncler and the other employees from -- were interviewed by the FBI.  That is where we got these names.  They're in the discovery.  There's no surprises here.  So, I'm not sure what -- I don't know what they meant by that.

MR. JULIEN:  I meant that you could have called him to talk about what he saw, as opposed to playing a 911 call describing -- saying things out of court.

MR. BOYLE:  Okay.

MR. KLING:  Judge, let me -- I'm sorry.

MS. BORMANN:  I was just going to say if it's admissible, that's the whole point is you don't need to call the witness because it's admissible.

MR. JULIEN:  It's hearsay.  Yes, I think we all agree -- some of us agree -- with the basic proposition that out-of-court statements being offered for the truth are hearsay, which is why you call the witness.

MR. KLING:  Which is why we have exceptions to the hearsay rule.

MS. BORMANN:  Right.

MR. KLING:  And if I can commend your attention also, Judge, regarding the time element, the committee comments

state: With respect to the time element -- and I'm quoting -- Exception Paragraph 1, which is present sense impression recognizes that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable.

Under Exception 2, excited utterance, the standard of measurement is the duration of the state of excitement. How long can excitement prevail? Obviously, there's no pat answer.

Judge, there are cases with sexual assault victims who it prevails months later. How long are you under the stress of the excitement? How long would you be under the stress of seeing somebody run down the street pointing a gun at somebody?

I would suggest that these clearly are admissible as exceptions to the hearsay rule.

MR. GREENBERG: Judge, we have to publish it for it to work.

THE COURT: Okay.

(Audio played.)

MR. GREENBERG: Judge, that's probably all we would play of that one, I think.

And, then, there's a couple more.

(Audio played.)

MR. GREENBERG: So, Judge, that one is independently

admissible for the time frame and the timeline here to show what time they went in and the Moncler guy called. So, that's not even a truth thing or -- it's independently -- and as is the other one where they called to show the timeline of events, which are very important in this case because, as you heard, it's 4:09 and 4:12, the two calls that come in. The shooting is at 4 --

MR. BOYLE: 26.

MR. GREENBERG: -- 26. So, 15 -- 12 minutes later. Something like that.

MR. JULIEN: So, Judge, this is even worse than I thought because they're not seeking to introduce the one from the salon, which was probably the closest call if there was one.

As you heard in the call from 4:09, Joe King, it's not even two -- it's three layers of hearsay. There's some women who claim they saw something who are talking to Steven about it, who is talking to Joe King. And as is evident what the problem with hearsay, what they're describing clearly didn't happen. Hey, there's someone downstairs who pistol whipped a woman. There's no video evidence of that. And that's inconsistent with what Mr. Brinson, who was there, saw and the suggestion that's been trying to -- forced in front of the jury through questioning of other witnesses, which is why we don't allow hearsay.

So, again, people -- unidentified declarants -- speaking to Steven, who doesn't have the story straight; speaking to Joe King, who doesn't know what's going on and he's trying to get Steven on the phone and he can't; and they're playing this game of telephone in relaying information that's not accurate.

So -- and that's the first call, which is closer in time to the event, which is about 4:07, 4:08.

Then there's 4:12. Again, the person who was the declarant was disclosed to us last night on the witness list for Mr. Turpin. So, that is someone who is actually going to be here. If they want to talk about what it is he saw or didn't see, the best source of that is that witness who is going to be here, not this recording, which is hearsay -- his statements out of court -- trying to get it in through Special Agent Case when, again, there's no indication that Mike even saw it. He's talking about there are people in the store. And it's clear based on the timeline that's been played out, he's talking about Turpin and Dent in the store complaining about what Turpin says he saw.

MR. BOYLE: What happened to Mr. Turpin, I think it is relevant to this idea of why he's hanging out in the Moncler. And the employee is saying these two gentlemen are in here being chased from someone. They're hiding in here.

Are they causing any disturbance? Are they a threat?

No, no, no, they're not.  They're just in here like sheltering, hiding.

I think that's relevant.  They keep showing that video of my client all upset and agitated.  And I don't know -- I think up until today, before Mr. Brinson actually testified and described the event that my client was a victim of, I guess this is the first time they're acknowledging that that actually happened to my client.  So, I do think it's relevant.

THE COURT:  Okay.  Just one second.

So, I think on the first call, I would -- hearing the tone of voice of Mr. King, I think Mr. King's speech is an excited utterance.  However, it then is relaying other levels of hearsay of who told him what.  And I guess I just don't see a basis to find that the second level of hearsay falls within an exception.  So, I would rule out the King call.

The second call, I think, is different because there's not multiple levels of hearsay.  There's just the one, you know, Moncler employee directly relaying that employee's own impressions.  And the question is:  Is it an excited utterance or present sense impression?  It does not sound that excited to me.  But I think it could fall within present sense impression.  So, I'll permit the second call.

I understand the government's argument that the defense can play it with the employee himself.  And I agree

that that would be better.  But it's not required, absolutely.

So, I will allow the second call, not the first.

Ready to proceed with the jury?

MR. JULIEN:  Yes, your Honor.

THE COURT:  Thanks, everyone.

We need the witness to return.

(Brief pause.)

MR. GREENBERG:  I'm just making sure I got the right call, Judge.

THE COURT:  Okay.

MR. KLING:  Judge, I'm sorry, when he's figuring that out, did you determine how late we're going today?

MR. GREENBERG:  Judge, this is the third call.

THE COURT:  There's a third call?

Are you seeking to play this, too?

You know, I --

MR. JULIEN:  This is what I was talking about.

MR. GREENBERG:  That's all right, Judge.

THE COURT:  We can --

MR. GREENBERG:  Someone else -- there's other cross. Mr. Turpin's lawyers can play it if they want.  That's fine. I just want to make sure I'm playing the correct one.

(Jury enters courtroom.)

THE COURT:  All right.  We can proceed with the cross.

MR. GREENBERG: Thank you.

BY MR. GREENBERG:

Q. So, Agent, you said when Mr. Julien was asking you questions that you had listened to some of the 11 calls, right?

A. I listened to all of them.

Q. All of the 911 calls.

Every one that came in that day, right?

A. All the ones from August 4th related to the Oak Street shooting.

Q. Okay.

A. Little before and after, as well.

Q. All right.

So, you listened to the calls that came in regarding the person chasing Mr. Turpin with a weapon, right?

A. Reports of a man chasing another man down the street, yeah.

Q. Okay. The reports of a man chasing another man.

And do you have any theory on who that man was that was being chased?

A. The person being chased?

Q. Yes.

A. Yes.

Q. Okay.

Who do you think that was?

A.   Ralph Turpin.

Q.   All right.  That's what I thought I asked.

A.   Okay.  I just am trying to say, like, nobody identified him in the 911 calls.

Q.   Right.  Nobody identified him.

They were calling about the chasers, not the chasee?

A.   Right.

Q.   Right?  Okay.

And you were able to hear what time those calls came in --

A.   Correct.

Q.   -- correct?

A.   Yes.

MR. GREENBERG:  So, this would be Roberson Exhibit 24?

MS. BORMANN:  24.

MR. GREENBERG:  24.

BY MR. GREENBERG:

Q.   I'm going to play one of those calls for you.

I'm sorry, I forgot to plug in.

MR. GREENBERG:  Judge, if I can have one split second.  I have to do this a different way or everyone's going to see all my e-mails, and so forth.  Not that I'm hiding anything, but --

(Brief pause.)

MR. GREENBERG: Judge, can we publish this, please?

THE COURT: Yes.

MR. GREENBERG: Thank you.

(Audio played.)

MR. GREENBERG: Okay. We can unpublish.

THE COURT: Okay.

BY MR. GREENBERG:

Q. All right. That was at 4:12, right?

A. Correct.

Q. And -- is that correct?

A. Yes.

Q. And there were other -- a couple of other calls that were within two or three minutes of that, right?

A. Two calls at 16:09.

Q. So, 4:09, right?

A. Correct.

Q. And those calls are of the people actually chasing down the street, correct?

A. Correct.

Q. So, our timeline for Mr. Turpin getting chased is 4:08, 4:09, right?

A. Right.

Q. All right.

Now, you've done all this video on all this, correct? You've looked at it, you've put it together, right?

A. Put what together?

Q. Video. The Camtasia you were involved in, right?

A. I did put Camtasia together, yes.

Q. And, then, Exhibit 2030, this long video we saw today, you were involved in that, right?

A. I didn't put it together, no.

Q. All right.

But you were involved in helping to put it together, weren't you?

A. No.

Q. Okay.

You looked at it, didn't you?

A. Yes.

Q. You testified about it, right?

A. Yes.

Q. It's got timestamps, doesn't it?

A. Yes.

Q. You're concerned with those timestamps, correct?

A. Right.

Q. So, based on the video evidence and the timestamps, do you have an idea of what time the vehicles left Parkway Gardens?

A. Right.

Q. I'm asking, do you have an idea? Yes?

A. Yes.

Q. What time?

Case - cross by Greenberg

8375

A. Approximately 4:04 p.m. there.

Q. So, that's before Turpin gets chased, correct?

A. Correct.

Q. So, now it doesn't matter that there's no call after 4:04 to anyone here because, according to the government theory, they've already left, correct?

A. There are calls made.

Q. From Turpin?

A. Right.

Q. Right. Okay.

So, do you know what time Turpin was in Milani?

A. He got there at approximately, I believe it was, 3:57 p.m. approximately.

Q. Okay. 3:57, 3:58, 3:59, somewhere in there?

A. Right.

Q. All right.

So, in that time frame, how many calls do you have between Mr. Turpin and anyone over on this side of the room?

A. None.

Q. Okay.

How many text messages do you have between Mr. Turpin and anyone on this side of the room?

A. I -- we don't have a search warrant for his phone, so I would have no text messages.

Q. All right.

You don't have any records from the phone company that shows that either, right?

A. Right.

Q. You don't have any data messages or anything like that, right?

A. I mean, there's the data usage in the mobility lines of the report.

Q. Well, let's talk about -- since we're talking about all that kind of stuff -- about my client Mr. Roberson, okay? You did get information from Mr. Roberson, right?

A. What kind of information?

Q. Electronic information.

A. What kind of electronic information?

Q. Did you get his Instagram?

A. Yes.

Q. Did you get his Facebook?

A. Yes.

Q. Did you get his cell phone?

A. Yes.

Q. Did you determine that he had more than one cell phone?

A. Yes. Well, there's a phone at the time of the murder and there's a phone later on that we discussed previously, so --

Q. All right.

But you don't have any evidence that after this crime, Mr. Roberson got rid of the phone he had on that date,

do you?

A. I'm not aware.

Q. You're not aware?

A. Of what he did.

Q. Well, wouldn't you like to know if someone after committing a crime disposed of their phone?

A. Yeah. I'd love for them to tell us that.

Q. I'm sorry, what?

A. Yeah. I'd love for them to tell us that.

Q. Okay.

Well, wouldn't you love to look at the records and see if there was a phone call after that date?

A. I'm --

Q. That would tell you that, wouldn't it?

A. Can you rephrase the question?

Q. Sure.

If someone gets rid of their phone, there shouldn't be any telephone calls after they get rid of it, right?

A. You can just get a new number on -- the same number and a new phone.

Q. Okay.

A. Depends on what kind of phone you're getting.

Q. All right, Agent Case, let's do this. We'll be here for three weeks.

When you get the phone records from the phone

Case - cross by Greenberg

8378

company, you can subpoena or get a search warrant for a phone number, right?

A.  Yes.

Q.  And when the phone company produces the records, they produce the records for that phone number, correct?

A.  Yes.

Q.  So, here -- and I'm not going to mark it as an exhibit because I don't want to turn it in -- is my brand-new iPhone 15, okay?

A.  Okay.

Q.  You with me?

A.  With you.

Q.  All right.

I got it the day after Thanksgiving.  If you subpoenaed my phone number, would it show you in those phone records the calls I made on Thanksgiving before I got my new iPhone?

A.  It's going to show you the records for the phone number.

Q.  Right.

So, did you see any evidence that Mr. Roberson stopped using that phone number after August 4th?

A.  Yeah.  We showed messages of him talking about a new phone number.

Q.  Way after, right?

A.  In -- not way after.

Q. November?

A. I wouldn't consider that way after, but --

Q. Okay.

So, the message you testified about earlier was in November, wasn't it?

A. Yes.

Q. And you remember those phone records, right? You looked through them, right?

A. The search warrant on the phone?

Q. Yeah.

You looked through the phone records that were produced, didn't you?

A. Can you clarify which phone records?

Q. Was there a phone number for Mr. Roberson that was 708-362-9675?

A. I don't have it memorized.

Q. Okay.

Would a printout --

(Brief pause.)

MR. GREENBERG: May I approach, Judge?

THE COURT: Yes.

BY MR. GREENBERG:

Q. I'm going to show you what I marked as Roberson 26.

(Document tendered.)

BY MR. GREENBERG:

Q. Tell us if you've ever seen that document.

(Brief pause.)

BY THE WITNESS:

A. I have not personally seen this document, no.

BY MR. GREENBERG:

Q. Okay.

So, you don't recognize this as a printout from the download for Mr. Roberson's phone?

A. Again, I haven't seen that myself, so I'm not sure.

Q. Turn to Page 3 of this document. And if you look at the bottom, it's got some of what you testified about today. You from the O Dipset? I'm OTF, though?

MR. JULIEN: Your Honor, I'm going to object because I'm not sure if this is refreshing or what this is.

MR. GREENBERG: It's the rule of completeness, Judge. They can't just ask about a single message and then not allow us to ask about the rest of the conversation.

MR. JULIEN: I don't know that that's how the rule of completeness works. But I also know that this witness said she's never seen this document before.

MR. GREENBERG: Okay. I'll ask another question, Judge.

THE COURT: Okay.

BY MR. GREENBERG:

Q. Does this document appear to be text messages from

Mr. Roberson to 312-887-2618?

A. Yes.

Q. And is that, in fact, the text exchange you were testifying about earlier today?

A. I testified about a text exchange that has, yeah, similar wording. Again, I also didn't do the review of Kenny Roberson's phone, and I also have never seen this document before, so --

Q. Okay.

But you testified about these very text messages, didn't you?

A. I testified about the ones that we put in evidence earlier.

Q. Right.

You testified about the ones that helped you. So, now I want to ask you about the rest of them, okay?

A. Okay.

Q. This appears to be a text message exchange between Mr. Roberson and a young lady, correct?

MR. JULIEN: Objection. Foundation.

THE COURT: Overruled.

MR. GREENBERG: Thank you.

BY MR. GREENBERG:

Q. Is that right?

A. Correct.

Case - cross by Greenberg

8382

Q. And the first thing on here is -- the first messages are from, it looks like, October 28th of 2020, correct? It's at the very top, where it says "Start Time."

A. I see it, but I don't know if that specifically means the start time for all of these message- -- I don't know what the start time on this is because I've never seen this before. So, I can't tell you if that's the start time of this message change because the next one starts --

Q. Okay.

The next one is December 14th, right?

A. Right.

Q. Okay.

So, let me ask you this: The 708 number that's on here -- 708-362-9675 -- is that a number that you acquired information for in the course of your investigation?

A. I don't have his number memorized, but if you showed me something with it, then I can compare it.

Q. Okay.

Well, obviously, the phone search you did was where the messages that you testified about earlier came from, correct?

A. Again, I didn't do that search. But, yes, the messages came from the review of his phone.

Q. All right.

So, if the same messages are contained in this

Q. document, it's probably the same phone, right?

A. I don't know.

Q. Well, can you turn to Page 3. You see at the bottom where it looks like the young lady says: You from the O.

And the response is: Dipset. I'm OTF, though.

Right?

A. Right.

Q. Do you know what it means to be a groupie?

A. No.

Q. You never heard that phrase "groupie"?

A. Like a hippie. I don't know.

Q. Okay.

Like did you ever see people like they want to hang out with people in a band or something like that?

A. No.

Q. You've never heard of that?

A. Nope.

Q. So, if Mick Jagger came walking in here, you'd be shocked if all of us got up and walked out with him just because we would rather hang out with him than these guys?

MR. JULIEN: Objection. Relevance.

THE COURT: Sustained.

MR. GREENBERG: Okay.

BY MR. GREENBERG:

Q. So, have you ever heard of people who want to be with

Case - cross by Greenberg

8384

famous people?

A.  Sure.

Q.  Right?  I think we talked earlier in the trial a little bit about Taylor Swift, like people want to hang out with Taylor Swift, right?

A.  Sure.

Q.  All right.

And you've heard -- so, the O has more than one meaning, doesn't it?

A.  Means -- it stands for O-Block.

Q.  Doesn't it also stand for Parkway Gardens?

A.  Sure.

Q.  Right?

And people go to Parkway Gardens because it is the birthplace of a certain kind of music, correct?

A.  Can you ask that again?

Q.  Sure.

You're aware there's been testimony here that people go to Parkway Gardens because it's sort of the birthplace of drill rap, right?

A.  Like what kind of people?

Q.  People who are fans of drill rap.

A.  I guess.  I don't know.

Q.  You don't know?  That's not something you'd be interested in?

A.   No.  I do know that we've had people testify that if you say you're from the O, you're a gang banger.  So, they said that's specifically a term if you're from the O.

Q.   Who testified to that?  I must have missed that.

A.   Well, you --

Q.   Hmm?

A.   It was testimony earlier in this trial.

Q.   There was testimony earlier in this trial that O-Block referred to Parkway Gardens.  You didn't hear that?

A.   I did.

Q.   Okay.  Well, I just asked you that.

A.   What's your question again?

Q.   So, you've heard of people claiming Parkway Gardens is -- like they want to be associated with it, right?

A.   I don't know.

Q.   How about OTF?  How about OTF?

A.   What about it?

Q.   Do people want to be associated with OTF, meaning the music label?

        MR. JULIEN:  Calls for speculation.  Objection.

        MR. GREENBERG:  I'll rephrase it, Judge.

        THE COURT:  Okay.

BY MR. GREENBERG:

Q.   You've heard about OTF as a music label, right?

A.   Yes.

Q.   Lil Durk?

A.   Yes.

Q.   Chief Keef, right?

A.   Right.

Q.   Do you know who those guys are?

A.   Yes.

Q.   They're pretty successful, aren't they?

A.   Yes.

Q.   And people want to be associated with that label, right?

A.   Can't speak for other people.

Q.   Well, did you hear testimony about that?

A.   I don't know.

Q.   You don't remember if you did or you didn't?

A.   Just I don't remember.

Q.   Did you see the video recently of Lil Durk giving Morgan Wallen an OTF diamond necklace?

A.   Lil Durk wasn't in that video.

Q.   Right.

     But Lil Durk was giving it to him, wasn't he?

A.   That's what the label on the video said.

Q.   Right.  Because they did a song together, right?

     MR. JULIEN:  Objection, your Honor.  None of this is in evidence.

     MR. GREENBERG:  It's cross.

     THE COURT:  So, overruled.

Case - cross by Greenberg

8387

BY MR. GREENBERG:

Q. Right? They did a song together?

A. Are you talking about Morgan Wallen?

Q. And Lil Durk.

A. Yes.

Q. All right.

And you're not suggesting that Morgan Wallen is a member of O-Block, are you?

A. Nope.

Q. So, I would be correct, then, that OTF stands for various things, right?

A. Yes.

Q. And when you want to be with OTF, it can be like a boosting thing -- I'm with OTF -- right?

A. Sure.

Q. And if I'm part of O-Block, I'm cool, I'm with the music scene, right?

A. I guess. I'm speculating at this point.

Q. Well, would it be a fair statement that it's probably -- this is between Mr. Roberson, this exchange, and a young lady, right?

A. Right.

Q. And if you read the whole exchange, it looks like Mr. Roberson is trying, for lack of a better term, to hook up?

MR. JULIEN: Objection. Speculation.

BY MR. GREENBERG:

Q. Well, let me take you to that point. Turn to the next page, which is the page that starts at 1:13:26.

Do you see that?

MR. JULIEN: No. We don't have it.

MS. BORMANN: It's in discovery, guys.

MR. GREENBERG: Where is the copy? The extra copy.

We do have an extra copy for you.

BY MR. GREENBERG:

Q. Okay. It looks like Mr. Roberson says: When can I see you?

She says: I don't know. You tell me.

And this is at 1:15 in the morning?

Today if you ain't busy. I can come smoke with you if you smoke.

Right?

A. Right.

Q. I'm sorry, 1:15 in the afternoon. I'm sorry, not the morning.

Right?

A. Mm-hmm.

Q. All right.

So, it looks like he's trying to meet up with her, right?

A. Right.

Q.  Probably wouldn't be a really good meet-up line to say, gee, I'm a gang banger, would it?

A.  I don't know.

Q.  But it's probably a pretty good meet-up line to say, hey, I'm with Lil Durk, right?

A.  I don't know.

Q.  People are cooler if they're with the band, right?

A.  I don't know.

Q.  Well, let me ask you about your searches of Mr. Roberson's social media and all that, okay?

A.  Okay.

Q.  We saw the picture from Instagram where it says, free the guys, and it lists a bunch of different things, right?  OTF and Dipset and O-Block and other things, right?

A.  Right.

Q.  Other than that, how many text messages did you locate where Mr. Roberson makes reference to O-Block?

A.  I would have to go back and look because there's a lot.  I don't know if you're talking about -- I didn't do all the phone reviews.  I'd have to go back.  There's so much stuff on the phone.  So, not off the top of my head.

Q.  Okay.

        But we didn't see any in trial, did we?

A.  Doesn't mean that we didn't create a report on it.

Q.  Right.

So, you want to tell this jury that there might be references to O-Block in Mr. Roberson's social media and they just didn't see it?

MR. JULIEN: Objection. It misstates the last question and answer.

THE COURT: Sustained.

BY MR. GREENBERG:

Q. Are you saying that as you sit there now, as the case agent, you can't tell us with certainty that there's no reference to O-Block in Mr. Roberson's social media?

A. Again, it was a lot of data. I'd have to go back. So, I don't know off the top of my head.

Q. Would you agree that'd be a pretty important piece of evidence?

A. I believe we've already shown pieces of that evidence already, so --

Q. How many pictures are there of Mr. Roberson flashing an O-Block sign? Is there an O-Block -- let me --

MR. GREENBERG: Strike that.

BY MR. GREENBERG:

Q. Is there an O-Block sign?

A. I believe so.

Q. Okay.

Well, shouldn't you know this?

A. Yeah, I just -- I don't know what the sign is, so --

Q. I'm sorry, what?

A. I don't know how to do the sign, so --

Q. I didn't ask you to do the sign. Is there a hand signal for O-Block?

A. I believe so, yes.

Q. Do you know what it is?

A. I -- no, I wouldn't.

Q. You don't know what it is or you can't make it?

A. Like, I can't do it. I don't know what it is.

Q. Okay.

So, if you saw the O-Block hand sign, you wouldn't be able to identify it?

A. I would just have to go back and look.

Q. All right.

And would I be correct that you don't have a single image of Mr. Roberson showing an O-Block hand sign?

A. I don't know. There were thousands of photos. So, again, I'd have to go back and look.

Q. Okay.

How about the chains? You know the O-Block chains?

A. Yep.

Q. All right.

How many pictures did you find of Mr. Roberson wearing an O-Block chain?

A. I don't recall any.

Case - cross by Greenberg

8392

Q. Right. There aren't any, are there?

A. Not that I'm aware of.

MR. GREENBERG: Give me one second, Judge.

THE COURT: Sure.

(Brief pause.)

BY MR. GREENBERG:

Q. Text messages. How many text messages are there where Mr. Roberson is referring to O-Block?

A. A few were identified. Again, I didn't do the search of that phone.

Q. They were identified? A few?

A. Yep. We just put them on.

Q. Are you talking about the, take it to the O?

A. We just put text messages up.

Q. Right.

Are you talking about the message that said take it to the O, or what text message are you referring to?

A. The ones that we just showed earlier.

MR. GREENBERG: If I can have one sec, Judge?

THE COURT: Sure.

(Brief pause.)

BY MR. GREENBERG:

Q. All right. I'm going to pull those up in a second.

You were involved in listening to the tape recordings from the jail, correct?

Case - cross by Greenberg

8393

A.  No.

Q.  Do you know who TY is?

A.  TY, I believe, is somebody that was killed.

Q.  Okay.

TY, in fact, is Mr. Roberson's deceased brother, right?

A.  I didn't know for sure.  I don't know.

Q.  Well, as you were listening to these calls, weren't you interested in who Mr. Roberson was referring to when he said, on TY?

A.  Usually people say on a name.  They're just referring to somebody that's dead, so --

Q.  But weren't you concerned with who it was?

A.  No.

Q.  Well, if he'd have said, on Odee Perry, or, on OP, you would have been concerned, right?

A.  I mean, they're dead, so I don't know why that would be important.

Q.  So, it's not important if someone's dead to your investigation?

A.  When they're swearing on somebody's name, that's not really -- not important.  They say it all the time.

Q.  Okay.

I think earlier in the case we asked you about had you gone to the scene, the scene being Oak Street, right?  You

testified about that, correct?

A. Correct.

Q. And after that, we asked you -- I think I asked you if you had ever gone to Parkway Gardens, right?

A. Right.

Q. And at that point, you said you hadn't gone to Parkway; is that correct?

A. That's false.

Q. Hmm?

A. That's incorrect.

Q. That's incorrect.

So, when I asked you earlier, you had been to Parkway?

A. I said last time I testified that I've been to Parkway numerous times.

Q. Okay.

Again, it's been a long trial and I apologize. I'm not trying to trick you up.

So, you've been to Parkway?

A. Yes.

Q. All right.

Well, let's talk about Oak Street first.

MR. GREENBERG: Judge, I think this was already -- I know this was already admitted. This is Government Exhibit 5000. Can we publish this?

THE COURT: Yes.

BY MR. GREENBERG:

Q. So, this is the map of Oak Street, right?

A. That's the incorrect one.

MR. GREENBERG: This is not the map? There's an updated version, okay. All right. Well, can I use it?

I'll mark this, Judge, as Roberson 27.

It's fine. Jason -- you got it? Okay. Got the updated one?

(Brief pause.)

MR. GREENBERG: I'm going to hire a young associate next time.

This is the new Government 5000.

Can we publish this, Judge?

THE COURT: Yes.

MR. GREENBERG: It was admitted into evidence.

THE COURT: Yes, we can publish.

MR. GREENBERG: Oh, sorry. Yeah, it's on document camera.

There you go.

Some of us are old enough to remember chalk and a blackboard.

BY MR. GREENBERG:

Q. So, Moncler on this map is almost at Rush Street, correct?

A. Close to Rush, yes.

Case - cross by Greenberg

8396

Q.  Close to Rush.

And it's in -- if I have my Oak Street geography correct -- and if we need an expert, I'll call my wife, but it's in the same building as the Hermes store, right --

A.  I don't know --

Q.  -- at that point?

A.  -- if they're connected.

Q.  Okay.

Have you gone out to that -- where Moncler used to be?

A.  Yes.

Q.  Did you go inside?

A.  No.

Q.  Why not?

A.  I was just there to get -- like I said, look at the scene of the crime, get a lay of the land.

Q.  Okay.

So, when you're getting the lay of the land, isn't one of the things that's important in getting the lay of the land to determine what Mr. Turpin was looking at while he's standing by the window?

A.  You can see it from the sidewalk generally as well, so --

Q.  You can see what from the sidewalk?

A.  You can see, essentially, probably the same view from the sidewalk if you're seeing right in front of the door as if you

were just inside of the doorway.

Q. Well, if I have this correct, the Moncler store entrance is not flush with the sidewalk. It's set back, correct?

A. Correct.

Q. Okay.

And, so, when you're saying you could see the same view from the sidewalk, are you talking about when you're standing against the glass or when you actually are out on the sidewalk?

A. I believe that the view from when you're right up on the door looking outward is probably very similar to the view as if you're standing on the sidewalk with your back to the door looking outward.

Q. Okay.

And, of course, if Mr. Turpin were calling in people to do something to someone who was in line at Dolce & Gabanna, would it be a fair statement that he would probably want to be able to see Dolce & Gabanna? Right?

A. Right.

MR. GREENBERG: Can I just have one second, Judge, please?

THE COURT: Sure.

(Brief pause.)

BY MR. GREENBERG:

Q. And based on this, how far down the street is Dolce &

Gabanna?

A. Couple shops.

Q. A couple of shops?

A. I don't know what the exact distance is, but it's a few stores down.

Q. Well, isn't it, in fact, about a half a block or more down the street?

A. Like I said, it's a few buildings down the street.

Q. Okay.

Isn't the distance important to you?

A. Like I said, it's a few blocks down the street.

Q. I know. You keep saying that. And that wasn't my question. My question was: Wasn't the distance important to you?

A. I don't know.

Q. You don't know if it was important?

A. Like the exact distance between Dolce & Gabanna and Moncler?

Q. Yeah.

A. No, because you can go there for yourself and see approximately how far away everything looks.

Q. Okay.

So, did you create a report that said how far away everything was?

A. No.

MR. GREENBERG: I'm going to -- so we don't delay, I'm going to --

(Brief pause.)

BY MR. GREENBERG:

Q. So, unfortunately, as well as I tried to map it all out ahead of time, I didn't succeed.

The Moncler store is at that point at 33 East Oak, correct?

A. Correct.

Q. Okay.

And there is a white wall at the Moncler store with the number 33 on it, right?

A. Right.

Q. You've seen that in all these videos, right?

A. Right.

Q. And isn't it a fact that when you're standing inside the Moncler store, you cannot see to the east because that wall sticks out?

A. Like I said, I never went in the store, so can't say for certain.

Q. So, you never wanted to see if Mr. Turpin could see Dolce & Gabanna from Moncler?

A. He left Moncler and then went closer to the scene of the crime to get a view, so --

Q. That's your opinion?

A.   Right.  But he did leave Moncler and move closer to Dolce & Gabanna, which is seen on the surveillance tapes.

Q.   Right.  And he also ran down the street, didn't he?

A.   Correct.

Q.   And ran on Rush Street, right?

A.   Yep, and waved down --

Q.   And ran --

A.   -- the police officers and didn't leave Oak Street.

Q.   Right.  And he didn't leave Oak Street, that's correct.

A.   Correct, because he was waiting.

Q.   And he tried to get some stranger to let him jump in his car, right?

A.   He did ask a stranger for a ride, yes.

Q.   Yeah.

     And Adonnis told you that -- and Adonnis told us yesterday that they were afraid that if they got into Mr. Turpin's car, that they would be followed and in danger, right?

A.   That is what he said, yes.

Q.   And you had met with Adonnis, correct?

A.   Correct.

     MR. JULIEN:  Objection.  Asked and answered.

BY MR. GREENBERG:

Q.   You talked to Adonnis?

     MR. JULIEN:  There's an objection pending.

Case: 1:21-cr-00618 Document #: 505 Filed: 01/31/24 Page 241 of 308 PageID #:12753
Case - cross by Greenberg
8401

THE COURT: Overruled.

BY MR. GREENBERG:

Q. You got to ask Adonnis whatever questions you wanted to ask, right?

A. Right.

Q. Adonnis testified before the grand jury, right?

A. Right.

MR. GREENBERG: Judge, can we publish -- I have it now. It's part of 2030. And it starts at 7:59.

THE COURT: Yes.

MR. GREENBERG: Thank you.

BY MR. GREENBERG:

Q. This is Mr. Turpin, right?

A. Right.

Q. In the Moncler store, correct?

A. Correct.

Q. Okay. Let's watch this.

(Video played.)

BY MR. GREENBERG:

Q. All right. Now, you see this across the street -- or this 33 here on the wall sticking out?

A. Yes.

Q. And across the street is an apartment building, right?

A. Right. Appears so, yes.

Q. Right.

So, let's take a look at -- the apartment building is right here, correct?

MR. GREENBERG: Can we publish this, Judge? I went to back to 5000.

THE COURT: Yes.

BY MR. GREENBERG:

Q. It's right here, correct?

A. Right.

MR. GREENBERG: Can we go back to the video, Judge?

THE COURT: Yes.

BY MR. GREENBERG:

Q. So, this is Mr. Turpin inside Moncler.

(Video played.)

BY MR. GREENBERG:

Q. Now, Mr. Turpin, you see his head there?

A. Yes.

Q. Which way does it appear he is looking?

A. Out the window or out the door.

Q. I'll start it again. It's at the 8:03 mark. And he is not going to disappear.

(Video played.)

BY MR. GREENBERG:

Q. Which way does he appear to be looking as he's talking?

A. Out the door.

Q. Well, when he looks out the door, is he facing in a

geographic direction?

A.   He's facing with his body turned to the west.

Q.   He's looking to the west, correct?

A.   Looks like it could be north or northwest.  I can't say for sure.

Q.   Okay.

And which way is Dolce & Gabanna?

A.   To the east.

Q.   To the east.  All right.

And at some point he moves to the other side of the store for about 10 or 12 seconds, right?

A.   To the left side of this frame, yes.

Q.   Yeah.  He moves around a little bit, right?

A.   Right.

Q.   Okay.

(Video played.)

BY MR. GREENBERG:

Q.   Okay.  Now, Mr. Dent also appears to be on the east wall of the Moncler store looking out the window towards the west, correct?

A.   Looking out the window.

Q.   All right.

And you can't tell from that where he's looking?  And I stopped it at the 8:28 mark.

A.   Looks like he's looking in the northerly direction.

Q.   In a northerly direction.  Okay.

But not east, right?

A.   Correct.

Q.   And you never see them walk out of there and start looking towards Dolce & Gabanna at the Moncler store and then walk back in or anything like that, right?

A.   Dent goes in and out of the store.

Q.   Dent goes in and out of the store, but you never see Turpin do it --

A.   Correct.

Q.   -- right?

And when Dent walks out of the store, Dent, in fact, stands out in front of Dolce & Gabanna and looks to the west, doesn't he?

A.   Can you rephrase that question?

Q.   Sure.

When Dent walks out of the store, he looks to the west and stands there and looks to the west and then walks back in, right?

A.   If you play it, we can see.  I think he generally looks around.

Q.   Okay.

(Video played.)

BY MR. GREENBERG:

Q.   Do you know at what point he walks out?

A.   I don't have that memorized, no, but --

Q.   I made notes.  Let me go to it.

     So, here we see Mr. Turpin -- and, in fact, let's back it up a little bit so we can see exactly where he's looking.  I'm going to start it at the 10:32 mark.  Okay?

     (Video played.)

BY MR. GREENBERG:

Q.   So, now he's on the east side, correct?

A.   No.

Q.   What?

A.   He's on the west side of the door.

Q.   Well, he's on the east side of the store there, isn't he?  I'm sorry, the west side.  You're correct.  The west side, right?

     And he's still looking -- he looks like he's looking straight out, right?

A.   Now it looks like he's looking in a northeastern direction.

     (Video played.)

BY MR. GREENBERG

Q.   And now Mr. Dent's leaving at the 10:50 mark?  Do you know if Mr. Dent was opening the door for the lady with the stroller?

A.   Maybe.  Sure.

Q.   Did you ever ask him?

Case - cross by Greenberg

8406

A.   No.

Q.   Did you ever try and talk to that lady?

A.   No.

Q.   Did you ever ask Moncler to produce any receipts from anyone who may have been in the store at that time?

A.   Not that I'm aware of, no.

Q.   Okay.

You could have done that, right?

A.   You can, yeah.

Q.   I'm sorry, what?

A.   You can get a subpoena for it if you want.

Q.   Okay.

And, then, you could have found out other people in the store and maybe talked to them about what they saw, right?

A.   You could, yes.

Q.   Let me start it again at the 10:57 mark.

(Video played.)

BY MR. GREENBERG:

Q.   Now, Mr. Turpin, it looks like, is going back to the east side.  Now he's walking past.  11:19.  There goes Mr. Dent.

Which way does it look like Mr. Dent is looking when he walks out of the store?

A.   Right now, in the northwest direction.

Q.   All right.

So, the opposite direction of Dolce & Gabanna, right?

Case - cross by Greenberg

8407

A.   Right.

Q.   So, he's not -- he doesn't walk out of the store and look, hey, is Duck still there in front of Dolce & Gabanna, right?

A.   I don't know what he's thinking at this time, so I don't know.

Q.   Okay.

     Did you ask him?

A.   What he was thinking at this time, no.

Q.   Did you play the video for him when you talked to him?

A.   He actually didn't want to see the video.

Q.   Okay.

     Did you tell him he had to see the video?

A.   No, because he doesn't have to.  It's prep, and he didn't want to watch it.

Q.   So, if you want -- he didn't want to watch it and no one said, hey, you know, you're a witness, we're going to play this for you, watch it?

A.   We -- he --

Q.   Just let him -- I'm sorry.

A.   He didn't want to watch the video.

Q.   Okay.

     And the witnesses get to decide what they want to do?

A.   He chose to go that route, so that's his decision.

Q.   Maybe you didn't want to know what he was going to tell you.

MR. JULIEN:  Objection.

(Video played.)

BY MR. GREENBERG:

Q.  Now, it looks to me like he glanced to the east and now he's looking west again, right?

A.  Sure, yeah.

Q.  And that car we were asking about -- someone was asking about -- earlier, the dark car, that car, in fact, had gone to the west, right?

A.  Which car?

Q.  The black car that ran the red light.

A.  What's the question about it again?

Q.  The black car that ran the red light went to the west, correct?

A.  Correct.

Q.  Okay.

Same direction Adonnis is looking?

A.  Right.  Well, what's the timestamp of that car leaving the intersection?  It's way -- it's way before this video.  That car's long gone.

Q.  Well, you don't know if that car is circling the block or not, do you?

A.  I have watched the raw footage and I don't see cars circling the block.

Q.  Okay.

Did you notice the white Porsche convertible circling the block or is that just a guy thing because we all want one?

A. I don't know. But that car, I don't believe I see it again. It took off westbound, so --

Q. Okay.

Did they have a sign on it that said, you know, the guys with the pistols are leaving, you guys are all good now?

A. No.

Q. Right.

So, they don't know that the car is gone, right?

A. I'm pretty sure Turpin was running and looking in the same direction that car was going, so --

Q. Right.

Turpin was running to get away from that car, and that car was going the same way, runs the red light. My question is -- well --

A. Well, you don't know that he was running away from that car. You're just saying that. But you're assuming at this point.

Q. Okay.

Did you ask Adonnis?

A. About that car, no, because it's not relevant.

Q. Did you ask Adonnis if at this moment they were worried about those guys coming back?

A. I don't know the exact questions we asked. I don't

believe we asked that specific question.

Q. And I stopped it at -- I think it says 11:34. 11:34 mark, right?

MR. GREENBERG: This is Exhibit 2030 for the record.

BY MR. GREENBERG:

Q. So, Mr. Turpin appears to be looking, again, to the west, right?

A. Right.

Q. Sort of pushing his face against and looking out, right?

A. Right.

(Video played.)

MR. GREENBERG: Okay. We can unpublish, Judge. Thank you.

THE COURT: Okay.

BY MR. GREENBERG:

Q. So, on this video -- you've watched the video. You said you've watched the Camtasia dozens of times, right?

A. Right.

Q. How many times have you watched this, Exhibit 2030?

A. Many times.

Q. Many times, right?

A. Right.

Q. More times than you care to see it, right?

A. Right.

Q. So, you know it pretty well; is that a fair statement?

A. Pretty fair, yeah.

Q. Okay.

And there are people on Oak Street that day, correct?

A. Correct.

Q. Even though it was COVID, it wasn't totally deserted, right?

A. Right.

Q. There are people who were waiting in line to get into various stores?

A. Right.

Q. And I think we've already established that you didn't go to any of the stores to try and figure out whether people -- you know, who the customers were that day?

A. I did not go -- I did not do that, no.

Q. All right.

So, you have no information about what those people saw?

A. Agents earlier in the case went and interviewed various people from Oak Street. Again, I wasn't here for that, so --

Q. Okay.

But the earlier agents didn't do that either, did they?

A. Interview customers, no, not that I'm aware.

Q. All right.

There's that -- the two officers that come out and

Case - cross by Greenberg

8412

they talk to Turpin and Dent.

A. The ones that they blew off, yeah, what about them?

Q. By the way, were you here yesterday when they played this video for Mr. Dent?

A. Yep.

Q. And you're saying that was the first time he saw it?

A. I believe -- I don't know if -- I can't remember exactly if he saw it in grand jury, but when I prepped him, he refused to watch it.

Q. Okay.

Were you present when the prosecutors met with him?

A. When do you mean?

Q. Well, when a witness -- witnesses have testified in this case there's been what they call witness prep, right?

A. That's the one I'm referring to.

Q. Okay.

So, that was with the prosecutors?

A. Yes. A prosecutor.

Q. I'm sorry, what?

A. It was with one prosecutor.

Q. One.

And when was that?

A. I don't recall. Sometime before this trial.

Q. Before the trial?

A. Right.

Q. All right.

But there were additional prep sessions, right?

A. No.

Q. And you're saying that as you sit there now, you're not aware of whether he was shown this video before he was asked questions about it during those sessions?

A. He might have been shown in grand jury. I just can't remember. If you show me the grand jury transcript, we can just figure it out right now.

Q. Okay. Well, someone will look for that for us and save some time.

So, the police officers that were out there that, as you gratuitously said, these guys didn't want to talk to -- by the way, that's not unusual, is it?

A. What was that?

Q. For people not to want to talk to Chicago police officers. That's not an unusual thing, is it?

A. I mean, what I do usually, no, it's not unusual.

Q. Right.

So, those police officers, did you speak with them in the course of your investigation?

A. For trial prep.

Q. Okay.

And when did you first get on this case?

A. October 2022.

Case - cross by Greenberg

8414

Q. All right.

So, when you say "for trial prep," that means more recently, like this fall, right?

A. Right.

Q. So, between October of 2022 and this fall, you never tried to talk to those officers to see what happened; is that right?

A. I did not talk to them, no.

Q. Okay.

Let's talk about the Chrysler for a minute, okay?

A. Okay.

Q. So, you said that DNA was recovered from the Chrysler, right?

A. From the Chrysler?

Q. Right.

A. They swabbed for DNA, right.

Q. Right. Right. They swabbed for DNA. And the DNA was not tested; is that right?

A. It was not submitted for testing.

Q. Right.

You could have submitted it for testing, correct?

A. I could have.

Q. The FBI has a DNA lab, correct?

A. We do.

Q. One of the things about DNA is, as you told us, it doesn't tell you when someone was somewhere, correct?

A.  Correct.

Q.  But the theory is that people were in the car, right?

A.  What theory?

Q.  Well, the theory you guys have is that certain people were in this car, right?

A.  Right.

Q.  Now, it's Mr. Roberson's car, so we would not be surprised to find Mr. Roberson's DNA in Mr. Roberson's car, right?

A.  Correct.

Q.  But you think other people were in that car with Mr. Roberson, right?

A.  Right.

Q.  And, so, if their DNA was found in the car, that would show that at some point they were in that car, right?

A.  If the DNA is found on the drink bottle, it just shows that that person drank out of that bottle.

Q.  Which was in the car, right?

A.  It just says that the DNA will match that that person drank out of that bottle.

Q.  Okay.

And let's do this the hard way.  Where was the bottle?

A.  In the car.

Q.  How do you think the bottle got in the car?

MR. JULIEN:  Objection.

BY THE WITNESS:

A.  Don't know.

MR. JULIEN:  Calls for speculation.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't know.

BY MR. GREENBERG:

Q.  Well, do you think the bottle was born in the car?

A.  No.

Q.  Do you think the bottle walked over to the car and threw itself in the door cup holder?

A.  No.

Q.  Would it be reasonable to presume that somebody put the bottle in the car?

A.  Yes.

Q.  Okay.

So, if someone you thought had committed this crime and put that bottle in the car, their DNA might be on it, right?

A.  Right.

Q.  Right.

So, by not doing that, it's left to guess, right?

A.  Whose DNA on the bottle, right, yep, left to guess.

Q.  Who was in the car is left to guess --

A.  No.

Case - cross by Greenberg

8417

Q.   -- right?

A.   Whose DNA is on the bottle is left to guess.

Q.   You saw the car -- the pictures of the car after it was towed, didn't you?

A.   Yes.

Q.   Did you ever look at the car yourself?

A.   No.

Q.   Did anyone from the FBI ever go look at the car that you know of?

A.   I believe there were two FBI agents that went to that search.

Q.   Okay.

Did anybody determine how much leg room there was in the front or back of that car?

A.   Not aware.

Q.   It looks like there's stuff on the backseat when the car is towed, right?

A.   Right.

Q.   Did anyone ever determine if there was enough room for someone to sit there?

A.   It's a car.

Q.   Okay.

If there's stuff --

A.   It's made for people to sit in it.

Q.   I'm sorry.  I don't mean to talk over you.

A.   The car is made for people to sit in it.  So, I don't really get your question.

Q.   All right.

Well, my question is there's stuff all over the backseat, right?

A.   Right.

Q.   Including cardboard boxes, right?

A.   Right.  Things that are movable, right.

Q.   Right.

So, did anyone ever determine if that stuff was covering the seats or not?

A.   Can you rephrase the question?

Q.   Sure.

If the cardboard boxes and the other stuff was covering the entire backseat, did anyone ever determine that?

A.   I still don't get your question.

Q.   All right.  It's not that important.  We'll move on.

You talked a little bit about Tiffany Huff, right?

A.   Right.

Q.   And, in fact, you -- after she testified about pictures, you guys served her with a subpoena, you told us, right?

A.   Right.

Q.   And what was the response you got?

A.   The response was that there was nothing -- essentially nothing was produced because --

Case - cross by Greenberg

8419

Q.   Nothing was produced; is that right?

A.   Right.

Q.   Did you get records --

(Brief pause.)

THE COURT:   Actually, I'm really sorry, can we switch court reporters quickly?

MR. GREENBERG:   Yeah.  Are we just -- are we ending for the day, Judge?

THE COURT:   Well, let me just ask the jurors, can we keep going for a few more minutes?

(Jurors nodding.)

THE COURT:   Does anyone have any difficulty staying a few more minutes?

A JUROR:   What's a few more minutes?

THE COURT:   It's a fair question.  I would say 5:30 at the latest.  5:15 if someone needs to leave.

A JUROR:   I have a 5:45 train.

MR. GREENBERG:   To what, Judge?

THE COURT:   I would say 5:15 if someone needs -- first of all, if anyone needs to leave right now, we can absolutely do that.  Second of all -- not including you.

If someone needs to leave at 5:15, we can do that, or if you can, we can go to 5:30.

A JUROR:   5:15 probably.

MR. GREENBERG:   Judge, and I'm going to bleed over

Case - cross by Greenberg

8420

5:15, just so you know.

THE COURT:  Okay.  Let's go to 5:15 then, and then we'll end there.

MR. GREENBERG:  All right.

BY MR. GREENBERG:

Q.  So, Tiffany Huff was represented by a lawyer, correct?

A.  Correct.

Q.  And you guys communicated with her lawyer regarding the subpoena for the phone stuff, right --

MR. BOYLE:  The court reporters.

MR. GREENBERG:  Oh, I'm sorry, we've got to switch court reporters.  Is that right?

THE COURT:  We'll switch at 5:15.

MR. GREENBERG:  But we're stopping at 5:15.

THE COURT:  With the jury.

MR. GREENBERG:  Okay.  All right.  Sorry.

BY MR. GREENBERG:

Q.  So, they gave you records, right?

A.  They -- her attorney was in communication with our prosecutors, and the records that we were seeking were not produced.

Q.  Okay.

What was produced was evidence that Ms. Huff had gotten a new phone in November of this year, right?

A.  Right.

Q.  All right.

So, when you tell us that somebody didn't produce something that you asked for, the way you made it sound, with all due respect, is that she wasn't honest or she refused to produce something.

A.  Just meant she didn't produce the records that we requested.

Q.  Okay.

And, in fact, she produced a text message exchange which said that her --

MR. JULIEN:  Objection.

BY MR. GREENBERG:

Q.  -- son --

MR. JULIEN:  Hearsay.

MR. GREENBERG:  It's not hearsay, Judge.

MR. JULIEN:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MR. GREENBERG:

Q.  Well, in fact, you learned that her phone had been --

MR. JULIEN:  Same objection.

BY MR. GREENBERG:

Q.  -- ruined in an accident?

MR. JULIEN:  Same objection.

THE COURT:  Overruled.

MR. GREENBERG:  Thank you.

BY MR. GREENBERG:

Q. You learned that her phone had been ruined in an accident, right?

A. Allegedly, yes.

Q. Allegedly?

A. I don't know how true that is. I can't verify it. Just allegedly.

MR. GREENBERG: Judge, may I approach?

May I approach, Judge?

THE COURT: Yes.

(Document tendered.)

BY MR. GREENBERG:

Q. I'm showing you what I marked as Roberson Exhibit 27, which appears to be text messages, right?

A. Right.

Q. What's the date on those text messages?

A. November 15.

Q. Okay.

And do those text messages explain what happened to her phone?

A. It says what happened, that her phone was dropped in oil.

Q. Right.

And are you saying she allegedly made up this story or she made up -- I guess the right way to ask it is she made up this alleged story in the middle of November just in case

in December you asked for pictures?

A.  I'm saying allegedly because I can't verify any of this.

Q.  Okay.

A.  And, also, phones have iCloud backup.  So, this is the reason for not producing a photo that could be in your iCloud. I can't say anything.  It's allegedly.

Q.  Do you know what kind of phone she had?

A.  Looks like an iPhone.

Q.  All right.

I'm going to show you what I marked as Roberson Exhibit 28.

(Document tendered.)

BY MR. GREENBERG:

Q.  Does that appear to be the paperwork for her new phone in November?

A.  Looks like a new order on November 17th.

Q.  I'm sorry?

A.  Add new device to existing line.

Q.  Right.

A.  And this is a phone number that I'm aware she already had. So, adding a new device to existing line and you have an iCloud account with iCloud data.  It's allegedly that she doesn't have the documents that we requested.

Q.  Okay.

And, in fact, she indicated that her phone wasn't

backed up to iCloud at the time it got destroyed, right?

MR. JULIEN: Objection. Hearsay.

BY THE WITNESS:

A.  I don't know --

THE COURT: Sustained.

BY THE WITNESS:

A.  -- that. I've never heard that.

THE COURT: Sustained.

BY MR. GREENBERG:

Q.  Did your subpoena say you wanted anything from her iCloud account?

A.  It said records from August 4th, 2020. So, it doesn't matter where it came from. If you have them for that date, that's what we're requesting.

Q.  Did you issue a subpoena to Apple?

A.  Nope.

Q.  You can do that just by uploading it, right, to the portal?

A.  You can, yeah.

Q.  Okay.

So, you could have done that, right?

A.  You would need a search warrant for content. So, we wouldn't have gotten photos that way.

Q.  All right.

So, did you go to the prosecutors and say, hey, man,

I need a search warrant for this?

MR. JULIEN: Objection. Relevance.

THE COURT: Sustained.

BY MR. GREENBERG:

Q. I want to ask you about Mr. Wilton. Do you remember Mr. Wilton?

A. Yes.

Q. Were you here for his testimony?

A. Yes.

Q. And, in fact, you were involved in Mr. Wilton's prep, correct?

A. Some of them. I don't know if I was involved in all of them.

Q. Do you remember sitting down with Mr. Wilton on October 20th of 2023 --

MR. GREENBERG: I'll just leave this on for you guys. Then you don't have to find it.

BY MR. GREENBERG:

Q. -- on October 20th of 2023 while Ms. Walgamuth was preparing him to testify?

A. Is my name on that report?

Q. Oh, it's on your screen, too. Sure.

At the bottom, does it say "Christine Case" and "Dominique Dixon"?

A. I can't see it.

Q. You can't see this?

A. I don't have it on my screen.

MR. GREENBERG: Can we publish to the witness, please.

THE COURT: Yes.

BY THE WITNESS:

A. Yes. Then I was present for this.

BY MR. GREENBERG:

Q. Okay.

And do you remember when I was asking him all those questions about his drug use? Right?

A. Right.

Q. And he was saying he never used all sorts of drugs, right?

MR. JULIEN: Okay, your Honor, I'm going to object to this as being outside the scope of this witness' direct examination.

MR. GREENBERG: I mean, I can recall her during our case, Judge, for this one thing.

MR. JULIEN: They could.

MR. GREENBERG: That's fine. I can recall her, Judge, during our case. That's fine.

THE COURT: I'm going to overrule it.

MR. GREENBERG: Okay. Thank you.

BY MR. GREENBERG:

Q. Did Mr. Wilton tell you that he used drugs as a coping

Case - cross by Greenberg

8427

mechanism?

A. Yes.

Q. He told you Ecstasy?

A. Right.

Q. Ritalin?

A. Right.

Q. Xanax?

A. Correct.

Q. Percocet?

A. Correct.

Q. Cough syrup?

A. Correct.

Q. And marijuana, right?

A. Correct.

Q. And you sat here while he denied all of that, right?

A. Right.

Q. Except the marijuana.

MR. GREENBERG: Judge, I know we said 5:15. I was going to get into the jail calls, and that's going to take a bit of time. So --

THE COURT: Okay. So, why don't we pause here and resume at 9:30 tomorrow with the jury.

Same reminders as always. Please don't research, discuss, or read news about the case.

To the witness, you're on the stand. Please don't

discuss your testimony with anyone.

THE WITNESS: Yes, your Honor.

THE COURT: Thanks, everyone. Thank you also for staying a little bit later.

(Jury exits courtroom.)

(Change of reporters.)

THE COURT: Okay. We are ready. So anything we address at this point?

Now we are ready. Sorry.

MR. JULIEN: Friday, I had sent an email to the group, reminding everyone that you had ordered everyone to tell us by close of business on Friday what witnesses they were calling this week, and I thought I made clear what I was asking for and reminding everyone of what you had said. And it seems like there was still some confusion about that because we've been getting names after that, including last night.

I just need to know and we need to know, like, today right now who people are calling starting tomorrow.

MR. BOYLE: I can go first, I think. This is on behalf of Mr. Turpin.

I apologize if there was some confusion about that. Don't usually put on a case. Don't usually use investigators, and Mr. Adams was helping me on that issue, and just this idea of, you know, we gave our witness lists, you know, months ago.

8429

And through the course of the case, some evidence came in, so we just kind of scrambled.

I didn't want to -- I mean, I reached out to the government Friday afternoon, Saturday, I believe, about is there some way we can get in some things through agents, and, you know, so we, after that conversation, I think we added a few names. So I recognize that.

The names we gave yesterday would be the totality. We have four people under subpoena. I'm not sure we're going to call all of them. We're certainly not going to call any additional names, which I know that's what you're most interested in, and I think they would all be pretty brief on direct.

These are all, you know, witnesses that have been interviewed by FBI agents attached to this case during the course of the investigation of this case, so there shouldn't be any surprises for anyone, and we'll try to make the directs as pointed and as quick as possible.

MR. ADAMS: And, your Honor, what time would you want our witnesses here? Just for scheduling purposes.

THE COURT: Okay. Let's definitely discuss that and the overall schedule, but let's finish this disclosure issue first.

I would say I did order that on Friday. I understand there's been some subsequent developments that you just

mentioned, but now would be the time to either disclose or that's it. Someone cannot be called if they're not disclosed beyond basically now.

So if there's any other witnesses, please do disclose them really now or I guess at the latest within, you know, 15 minutes after we leave court today.

MR. JULIEN: So we have his four. Is there anybody else from anybody else?

MS. DOMPH: Judge, I've discussed with Sean Hennessy that we believe Dr. Loftus will be on sometime tomorrow.

THE COURT: Okay.

MS. DOMPH: And we've been speaking to one another about it.

THE COURT: Okay.

MS. GIACCHETTI: And I've submitted some stipulations. We do not intend to offer any live testimony.

THE COURT: Okay.

MR. GREENBERG: And I don't think we're going to call Agent Case anymore.

THE COURT: Okay.

MR. JULIEN: So is Roberson not calling anyone else?

MR. GREENBERG: I sent you a list, but I don't think so.

MR. JULIEN: Here's the --

MR. GREENBERG: If we have to prove up some

8431

impeachment, it's either through Case or Dixon.

MR. JULIEN: I'm not saying this to be pointed, but I did, I think, point this out on Friday.

There's a difference between us just referring people generally to our witness list and saying here's who we're calling on this day. Here's who we're calling tomorrow, Thursday, and we need to know that information.

Part of it is we need to have the people here if we're talking about, you're going to call someone for purposes of impeachment, that's fine. I need to know who they are so we can have them here.

So, your Honor, I thought you were clear about this on Thursday. I thought I was clear about it on Friday. I just -- we need to know right now.

THE COURT: And I do agree with that. The point that listing someone on the will call or may call list, there is a difference between that at the beginning of the trial and then the kind of ongoing updates as to who is actually happening within the next day or two.

And that does matter for a variety of reasons, including if there are witnesses that the government is in charge of ensuring their presence and also just for the preparation of outlines for examinations.

So, I mean, that is what I was talking about on Friday, and we are at the point right now where if defense

8432

case is starting tomorrow, it is basically we are at that point where it needs to be disclosed or it just -- it's not going to work.

MR. SPIELFOGEL: So, your Honor, we gave the government the list of our prove-ups that we need. I believe the government has agreed to stipulate to all of it. I'm waiting to hear back on those stipulations, on those agreements as to the prove-up.

MR. JULIEN: That's correct. We'll have some edits to the stips, but in substance, I think we're on the same page.

MS. GIACCHETTI: And is that accurate as to ours also, Mr. Julien?

MR. JULIEN: I just haven't had a chance to -- so I think for purposes of Mr. Liggins, we got them I think that was yesterday. We just haven't had a chance to look yet, but we will take a look.

MS. GIACCHETTI: Thank you.

THE COURT: Okay. So I guess are there any other witnesses or stipulations that are in the works that we haven't yet talked about?

(No response.)

THE COURT: Okay. I'm not hearing anything else.

So it sounds like there are several witnesses from Mr. Turpin, and then there is Dr. Loftus, so that's just in

8433

terms of the witnesses.

Are there any other, I guess, proposed defense witnesses?

MR. KLING: Judge, Mr. Offerd is relying on the government's inability to prove him guilty beyond a reasonable doubt and will not be calling any witnesses.

MR. BARNETT: Likewise for Mr. Smart. We won't be calling any witnesses I don't anticipate, your Honor.

MR. GREENBERG: Judge, as I indicated, I don't think we have anything to prove up for impeachment, but if we do, I think the witnesses are here anyway --

MR. JULIEN: Your Honor --

MR. GREENBERG: -- might be one or two things.

MR. JULIEN: -- I'm not trying to be difficult about this. Today is the day, okay?

Special Agent Case is the last witness we intend to call, so I don't know what more they need unless he needs to hear more, again, I'm not saying this to be pointed, he's doing the cross-examination right now. I don't know what more he needs to learn in order to know whether --

MR. GREENBERG: No, we're talking about perfecting impeachment.

MR. JULIEN: That's what we're talking about, all right? So we need to know that today. If there's somebody I need to have in the building tomorrow or Thursday, I need to

8434

know it immediately.

MR. GREENBERG:  Case and Dixon, please.

THE COURT:  Okay.

MR. JULIEN:  I am going to ask, and we can do it now, but I'll send via email, we know the topics just kind of like I sent an email last night, unlike one that I've ever sent before, outlining a multitude of topics for Special Agent Case's direct examination today, I'm going to request the topics of any examination of Special Agent Case and Dixon by Mr. Roberson or by anyone else.

MR. GREENBERG:  If we have any impeachment to perfect, it would only be to perfect impeachment.  If we have it, we will give you the actual transcript pages where the questions were asked so that we can do it seamlessly, and Ms. Bormann can cruise through it.

MR. JULIEN:  Your Honor, I'm going to ask that you order that it be resolved in the next 45 minutes.  I mean, you said this on Thursday.  I said it on Friday.  I don't understand why we're -- we're not putting on any additional evidence, so at this point, besides the redirect maybe, I don't understand why or what more needs to be divined in order to know whether there's going to be some impeachment.

That is something that should be answered already.  We've gotten stipulations from other people.  He asked a question about impeachment during cross-examination.  We need

to know that information.

MR. GREENBERG: I don't think that's the rules.

THE COURT: I -- so I was giving more leeway and not strictly enforcing the scope of the direct, consistent with how I've done it throughout, and part of the reason for not enforcing that so strictly is because it's for efficiency because if they're going to be recalled in the defense case, it's just efficient to get this all done now.

So I guess that's partly why I did what I did today. If you think there are other reasons to recall the agents, then I think --

MR. GREENBERG: We don't.

THE COURT: Okay.

MR. GREENBERG: We don't, Judge. It was just for impeachment.

MR. JULIEN: So they're saying that they're not going to recall -- I don't -- are they saying they're not calling them again? That's what -- I don't know if it's just me, but it sounds like right now Mr. Greenberg is saying we're not calling anybody else, I got what I needed to get, and that's what he said to you a little bit earlier.

MR. GREENBERG: Okay.

MR. JULIEN: But the problem that I'm having is it seems like he keeps saying we may call them for other things, and I'm saying please tell me what the other things are.

8436

MR. GREENBERG: Mr. Julien, I'm going to try and make this easy.

We may have to perfect a couple of things of impeachment. I took a look through my witnesses that I did, and I don't think there is anything else because I think it came out when the witnesses were testifying.

Ms. Bormann is going to take a look through the witnesses she did, and if there's anything else as far as impeachment, which we actually don't have to identify for anyone, but we will provide a copy of the page of the transcript where there was the question and the answer that we now need to perfect.

And if we need to do that, we will do it through Agent Case when we finish in the morning to the extent we can. And if we can't and it requires Agent Dixon, then we would call Agent Dixon to ask those few things, and it's that simple.

THE COURT: Okay. But when --

MR. GREENBERG: We don't have to, Judge. We don't have to give them -- I don't mean to interrupt, but we don't have to give them what we -- what impeachment we want to perfect ahead of time.

THE COURT: Okay. So that's generally a fair point, but we need to know it at this point for scheduling purposes because, for example, we just spent a 45-minute break on the

8437

911 calls, which was a -- something that was just coming up, you know, kind of impromptu.

And we are at the point where we have a very limited amount of time before we break for the holidays, and in the interests of just managing the rest of the time, I have to -- I've got to set some boundaries on this. So what time will you be in a position to disclose that to the government?

MR. GREENBERG: Judge, we're literally talking about two minutes of testimony, if anything.

MS. BORMANN: Yeah, this would be with respect to Mr. Sloan.

MR. GREENBERG: And Mr. Wiley.

MS. BORMANN: And Mr. Wiley. And Mr. Greenberg and I got our wires crossed, and obviously I've been in court all day.

So the cross-examinations on them are short, and I should be able to identify it fairly quickly if we need to.

The bottom line on this is it's not going to be anything lengthy at all. And so I'm happy to do it, but I can't do it while I sit here.

MR. JULIEN: We're going to ask for the information by 9:00 p.m., your Honor. There have been numerous complaints that we haven't told people exactly what we're going to ask about, and they don't have reports --

(Indiscernible cross-talk.)

MR. JULIEN: -- I need to know what information we need to have up here in court, don't have every single report for every person. I would just ask that they provide that information by 9:00 p.m.

MS. BORMANN: Judge, I will provide the -- just the name of the agent -- it's going to be either Agent Dixon or Agent Case. It's probably going to be able to be covered by Mr. Greenberg during his cross if we're given leeway. That's the issue, right?

So I'm not sure what else I can do here.

MR. JULIEN: Tell us what the information is.

We've done it. We've done it all trial, but, your Honor --

MR. SPIELFOGEL: It sounds like it's going to be the exact same thing that I gave you, where you just say the page, here's the impeachment where the person denied it or couldn't recall it, and that's going to be it. That's what it sounds like to me.

MR. JULIEN: I'm not sure, but, hey, we're just going to waste time, and that's fine if people are okay with wasting time if things come up --

MS. BORMANN: Sure.

MR. JULIEN: -- fine.

MR. GREENBERG: 9:00. 9:00.

THE COURT: Okay. So by 9:00, that information will

8439

be disclosed.

MR. GREENBERG: And we're going to -- no 7-minute time lag, like 9:07 doesn't mean 9:00. I got it.

THE COURT: Okay. So it's also almost 5:30, and that's the time when typically the marshals need to head out.

Do the defendants want to stay for the continued discussion here until 6:00, or would the defendants waive their presence? Either way is fine. I'm just checking in because of the time, it's almost 5:30.

MR. KLING: Judge, Mr. Offerd will waive his presence.

MS. DOMPH: Mr. Thomas will, too.

MR. GREENBERG: Mr. Greenberg will.

MR. BARNETT: Smart will waive.

MS. BORMANN: Mr. Roberson will waive his presence.

MR. BOYLE: Mr. Turpin waives his presence for this.

MR. MITCHELL: Judge, Mr. Liggins has another concern, Judge, that was just raised again concerning trying to get here in the morning and the rest.

Apparently the separatee issue is still causing some issues with them coming downstairs. I'm not quite sure, but I understand that because of the separatee issue, there's some --

MR. LIGGINS: We can't get downstairs in time. We coming down -- if we supposed to be coming down at 7:30.

8440

If we supposed to be there for court by 7:30 supposed to be in the sally port. The sally port is a thing outside of thing, it's like a little -- in between the door and the elevator.

We can't come down because they telling us that we can't be in the R&D with our separatees, which is -- R&D is where they take us to go to court.

So they be saying, like, they be having to transport two of our co-defendants by they self, which has never happened, but this happened today. You know, they be telling us, like, we can't be around them or something like that, like we can't be around them or something.

THE COURT: Okay. Let me ask the marshals.

THE MARSHAL: We have spoken to MCC about the lifting of several of the separatees, your Honor. This morning I believe there was a little bit of conflict in movement as well, just moving the regular court loads around R&D around the same time.

It has been better here lately. I can speak to them again tonight when we go over there.

MR. LIGGINS: This wasn't just about -- separatee that y'all has lifted. It ain't about us. It's about the other two separatees that they still got on us. They still move us like they all separatees still. It's absurd. It's little different in the movement.

8441

THE MARSHAL: Again I can speak to them again tonight.

THE COURT: Okay. You know, this morning though, as I recall, the defendants were here in time to start with the jury. I mean, there was some delay in starting with the jury at 9:30, but that was because we were doing arguments. It wasn't because the defendants were late to court at 9:30. Defendants were here by 9:30.

So I expect if the issue that occurred today is recurring, which I would ask the marshals to look into that again, that issue did not present an issue with being here by 9:30 with the defendants. So -- and, again, I understand that there have been a number of issues, you know, along the way. I certainly understand that with different logistical issues.

But I also, you know, we had this before. You know, at this point, time is important for the next couple days.

If -- if someone doesn't appear and my information that I'm hearing is that that decision is within the person's control, then I will consider that a voluntary absenting of yourself, and we will proceed with the trial without you.

So we discussed this before. I -- and I'm just reiterating it.

MR. LIGGINS: That's not what happened today though.

THE COURT: Well, no, I understand that's not what happened today, but I'm just mentioning it because the topic

of delay is coming up. I'm just reiterating what happened before and the warning that I gave everyone before, so that we use the time over the next couple days as efficiently as possible with the jury.

MS. GIACCHETTI: And I think Mr. Liggins raised the issue not because he's not going to come because he wants to come and he wants to be here on time.

THE COURT: Understood.

MS. GIACCHETTI: Okay. Just, that's -- okay.

THE COURT: Okay. So at this point, is there anything else -- and I heard waivers of appearance for all defendants except for Mr. Liggins.

So I guess what's Mr. Liggins' position on that for right now?

MS. GIACCHETTI: Now? I think they want -- yeah, he wants to leave and he waives his appearance for whatever issues we're going to deal with while he's gone.

THE COURT: Okay.

(Defendants exit courtroom.)

THE COURT: Okay. So we're turning to -- oh, no problem.

Just returning to any open issues. Let's just talk about the overall projection on the schedule.

So what is, I guess, the current projection?

I would say the first thing turns on, you know, the

8443

estimate of the length of the cross.

MS. GIACCHETTI: Of Agent Case?

THE COURT: Yes.

MS. GIACCHETTI: At the moment, I don't think I'm going to cross. I'll take another look, but I don't think so.

MR. KLING: Judge, I have maybe a half hour, 45 minutes of cross of Case on behalf of Mr. Offerd.

MR. SPIELFOGEL: I don't believe we'll be crossing.

MR. BARNETT: I don't believe we will either. Maybe one question. That's it.

MS. DOMPH: Patrick, your time for cross?

MR. ADAMS: Cross on Case? Maybe 10 minutes. I'll talk really fast. I'm just kidding, Madam Court Reporter. I'll talk really slow.

About 10 minutes.

MS. DOMPH: So an hour it sounds like?

MR. JULIEN: I don't think we got a response from Roberson as the remainder of Mr. Greenberg's cross.

MR. GREENBERG: I don't know. It won't be -- half hour to an hour probably.

THE COURT: Okay.

MR. GREENBERG: Go through the jail calls and some other stuff.

THE COURT: Okay.

MR. GREENBERG: And the videos six more times.

8444

THE COURT: Okay. So that total could range anywhere from another hour to a couple hours, and then the redirect estimate?

MR. JULIEN: What was the question, your Honor?

THE COURT: What's the estimate of the redirect? I mean, it turns to some degree on what else happens in the cross, but what's your estimate?

MR. JULIEN: Five minutes.

THE COURT: Okay. All right. So then after that, does the government intend to rest at that point?

MR. JULIEN: Yes, your Honor.

THE COURT: Okay. Then we will have the jurors step out. We'll do Rule 29 motions, and then we'll start with the defense case.

Just so everyone's aware, I do intend to take the Rule 29 motions under advisement, and so I just want to let you know that before you actually make the motions.

MR. KLING: Judge, may I suggest --

MS. GIACCHETTI: Can I make a suggestion, that although we obviously want to argue the Rule 29s, we know you'll take it seriously. What we could do is when they rest, say, Judge, we're all making our Rule 29 motions. We will argue at the end of the day, and then move on with witnesses because I know Dr. Loftus has to be done tomorrow.

And so rather than take up that time in the middle,

as long as we say that and then we say we'll argue it at 4:30 or 5:00, then -- we want the opportunity to do it, but it seems to me to not -- you know, you've got six people.  Do we want to take up an hour when we've really got witnesses who have to get back on a plane, and I don't know what the situation is on other people.

MR. KLING:  Judge, that's my suggestion as well, and the Rule 29s, if we make the motion and just say we're moving and if we could have argument either late tomorrow or on Thursday.

MR. JULIEN:  We join in that proposal, your Honor. We would propose, as Mr. Kling suggested, depending on how many defense witnesses there are and how long it takes that we could even -- as long as they make the motion, they can be argued Thursday afternoon when the jury is no longer here.

MS. DOMPH:  That's fine.

MS. BORMANN:  That makes the most sense.

MR. BARNETT:  I agree, your Honor.  That makes sense.

THE COURT:  Okay.  Great.

So we will -- obviously we'll have time for the motion to be made, but then we'll have the arguments probably Thursday without the jury obviously.

MR. BARNETT:  And just really quick, we intend to follow it up with a written motion, and you understand that, correct?

8446

THE COURT: Yes. And if anyone would like to, you're free to do that, meaning submit a written motion.

Obviously, there's also an opportunity after the trial if -- you know, if that is -- right, but that, if anyone would like to file one at this stage, you can do that as well.

MR. BARNETT: We intend to do it after, but it will be coming.

THE COURT: Okay.

MR. ADAMS: Your Honor, for scheduling, what time do you want me to have Ms. Batko here? She -- like her store opens at 11:00 so if she's later, she's going to be closing it. I prefer for her to go before Mr. Loftus or whatever his name is.

MS. DOMPH: Dr., Dr. Loftus.

MR. ADAMS: Dr. Loftus, and we can do that -- for Ms. Batko to go first. She's anxious about having her store closed for an extended period of time, being a small business owner.

THE COURT: Okay. Well, how long is her examination going to take? Because Dr. Loftus also has to travel tomorrow, right? So he needs to be --

MR. ADAMS: 10, 15 minutes. It's very narrow tailored to her grand jury testimony.

MS. DOMPH: Well, that's not cross though, right?

MR. JULIEN: Yeah, honestly, your Honor, I think

8447

Ms. Batko's cross-examination could be significant, so -- and I appreciate the dynamic there.

I don't know what time Dr. Loftus's hard stop is, so it sounds like we've got at least -- when we say at least -- maybe two more hours of cross-examination of Special Agent Case, some redirect, at least five minutes now, maybe it jumps up to 10 minutes depending on what happens tomorrow.

So two hours and 10 minutes, and maybe Dr. Loftus, I don't know, his direct is an hour or something like that, or if Ms. Batko goes before him, the direct is 15 minutes, the cross I think could easily last as long as the direct, so 30 minutes for her, so now we're talking almost three hours before Dr. Loftus gets on the stand, which is about at the lunch break.

MR. GREENBERG: We can bring in lunch tomorrow.

(Indiscernible cross-talk.)

MS. GIACCHETTI: Do Thursday, let her do Loftus tomorrow.

MR. ADAMS: Are we thinking Thursday morning for Mrs. Batko, is that possible, or that's stretching it?

MR. GREENBERG: I thought we weren't making them come in Thursday for part of the day.

MS. GIACCHETTI: For the afternoon, but you can get --

MR. GREENBERG: I thought we weren't going to make

8448

them take a two-hour train.

MR. SPIELFOGEL:  They're coming Thursday morning.

MS. GIACCHETTI:  They're going to have to come Thursday morning to get this done.

MR. JULIEN:  Here's what I propose, your Honor.

So it sounds like, based on some of the discussion, we actually don't have as many defense witnesses as we thought.  What I don't want to do is if there's a chance that we can just be done at the end of the day tomorrow with witnesses at least and we don't have to bring the jury in, so let's say we can get through all the witnesses that need to be gotten through, and then we can do Rule 29 Thursday morning, but we can tell the jury you don't have to come in Thursday at all, I'd prefer to do that, as opposed to we have a witness who could take 30 to 40 minutes in total in Ms. Batko and just say we're going to save her for Thursday morning.

I'm sympathetic that she's a small business owner, but she has -- her husband is also part of the business.  So she's not the sole proprietor.  I think he can hold down the fort for an hour.

MR. SPIELFOGEL:  You know, if there's time to get her on after Loftus, then we'll get her on.  We can never predict this stuff.

MR. JULIEN:  I think we're saying the same thing.  What I'm saying is we put Dr. Loftus on first --

8449

MR. BARNETT: Absolutely.

MR. JULIEN: -- and not put that witness on and risk -- yeah, but what I'm pushing back on is the idea --

(Court Reporter Interruption.)

MR. SPIELFOGEL: I'm sorry, I'm sorry, Kathy.

MR. JULIEN: What I am pushing back on is the idea that I think some of us or most of us agree we put Dr. Loftus first. The idea that if Ms. Batko is not going first, that means she's going Thursday morning. That's what I am pushing back on.

I am suggesting we'll see how the day goes. I know that she has -- that she runs the business with her husband, and so if we -- as we've been doing, we kind of see how it's going, we can say, hey, can you come from Oak Street to here to testify and be done, we don't have to bring the jury in on Thursday potentially at all.

MR. GREENBERG: Judge, I've got to be somewhere at 6:00. May I be excused?

THE COURT: Yes.

So I agree that Dr. Loftus should go first. Also that -- and that's because of his travel, and he's rearranged his schedule already quite a bit.

And also I definitely understand the inconvenience to Ms. Batko and would prefer to avoid that, but I do think if it is -- if it comes down to we come in Thursday at all versus

8450

finish tomorrow, it's best to just finish tomorrow if we can.

MR. ADAMS: Absolutely, Judge. Not an issue.

THE COURT: Okay.

MR. BOYLE: Judge, we have a quick issue regarding one of our witnesses.

There was a woman on the scene of Oak Street, saw the person, at least one person jump out of a car all in black, I think wearing a black mask with a handgun pursued -- pursue a man in a white T-shirt, I think actually heard the gun jamming. That's why the gun didn't discharge, but heard a jamming sound.

She was then still on the scene for the murder of Mr. Weekly. She was interviewed by a Chicago police detective, Detective Bartell.

We have done everything we could to locate the civilian witness, Ms. Diamond Jones, to just have her testify as to what she saw that day.

We've been unable to locate her. Based upon that, we did recently subpoena Detective Bartell. We would be calling the detective to testify as to that interview of Ms. Jones, which I do think, you know, she's a firsthand observer of the aggravated assault with a firearm as to my client. She would be able to testify as to that.

She's unavailable. The detective, it would be maybe five questions to the detective.

8451

The government, I think, is objecting, saying it's hearsay. I do think it would fall under some hearsay objections, but I wanted to raise it. I think we can briefly argue it. I think I've just argued our side, and the government can argue theirs, and then I will let the detective know if he needs to come in tomorrow. That would be the purpose of his testimony.

He was not an eyewitness to either my client being chased or the shooting of Mr. Weekly, but he was on the scene very shortly thereafter and interviewed her.

MS. WALGAMUTH: And, your Honor, we do object. This is, as Mr. Boyle laid out candidly, this is purely a hearsay. He's seeking to call a detective to testify about what a person, Diamond Jones, who is not in court stated to him for the truth of the matter asserted.

I'll note that this is -- I don't believe this is an exception for an unavailable witness. I don't know what steps, if any, were taken to find this individual, nor do I know what subsection of the rule Mr. Boyle believes it qualifies under, but this is pure hearsay.

It is not, for example, nor has he argued actually, this informed the detective's investigation. This is a statement. I think we're looking at the same report here. This is a report about the Weekly shooting, and the substance of this summary, which was drafted by another detective

8452

relaying Detective Bartlett's interview, exclusively discusses the fact that this prior incident with a male black wearing all black clothing carrying a handgun that occurred 10 minutes before the homicide of Weekly.

So the sum of this statement is about the incident that Mr. Boyle believes is related to Mr. Turpin. It's for the truth of the matter asserted. We do not have the opportunity to cross-examine that witness, and it does not fall into any of the exceptions. We're looking at 804(b) for an unavailable witness.

It is not former testimony. This Diamond Jones did not testify at trial or hearing under 1(a). It is not a statement under the belief of imminent death. This was not a witness who has died, and there's no -- it's not a statement against interest, or any of these other exceptions.

So there's no basis under 804 to allow this as a hearsay exception. It's pure hearsay, as Mr. Boyle candidly articulated. And for those reasons, we think this testimony, we will object to it in sum. It should not be admitted.

I think it would save us a witness.

MR. KLING: Judge, again, although it is hearsay and we agree it's hearsay, there are exceptions to the hearsay rule for present sense impression and excited utterance, and if this is a witness who said she saw somebody running down the street with a gun or an aggravated assault, certainly

8453

that's an exception to the hearsay rule under 803(1) and 803(2).

MS. WALGAMUTH: There's no information that this is a present sense impression or when this woman was interviewed by this detective after the shooting because this was -- she was interviewed after the shooting of Mr. Weekly, which we know occurred at 4:26 p.m., so this was at least some time before. It's not a present sense impression.

MR. KLING: Then it's excited utterance, which the time frame for excited utterance is as long as the declarant is still under the stress of excitement. If somebody saw -- if I saw somebody with a gun running down the street, I would imagine I would still be under the stress of excitement a half hour later, an hour later, maybe a day later.

MS. WALGAMUTH: I appreciate Mr. Kling's support of Mr. Boyle's witness, but this is still not an excited utterance. The detectives, as testimony has come in at trial, arrived sometime significantly later on the scene of the shooting. They were not first responding officers. This is not an excited utterance, nor does it qualify when this declarant is unavailable.

It's hearsay. It should be excluded, and the sum of his testimony is hearsay, Diamond witness's statement to him for the truth of the matter asserted. This is an out-of-court declarant. We cannot cross-examine Diamond Jones. None of it

8454

should be admitted, your Honor.

MR. BOYLE:  She was still on the scene.  I don't think it's a significant period of time after witnessing that traumatic event.  I think it was part of the canvass of Oak Street.  She was still on the scene to be interviewed.  So I do think it's a very small time window between what she observed and when she was questioned.

So for those reasons, I do think we should be allowed to get into it.

MR. KLING:  And, again, for excited utterances, the cases are replete.  It's still whether the declarant is under the stress of excitement.  It doesn't matter whether it's a half hour later, an hour later, it could be a week later, as long as the declarant is under the stress of excitement.

THE COURT:  So --

MS. WALGAMUTH:  Sorry, your Honor.  Go ahead.

THE COURT:  Who's the -- the detective you're looking to call is someone who interviewed her?

MR. BOYLE:  Yes, your Honor.  Chicago police detective, Bartell, B-A-R-T-E-L-L, and the government has the supplemental police report pulled up that I'm referencing if you need any more details.

THE COURT:  I mean, is there anything in there that would tell us more about whether it's an excited utterance?  I mean, I -- I do think even if -- you know, earlier it was

8455

helpful to at least hear the calls to listen to the tone of voice of the calls. I could tell from the tone of voice that, okay, this person seemed excited.

I don't know that without some more indication of what was going on in the statement or even just something, it's hard to -- I just -- I wouldn't say I'm just going to assume without any further information that any statement about what happened was an excited utterance just because it involved a gun.

I -- so I think unless there's some more information that gets at that, whether it was an excited utterance, then I don't see any of the 804 exceptions applying, and so I would -- I would tend to think it's hearsay, and it's -- it can't come in, barring some kind of further information from, I guess, this report that tells us more that could get at whether this was an excited utterance.

MR. BOYLE: Does it say she's excited?

MS. WALGAMUTH: There is no information in the report that discloses her state of mind or presence, yeah, it just said that she related to him and it's after the homicide.

I'll note, too, this report is secondhand in and of itself. It's a different drafter who drafted this who heard information from Detective Bartell that was then recorded in the report. There's no information about the witness's excitement or state of mind at all, just that she was sitting

8456

in her vehicle.

THE COURT: What does it say about what she saw?

MS. WALGAMUTH: Jones related 10 minutes before the homicide of Weekly she was sitting in her car at approximately 55 East Oak Street. Jones related a male black wearing all black clothing and a black -- and a face mask was carrying a handgun and chasing another black male in his 20s. Jones related both subjects were running westbound on Oak Street from 55 East Oak Street.

Jones related the male subject being chased ran across the street and ran into the Moncler store at 33 East Oak Street. Jones related she heard the handgun jam as it was being held by the second subject. Jones did not know which direction the second subject with the gun ran after the chase. Jones related 10 minutes later, she heard gunshots and observed a black vehicle with tinted windows speed off.

That's the sum of the statement, your Honor. As I just read, it mentions nothing about her state of mind. It's a very, you know, boilerplate summary.

I'll note, too, that this is just hearsay. I think most of this, except for the suggestion that the gun jammed, has been put in in testimony either through Mr. Brinson who talked about an individual chasing a person in a white shirt with a handgun, and I think we heard a 911 call played today that referred to some individuals in the Moncler store.

8457

So the substance of this paragraph is hearsay.

MR. KLING: Judge, it is hearsay. And, again, the present sense impression under 803(1) says if it describes an event when it happens or immediately thereafter, which is exactly what she did.

And I ask you rhetorically if you were sitting in your car and you saw somebody jump out of another car with a gun chasing somebody and you heard that gun click, would you not still be under the stress of excitement a half hour later? An hour later? Maybe a day later.

So it clearly qualifies. That's exactly the reasons for 803(1) and 803(2).

MS. WALGAMUTH: Your Honor, there's just no evidence to support Mr. Kling's speculation and hypothetical. This is not a hypothetical on an exam. This is a report from detectives canvassing numerous witnesses on the scene that they approached.

There's no information that this witness ran up to officers or in other ways expressed her excitement or her fear or her concern. There's no evidence. It's purely a hypothetical, so it does not qualify as an excited utterance. And there would be no basis to even allow him to testify to this without a substantial foundation about -- that would qualify as an excited utterance.

As your Honor noted, there is a difference in the

8458

analysis of excited utterance, are very fact-specific, down to the tone of voice, for example, on a 911 call or a dispatch call by an officer, for example.

We don't have any of this here, and it's hearsay that is not within that exception, and it should be excluded.

MR. KLING: Judge, and for present sense impression, there does not have to be a startling event or exciting event. It just has to describe the event when it occurs or immediately thereafter, and it sounds like that fits within all fours.

MS. WALGAMUTH: Mr. Kling is not familiar -- it's -- I appreciate Mr. Kling's comments, but this is not the witness he seeks to call, and I'll note that there's no evidence that this is a present sense impression either, your Honor.

This is a report by detectives that was -- I can find the date of it, but it was reported and submitted after the shooting.

It looks like the date this report was submitted August 23rd of 2020.

MR. BOYLE: No, but, counsel, you know she was interviewed on scene. I mean, that's disrespectful. You know she was interviewed on scene as part of the immediate canvass.

MS. WALGAMUTH: I don't know that from the report. I don't know if there's a paragraph that you can cite to. But I'm just noting that this is a -- I'm looking at the date of

8459

the report, which is -- the report is the evidence or the only proffer we have from Mr. Boyle or Mr. Turpin's counsel with respect to this witness. I appreciate that. That's the date of the report.

I'm looking at that interview. There's nothing that says when this individual was interviewed. It says that she was sitting in her car at approximately 55 East Oak Street on August 4th.

THE COURT: Okay. I -- I think, so we know she was -- this was -- wait, so do we know whether she was interviewed on scene or not? I --

MS. WALGAMUTH: From my review of the report, your Honor, and Mr. Boyle may have additional information he can cite a page or a line to, it does not state either way.

It states that the reporting detectives, who are different than Officer Bartell, were assigned a homicide investigation at 1700 hours, which is 5:00 p.m.?

MR. BOYLE: 5:00 p.m., yes.

MS. WALGAMUTH: It does not say when they -- it says that the reporting detectives -- again is not Officer Bartell -- reported to Oak Street at 17:25, which is 5:25 p.m.

MR. BOYLE: There is a street file report, too. Every morning I bring the reports I think I'm going to need, and then at the end of the day, I can't find them.

There is a street file report of the interview of

8460

Diamond Jones, like a general progress handwritten note that might be dated and timed. I apologize. Again, I thought I had both of them with me.

I do think -- you know, I do think it's the result of a canvass. I acknowledge that at some point, the lead detective, who was probably McKenna, you know, gathers all of that from general progress report notes from the officers doing the canvass and then puts them all together in his supplemental report. That is obviously a few days down the road, but I do think --

MR. ADAMS: It's at Bates CPD 40043. It's general progress report.

MR. KLING: Can't hear you, folks.

MR. BOYLE: We're just citing the Bates number in case some very talented person over there could pull it up.

And I understand the government's point is that it's not clear from the report when she was interviewed. I just -- I do think it was part of the original canvass. Maybe 5:00 p.m. on Oak Street, and then it was all just put together in this more formal supplemental report.

MR. KLING: Judge, and two seconds with the detective will resolve that issue. If the detective says it was weeks later, then obviously it doesn't get in. If the detective says it was right at the time or shortly thereafter, then it's admissible.

8461

MS. WALGAMUTH: We don't agree with Mr. Kling's representation that any information from a witness out of court that occurred on the date of the shooting would constitute present sense impression or an excited utterance under the hearsay exceptions. That's why we call witnesses to trial and have them subject to cross-examination.

MR. KLING: And we have exceptions to the hearsay rule to allow in hearsay.

MR. MITCHELL: Judge, you were talking about this yesterday. This could be one of these conditionally admitted and let him testify and if it turns out that the facts point out that it was at the time.

This person saw two traumatic events within ten minutes, a person being chased with a gun with the click. She sits in her car, and then she hears these 36 or 16 gunshots in the same place. She's still sitting in her car to be interviewed by the police officers.

I think, Judge, the wiser thing, given the way this case has come in is to allow the officer to come in and determine whether or not this question of where this person was and how this interview occurred would be something that you can conditionally accept.

MR. BARNETT: Especially because of the probative nature of the information. It's very relevant.

MS. WALGAMUTH: Your Honor, I can briefly respond.

8462

It is incredibly prejudicial to allow hearsay to come in on the condition and have the jury hear it for the truth of the matter asserted to evaluate whether at that point this officer in 2023 can explain whether the individual he spoke with on August 4th or at some later time in 2020 was excited or subjective of what his perception was of her present sense impression or her excited utterance at the time.

This is incredibly prejudicial testimony. It is hearsay. There is no exception that applies. We also disagree that there is much probative value in this at all. I think the only information that is -- first of all, this does not relate to the shooting of Mr. Weekly.

And with respect to -- I appreciate the Turpin defense theory somehow that this incident explains his call, but I don't know what information here besides the gun jamming is new information that has not already come in at trial. We do not have the opportunity to cross-examine this witness who actually -- about what she heard, how she knows it was a gun jam, what sound she heard if that is even consistent with a jammed gun, nor can Officer Bartell say anything besides what she reported.

This witness could have heard a car backfire. She could have no familiarity with firearms. She could be very familiar. We have no information of that. We can't subject that to cross-examination.

8463

Whether the gun jammed or not is not probative to or -- it does not have much probative value to the Turpin theory of the basis for the calls or the fact that he was chased with a gun. That has come out through a witness that was subject to cross-examination. It's been discussed at length today on direct and cross, and I just -- this is hearsay. It should not be permitted.

If they want to call Officer Bartell to have an extensive foundation laid to establish that, we can re-raise the objection, but I do not think that this witness can establish sufficient to have either a present sense impression or an excited utterance for this individual who is not in court.

MR. MITCHELL: If I can respond briefly, Judge, on behalf of Mr. Turpin's attorney.

It's not that -- the gun jamming is not being offered for the truth. It's being offered to indicate what her impression, what she saw. And in this particular case, Judge, it's not prejudicial because it's already here that this occurred.

This is going to simply support what the jury has already heard. So to say the government's going to be prejudiced by another person who basically gave a statement consistent with the evidence that's been -- already been presented, that somehow that that's prejudicial doesn't seem

to make any sense, Judge.

MS. WALGAMUTH: Your Honor, briefly, that's just untrue.

What Mr. Mitchell just described was hearsay. The fact of Mr. -- Detective Bartell testifying that a person he interviewed who is not in court told him a gun jammed is hearsay for the truth of the matter asserted. That is what that is. He's saying it because they want this come in as the truth.

That is hearsay. It's not subject to an exception to the hearsay rule, nor is it consistent with any testimony in court.

There has been no testimony about the gun being fired. In fact, Mr. Brinson testified that the gun was not shot. Could have been, close enough to have been, but was not shot.

He was asked on cross-examination: Did you hear a sound of a gun jamming? He said no. So to allow this hearsay statement in that contradicts a live witness who was subject to cross-examination is prejudicial to the government, and its probative value I still contest is very low.

There's no -- I don't know what the probative value is whether Mr. Turpin was chased with a gun that jammed or was chased with a firearm to the defendant's theory or their defense strategy in this case.

8465

MR. KLING: Judge, for hearsay under 803(3) --

THE COURT: You know, okay, you can have one final point, and then we have to end this. It's past 6:00 when the building closes.

MR. KLING: Okay.

THE COURT: I've let it go on much longer than it was supposed to in the first place, but I've been trying to let you make your points, but we have got to wrap this up.

So final point for Mr. Kling.

MR. KLING: Final point, Judge.

It is hearsay, no question about it. Every single 803(3) exception recognizes that the declarant is not going to be produced. That's what hearsay is. It's an out-of-court statement, where you don't have to produce the declarant.

And it's an out-of-court statement that was made to a police officer. And, again, if the police officer says it was right after the incident, then it qualifies either under 803(1) or (2).

If he says it was weeks later that I talked to her, then, okay, then maybe Mr. Turpin's lawyer is stuck.

THE COURT: Okay. So it is hearsay. It's being offered for the truth of the matter asserted, including that the gun jammed. It's being basically offered to confirm other evidence. It is -- so it is hearsay.

That means it has to fall within an exception to be

8466

admitted.

On excited utterance and present sense impression, I just think we don't -- there is not enough information to -- for me to find that either of those is the case. They are both things where there's not -- so I understand the point that the topics that this is referring to, which are, you know, a gun being pulled on someone, that is a -- certainly that's a surprising event.

But excited utterance is about, you know, are you so shocked by this that it is so reliable that we can trust this statement without the benefit of cross-examination, and I just -- I don't think we have that situation here.

I mean, like the government said, there's a lot of issues that would be subject to cross-examination. You know, did she actually hear the jamming? I mean, I -- there's just a lot of stuff there that would ordinarily be appropriate for cross, and I just don't think that -- I mean, in a way, this -- this is kind of the exact opposite of stuff that should come in under a hearsay exception because the stuff is very disputed, and it doesn't satisfy the reliability that justifies bringing things in under either of the present sense or excited utterance exceptions.

We don't know exactly when this person was interviewed. We don't -- there's just a lot of unknowns.

So I would be inclined, and I am going to exclude it

8467

as hearsay.

And it doesn't fall within any of the exceptions under 804 or the residual exception of 807 for unavailable witnesses.

MR. BOYLE:  Well, that would be over our objection, Judge.  We've made a record of our proffer of the anticipated testimony of the detective, and I -- perhaps me and the government can let him, the detective, know he does not need to appear tomorrow.

THE COURT:  Understood.  That makes sense.

Okay.  All right.  With that, we'll resume at 9:00 tomorrow.

Thanks everyone.

MR. JULIEN:  Thank you, Judge.

(Court adjourned, to reconvene at 9:00 a.m. on 12/20/23.)

* * * * *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Kathleen M. Fennell*

_____

*/s/ Charles R. Zandi*

_____

*/s/ Joseph A. Rickhoff*          December 20, 2023

_____   _____
Official Court Reporters                    Date
United States District Court
Northern District of Illinois
Eastern Division

I N D E X

PAGE

DAVON BRINSON

Direct Examination By Ms. Walgamuth        8212
Cross-Examination  By Mr. Boyle            8237

CHRISTINE CASE

Direct Examination (Recalled) By Mr. Julien    8250
Cross-Examination By Mr. Greenberg             8333


INDEX TO EXHIBITS

GOVERNMENT EXHIBIT                          RECEIVED

No. 201-132                                8214
No. 403-1A                                 8236
No. 3001-1                                 8279
No. 3001-2                                 8279
No. 3001-3                                 8279
No. 3001-4                                 8279
No. 3001-5                                 8279
No. 3001-6                                 8279
No. 3002-1                                 8279
No. 3002-2                                 8279
No. 3002-3                                 8279
No. 3002-4                                 8279
No. 103                                    8289
No. 814                                    8297
No. 812                                    8297
No. 813                                    8297
No. 506-1                                  8303
No. 506-5                                  8303
No. 506-7                                  8303
No. 506-3                                  8303
No. 529-3                                  8303
No. 529-6                                  8303
No. 529-1                                  8303
No. 529-4                                  8303
No. 529-2                                  8303
No. 712                                    8306
No. 713                                    8306

DEFENDANT'S EXHIBIT                         RECEIVED